**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAILY INSTRUMENTS** | § | |
| **CORPORATION d/b/a DAILY** | § | |
| **THERMETRICS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **NO. 4:13-CV-2189** |
| | § | |
| **ERIC HEIDT, WIKA INSTRUMENT,** | § | |
| **LP, WIKA PROCESS SOLUTIONS, LP,** | § | |
| **GAYESCO INTERNATIONAL, LP,** | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF'S AMENDED COMPLAINT AND**
**APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff Daily Instruments Corporation d/b/a Daily Thermetrics ("Daily") complains of Defendants Eric Heidt ("Heidt"), WIKA Instrument, LP ("WIKA Instrument"), WIKA Process Solutions, LP ("WIKA Process"), and Gayesco International, LP ("Gayesco") as follows:

**I.**
**NATURE OF THE SUIT**

1. This suit seeks immediate injunctive relief to stop Heidt, a former key employee of Daily, from violating the Confidentiality, Non-Solicitation and Non-Competition Agreement (the "Non-Competition Agreement") and Confidentiality Agreement (the "Confidentiality Agreement") between Daily and Heidt; to prevent Heidt from disclosing Daily's valuable confidential and trade secret information to any entity in the WIKA "family of companies" —

Daily's primary competitor in the thermetrics industry and Heidt's new employer[1] — including but not limited to Defendants WIKA Instrument, WIKA Process, and Gayesco; to prevent Heidt from continuing his employment with any WIKA entity in violation of his Non-Competition Agreement; and to prevent all Defendants from tortiously interfering with Daily's customers and employees or otherwise misappropriating Daily's confidential and trade secret information.

2.     Daily's primary business involves designing, developing, selling, and installing specialized temperature monitoring equipment for use in refineries and similar environments across the globe, including its patented CatTracker® reactor thermometry product.  Heidt was a key employee of Daily, serving as its Regional Sales Manager for Europe and for the Northern and Eastern United States.  Heidt was also responsible for facilitating relationships with licensors who authorize the use of Daily's thermometry products for their reactors world-wide.  In order to obtain access to the vast amounts of Daily's confidential and trade secret information necessary for the performance of his duties, Heidt executed the Non-Competition and Confidentiality Agreements as a condition of his employment, which include provisions that Heidt: (1) not use or disclose Daily's confidential and proprietary information at any time during or after his employment with Daily, except in the course of carrying out his employment responsibilities to Daily; (2) not compete against Daily in the reactor thermometry field in any country where Daily does business for 24 months after the termination of his employment; (3) not directly or indirectly solicit, service or accept competing business from any Daily customers that Heidt made contact with, or had access to Confidential Information about, during his employment with Daily for 24 months after his termination; and (4) not directly or indirectly solicit any Daily employees to leave their employment for 24 months after his termination.

---

[1] According to the Joint Motion for More Definite Statement filed by WIKA Instrument and WIKA Process, the WIKA "family of companies" includes over 80 different subsidiaries operating in over 40 different countries.  *See* Doc. No. 3 at ¶ 1.  This "family of companies" shall be referred to as necessary as "WIKA."

3.     In December 2012, Gayesco – at that time Daily's primary competitor in the extremely narrow reactor thermometry industry – was acquired by the WIKA family of companies.  Having positioned itself to compete directly with Daily in the reactor thermometry market, WIKA also began soliciting Daily's sales employees.  Specifically, a representative of WIKA Instrument Corporation (the predecessor entity to Defendant WIKA Instrument LP) contacted Heidt in addition to other Daily employees, including Daily's Vice President of Sales and Technology and its Regional Sales and Technology Manager, at the end of 2012.  Following these initial contacts, representatives from WIKA Process and Gayesco also had communications with Heidt to solicit him to terminate his employment with Daily and to accept employment with a WIKA entity, in violation of his Non-Competition Agreement.  WIKA Instrument, WIKA Process and Gayesco coordinated these solicitation activities, doing so with the knowledge that Heidt was bound by the terms of the Non-Competition and Confidentiality Agreements with Daily.

4.     On February 15, 2013, Heidt abruptly resigned his employment with Daily.

5.     Immediately prior to his resignation, on February 11, 2013, Heidt requested an updated copy of Daily's CatTracker® log from Daily's Senior Engineer/Product Manager.  The CatTracker® log is a spreadsheet that contains detailed information about all of Daily's orders and quotes, including dates, status, comments, customer names, pricing information, and assigned personnel for hundreds of current and prospective projects.  The CatTracker® log covers all of Daily's orders and quotes for projects world-wide, including but not limited to: Argentina, Australia, Belarus, Brazil, Canada, Chile, China, Colombia, France, Greece, Hungary, India, Indonesia, Iraq, Ireland, Israel, Italy, the Kingdom of Saudi Arabia, Korea, Lithuania, Malaysia, Mexico, New Zealand, Norway, Oman, Pakistan, Portugal, Qatar, Romania, Russia,

Singapore, Slovakia, Spain, Taiwan, Thailand, Trinidad, Turkey, the United Kingdom, the United States, Uruguay, and Venezuela.  Because Daily's Senior Engineer/Product Manager was unaware of Heidt's impending resignation, he provided the detailed CatTracker® log to Heidt on February 12, 2013.

6.     Subsequent forensic analysis of the company-owned computer used by Heidt during his employment revealed that on February 13, 2013 – just 2 days before his abrupt resignation, and one day after he received the aforementioned CatTracker® log – Heidt inserted two external storage devices into the computer, which would enable him to download highly valuable and confidential information of Daily.  In addition, this forensic analysis revealed that Heidt also established a folder for Google Drive – allowing for cloud storage of Daily's confidential and trade secret information and documents – shortly before his abrupt resignation.

7.     On information and belief, after he resigned his employment with Daily, Heidt signed an employment agreement with Gayesco, part of the WIKA family of companies.  Heidt contends that he currently works for a different WIKA entity, WIKA Instrumentation PTE, LTD in Singapore and, upon information and belief, is working to market and support the thermometry offerings of the WIKA family of companies, including WIKA Instrument, WIKA Process, and Gayesco.  Accordingly, Heidt is working for a direct competitor in a locale where Daily does business.  In doing so, Heidt is violating his non-competition obligations under the Non-Competition Agreement.  In addition, on information and belief, Heidt is using Daily's confidential, proprietary, and trade secret information to solicit Daily's customers and provide the WIKA family of companies, including WIKA Instrument, WIKA Process and Gayesco, with a competitive advantage in the extremely narrow market for reactor thermometry, in violation of his Non-Competition and Confidentiality Agreements and common law obligations.

4

## II.
## PARTIES

8.      Plaintiff Daily Instruments Corporation, d/b/a Daily Thermetrics, is a Texas corporation located at 5700 Hartsdale Drive, Houston, Texas 77036.

9.      Upon information and belief, Defendant Eric Heidt is a Tennessee citizen who has been served and has appeared in this action.

10.     Defendant WIKA Instrument, LP is a Georgia limited partnership doing business in the State of Texas, which has been served and has appeared in this action.

11.     Defendant WIKA Process Solutions, LP is a Georgia limited partnership doing business in the State of Texas, which has been served and has appeared in this action.

12.     Defendant Gayesco International LP is a Georgia limited partnership doing business in the State of Texas, which can be served via its registered agent for service of process, Helmut Dworschak, 950 Hall Court, Deer Park, Texas 77536

## III.
## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332.

14.     Venue is proper this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this lawsuit occurred in Harris County, Texas, and because the Non-Competition and Confidentiality Agreements between Daily and Heidt provide that the exclusive venue and forum for any legal action arising from the agreements will be Harris County, Texas.

## IV.
## BACKGROUND FACTS

A.    **Daily's Business and Its CatTracker® Product.**

15.    Daily began operations in 1973. It engineers, designs, manufactures, installs, repairs, and services reactor thermometry products for use in the refining, petrochemical, and chemical industries.   Daily operates worldwide and has current customers and potential customers for projects in Argentina, Australia, Bahrain, Belarus, Brazil, Canada, Chile, China, Colombia, France, Greece, Hungary, India, Indonesia, Iraq, Ireland, Israel, Italy, the Kingdom of Saudi Arabia, Korea, Lithuania, Malaysia, Mexico, New Zealand, Norway, Oman, Pakistan, the Philippines, Portugal, Qatar, Romania, Russia, Singapore, Slovakia, Spain, Taiwan, Thailand, Trinidad, Turkey, the United Arab Emirates, the United Kingdom, the United States, Uruguay, Venezuela, and Vietnam.   To service these projects, Daily maintains regional offices or representatives in China, India, Russia, Qatar, Kuwait, Colombia, Argentina, Turkey, Mexico, Singapore, Korea, Taiwan, Malaysia, Indonesia, the United Arab Emirates, the Kingdom of Saudi Arabia, and throughout the United States.

16.    Approximately half of Daily's yearly revenues come from its patented CatTracker® temperature-tracking system, one of the most precise and durable reactor-temperature monitoring systems available. The CatTracker® system is the product of many years of design and development work by Daily.   The CatTracker® system is based on applied aerospace technologies, making it entirely unique in its field, as no Daily competitor designs its products based on extensive knowledge and application of principles from the aerospace industry.  Daily also provides customization, installation, repair, and other services related to the CatTracker® product as needed to meet each client's unique needs, and further provides additional thermometry products for use outside of the reactor setting.

17.     In furtherance of its business, Daily has expended considerable time, money, and other resources developing, compiling, and assembling confidential, proprietary, and trade secret information ("Confidential Information").  Under the terms of the Non-Competition Agreement and the Confidentiality Agreement that Heidt executed, Daily's Confidential Information includes, but is not limited to: non-public technical information concerning the CatTracker® or related devices; details concerning the construction or welding of the CatTracker®; fabrication techniques; methods of material manipulation, including measuring, cutting, bending, and brazing metal components; "job plans" for the manufacture of the CatTracker®; other confidential drawings and specifications; manufacturing equipment preferences and settings; types of testing and precautions implemented for purposes of quality control; the manner and method of quality control testing, including "in process" quality control testing; details of Daily's sales training process; information concerning reactors where CatTracker® or any other Daily product is installed or used; the identity of customers and potential customers; contact information for persons working for customers; details of past sales; information concerning specific customer needs and information relating to how Daily met those needs; customer credit and financial data; customer payment history; pricing and pricing methodology; company strategy; customer feedback; technical details concerning the installation of CatTracker®; service requests from any customer; procurement procedures; information regarding preferred or disfavored vendors; details regarding equipment purchased and used, or rejected as a result of quality control efforts; information regarding specifications of components purchased for use in manufacturing; information concerning technical developments or advancements made by Daily, including, without limitation, any pending or potential patent applications; the names of and other information concerning investors, reactor licensors, and business affiliates; plans and

strategies for expansion or acquisitions; budgets; research; financial and sales data, history, and forecasts; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; Daily's electronic databases; models; specifications; computer programs; internal business records; contracts benefiting or obligating Daily; bids or proposals submitted to any third party; application engineering knowledge; training methods and training processes; organizational structure; salaries of personnel; and payment amounts or rates paid to consultants or other service providers.  *See* Exhibit A at ¶ 3; Exhibit B at ¶ 1.

18.     During his employment with Daily, Heidt had access to all of the above Confidential Information.

19.     Daily's Confidential Information has been obtained and/or created by Daily over the course of many years, at significant expense to Daily.  This Confidential Information provides Daily with a competitive advantage in servicing its customers and marketing to potential customers.

20.     Daily likewise invests a significant amount of time and money in training its sales employees to provide them with the skills necessary to service Daily's current customers and market to potential customers. To this end, maintaining a staff of highly-trained, knowledgeable and experienced professionals is essential to the business and economic success of Daily.

21.     The above-described Confidential Information is not available to the public, and Daily has taken reasonable steps to protect and maintain the secrecy of such Confidential Information. This Confidential Information is of considerable economic value to Daily and would be of value to a competitor.

**B.    Heidt's Employment with Daily.**

22.     Daily hired Heidt for a position in the Company's sales department at the beginning of 2008, less than a year after Heidt received his undergraduate degree.  Heidt had no

prior experience with the thermometry industry or with Daily's particular products.

23.     Heidt rose up through Daily's sales ranks, becoming intimately acquainted with Daily's products, including the CatTracker®.   Heidt further attended trade shows on Daily's behalf and created brochures for many of Daily's products.

24.     In 2010, Daily promoted Heidt to the position of Regional Sales Manager for the Northern and Eastern United States and for all of Europe.  In this position, Heidt was responsible for two direct reports with primary sales office locations in Chicago and Instanbul.  Heidt was also responsible for facilitating relationships with licensors who authorize the use of Daily's thermometry products for their reactors world-wide, and assisted with and received commissions for sales globally.

25.     Also in 2010, as a condition of his employment in this key position with Daily, Heidt executed the Non-Competition Agreement and the Confidentiality Agreement. True and correct copies of the Non-Competition Agreement and Confidential Agreement executed by Heidt are attached as Exhibits A and B, respectively.

26.     The Non-Competition Agreement between Daily and Heidt contained a non-competition clause, which provided:

> Employee agrees that during Employee's employment with the Company and for a period of twenty-four (24) months after Employee's termination of employment, Employee will not, directly or indirectly, for Employee or other, in the Territory:
>
> a.     perform for, render service to, or otherwise assist any Competitor in any position, job, task, function, skill, or responsibility that Employee has provided for, or on behalf of, the Company in the twenty-four (24) month period preceding the termination of Employee's employment; or
>
> b.     accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects that the Company's Confidential Information to which Employee had access during his employment with the Company, or in the preceding twenty-four (24) month period, would likely assist the competitor.

Exhibit A at ¶ 5.   A "Competitor," in turn, is narrowly defined by the Non-Competition Agreement to mean "any company that engineers, designs, manufactures, installs, repairs, or serves reactor thermometry products for use in the refining, petrochemical and chemical industries." *Id.*

27.   The Non-Competition Agreement's non-competition provision bars Heidt from competing against Daily in the United States and in other countries in which Daily does business. *See* Exhibit A at ¶ 5. Many of Daily's sales professionals based in the United States (which included Heidt) call on Daily customers, potential customers, and licensors for projects in foreign countries, including but not limited to Argentina, Australia, Bahrain, Belarus, Brazil, Canada, Chile, China, Colombia, France, Greece, Hungary, India, Indonesia, Iraq, Ireland, Israel, Italy, the Kingdom of Saudi Arabia, Korea, Lithuania, Malaysia, Mexico, New Zealand, Norway, Oman, Pakistan, the Philippines, Portugal, Qatar, Romania, Russia, Singapore, Slovakia, Spain, Taiwan, Thailand, Trinidad, Turkey, the United Arab Emirates, the United Kingdom, the United States, Uruguay, Venezuela, and Vietnam.  Because Daily does business in a very narrow field – thermometry services for refining, petrochemical, and chemical facilities – its sales professionals are familiar with, and have access to Confidential Information about, customers, potential customers, and licensors located in foreign countries.

28.   In reliance on Heidt's promise not to use or disclose Daily's Confidential Information except for Daily's benefit, Daily gave Heidt access to its Confidential Information. Daily provided Heidt with access to its relationships with its customers, suppliers, contractors, employees, and licensors, and it paid him to develop, cultivate, and maintain these relationships. Following Heidt's execution of the Non-Competition and Confidentiality Agreements, Heidt had significant contact with, and access to Confidential Information regarding, Daily's customers and

potential customers located in both the United States and in many foreign countries.

29.     In addition, Heidt has knowledge of Daily's marketing strategies, including Daily's specific market research concerning its products and industry, and knowledge of the selection process for attending trade shows and other speaking engagements, including the target audience, and the specific messaging strategies Daily uses when addressing different potential customers (such as how to tailor the information provided about Daily's products depending on the position of the specific individual receiving the information).

30.     Heidt also had knowledge of Daily's future plans within its exceedingly narrow market segment, including hiring strategies and methods, growth strategies, discussions with potential buyers and joint ventures, and future plans for adding manufacturing facilities.

31.     Heidt worked for Daily for over five years, which was sufficient time to access and become familiar with Daily's Confidential Information and form relationships with Daily's customers throughout the world. In his position, Heidt became familiar with Daily's worldwide customer base, including customers throughout the United States, Europe, Asia and the Middle East.

**C.     Following Its Acquisition of Gayesco, WIKA Is Daily's Primary Competitor in the Reactor Thermometry Market.**

32.     Reactor thermometry is an extremely specialized field, with less than a handful of companies making competing products to the CatTracker®.   Until 2012, Daily's primary competitor in the field was Gayesco.

33.     Upon information and belief, on or about December 3, 2012, Gayesco was acquired by the WIKA family of companies in order to boost its reactor thermometry business.

34.     WIKA Instrument, WIKA Process and Gayesco all share the same physical office address of 950 Hall Court, Deer Park, Texas 77536.   In addition, WIKA Instrument, WIKA

Process and Gayesco all market products and services similar to those of Daily in the narrow field of reactor thermometry, including products and services that compete directly with the CatTracker®.   WIKA Instrument's website indicates that it offers "an extensive line of thermocouples, resistance temperature detectors (RTDs), thermowells, and level measurement indicators" for "applications in the chemical and petrochemical; power generation; oil and gas industries; and offshore exploration and drilling industries."[2]

35.     After WIKA acquired Gayesco, the two companies issued a press release, stating:

> With the acquisition of Gayesco, WIKA intends to complete its product portfolio for the petrochemical, refining and process industries. . . . The product range includes multipoint sensors, tube skin sensors, sensor assemblies and field installation services. . . . Gayesco will become a part of the temperature measurement division of the WIKA Group.[3]

36.     Around the time of the acquisition of Gayesco, WIKA Instrument began aggressively pursuing Daily employees.   On November 14, 2012, Lori Ann Gerken, as a representative of WIKA Instrument Corporation, the predecessor entity to the Defendant WIKA Instrument,[4] sent an email to Walter Tijmes, Daily's Vice President of Sales and Technology, stating, "WIKA is aggressively growing our temperature multipoint business globally and [we] would like to discuss this opportunity with you."   She also stated that Paul Lemmens of WIKA Process would be interested in discussing employment opportunities with Heidt.   Daily Regional Sales and Technology Manager Kevin Kirksmith received a similar email in December 2012.

37.     Heidt did not tell Tijmes, his direct supervisor at Daily, whether he had been solicited by WIKA at this time.   However, Heidt inquired as to when his company 401(K)

---

[2] See http://www.wika.us/company_milestones_usa_en_us.WIKA?ActiveID=12619, last accessed August 2, 2013.

[3] Gayesco/WIKA press release at http://www.gayesco.com/picts/Gayesco%20Release.jpg, last accessed June 17, 2013.

[4] According an Amendment to Registration filed with the Texas Secretary of State on February 8, 2013, WIKA Instrument Corporation converted to Defendant WIKA Instrument, LP.

account would vest, and was told it would vest five years after the start of his employment. Heidt subsequently resigned in February 2013, immediately after his 401(k) account was fully vested.

38.     After receiving contacts from Gerken regarding employment with WIKA, Heidt interviewed for a position with WIKA in January 2013.   He also provided his Daily Non-Competition Agreement to Gerken for WIKA's review around that time.   Lemmens with WIKA Process also had communications with Heidt regarding his Non-Competition Agreement.

39.     Despite knowledge of Heidt's Non-Competition Agreement with Daily, Gerken (WIKA Instrument) and Lemmens (WIKA Process) continued to communicate with Heidt about employment opportunities with WIKA in January and February 2013, each from email addresses ending "@wikahouston.com."   Heidt also exchanged messages with Kelvin Tan, who used a "@wika.com" email address, and Dave Wannamaker, who was a "@wika.ca" email address. Bob Poteet of Gayesco also contacted Heidt regarding his potential employment.   All of these communications took place prior to Heidt's abrupt resignation from employment with Daily on February 15, 2013.

**D.     Heidt Resigns His Employment with Daily to Work for a Competitor.**

40.     On February 11, 2013, immediately prior to his resignation, Heidt requested an updated copy of Daily's CatTracker® log from Daily's Senior Engineer/Product Manager.   The CatTracker® log is a spreadsheet that contains detailed information about all of Daily's orders and quotes, including dates, status, comments, customer names, pricing information, and assigned personnel.   The CatTracker® log covers all of Daily's orders and quotes world-wide, including but not limited to: Argentina, Australia, Belarus, Brazil, Canada, Chile, China, Colombia, France, Greece, Hungary, India, Indonesia, Iraq, Ireland, Israel, Italy, the Kingdom of Saudi Arabia, Korea, Lithuania, Malaysia, Mexico, New Zealand, Norway, Oman, Pakistan,

Portugal, Qatar, Romania, Russia, Singapore, Slovakia, Spain, Taiwan, Thailand, Trinidad, Turkey, the United Kingdom, the United States, Uruguay, and Venezuela.  At the time of Heidt's request, Daily did not know that Heidt intended to resign and begin work with a competitor, so Daily provided Heidt with the highly confidential CatTracker® log on February 12, 2013.

41.    Subsequent forensic analysis of the company-owned computer used by Heidt during his employment revealed that on February 13, 2013 – just 2 days before his abrupt resignation, and one day after he received the aforementioned CatTracker® log – Heidt inserted two external storage devices into the computer.  In addition, this forensic analysis revealed that Heidt also established a folder for Google Drive (cloud storage) shortly before his abrupt resignation.  Upon information and belief, Heidt used external storage devices and/or cloud storage in order to download and save copies of Daily's confidential and trade secret information.

42.    Heidt was scheduled to travel to Dubai to meet Tijmes, his direct supervisor, for a sales trip on February 16, 2013.  Despite numerous requests that he book a flight and a hotel, Heidt delayed in purchasing accommodations until February 13, 2013, when he purchased a flight to Dubai on Daily's company credit card costing $1,623.50.

43.    Three days after he obtained a detailed list of all of Daily's orders and current sales quotes via the CatTracker® log, and two days after inserting two external storage devices into his company-provided laptop, Heidt abruptly notified Tijmes, his direct supervisor, that he was resigning his employment with Daily effective immediately.

44.    Tijmes, who met Heidt at Daily's office on the day of his resignation, reminded Heidt of his continuing obligations under the Non-Competition and Confidentiality Agreements not to compete against Daily for two years after termination of his Daily employment and not to

disclose Daily's Confidential Information.

45.     As identified on the detailed CatTracker® log that Heidt obtained just days prior to his resignation, Daily does business in multiple countries world-wide, including but not limited to: Argentina, Australia, Belarus, Brazil, Canada, Chile, China, Colombia, France, Greece, Hungary, India, Indonesia, Iraq, Ireland, Israel, Italy, the Kingdom of Saudi Arabia, Korea, Lithuania, Malaysia, Mexico, New Zealand, Norway, Oman, Pakistan, Portugal, Qatar, Romania, Russia, Singapore, Slovakia, Spain, Taiwan, Thailand, Trinidad, Turkey, the United Kingdom, the United States, Uruguay, and Venezuela.  Specifically, Daily designs, engineers, manufactures, sells, installs, repairs, and services reactor and other thermometry products, including Daily's CatTracker®, for use by refining, petrochemical, and chemical customers and potential customers in the aforementioned countries.

46.     Daily's Confidential Information includes information on Daily's customers, potential customers, vendors, strategies, pricing, and other business information in the aforementioned countries.

47.     On information and belief, after he resigned his employment with WIKA, Heidt initially accepted employment with Gayesco.  On further information and belief, Heidt's official employment was later re-designated to a different WIKA entity.

48.     On May 14 or 15, 2013, Tijmes spoke with Suzanne Costello, the Head of Events for Euro Petroleum Consultants, Ltd., an independent consulting company in the oil, gas, and petrochemical sectors and producer of specialized international conferences and training seminars in the industry.  Costello stated that Heidt had approached her to ask her advice as to upcoming trade shows that would be beneficial to attend on behalf of WIKA.  Costello stated that she was surprised to learn of Heidt's resignation from his position at Daily, as she had

considered him "the face of the company."

49.     Heidt is currently scheduled to speak on behalf of "WIKA" on the subject of "Improved Vacuum Tower Yield & Visibility through Advanced Temperature Measurement" at the Asia Technology Forum to be held in Bangkok on October 9 and 10, 2013.  In promotional materials for the event, Heidt's title is listed as "Manager, Business Development" for "WIKA."

50.     Upon information and belief, Heidt will market and service reactor thermometry products of WIKA Instrument, WIKA Process, Gayesco, and other WIKA entities in a territory where Daily does business and will share Daily's Confidential Information with these WIKA entities.

51.     Because the WIKA family of companies, including WIKA Instrument, WIKA Process, and Gayesco, compete with Daily in the area of reactor and standard thermometry for the refining, petrochemical, and chemical industries, Heidt has breached his Non-Competition Agreement by accepting employment with Gayesco and continuing employment with an entity in the WIKA family of companies. Heidt is further violating his non-competition and non-solicitation obligations, diverting Daily's goodwill to competitors, and inevitably violating his contractual and common-law obligations of confidentiality.

52.     Heidt's actions constitute a breach of his contractual non-competition, non-solicitation and confidentiality obligations to Daily, and Daily has or will be harmed by Heidt's actions.

**V.**
**CONDITIONS PRECEDENT**

53.     All conditions precedent have been performed or have occurred, entitling Daily to the relief requested herein.

# VI.
## CAUSES OF ACTION

### A.   Breach of Contract (Heidt)

54.   Heidt has contractual obligations to Daily, which are set forth in the Non-Competition Agreement and Confidentiality Agreement between Daily and Heidt.  Among other things, these contractual obligations require that Heidt: (1) not use or disclose Daily's confidential and proprietary information at any time during or after his employment with Daily, except in the course of carrying out his employment responsibilities to Daily; (2) not compete against Daily in the reactor thermometry field in any country where Daily does business for 24 months after the termination of his employment; (3) not directly or indirectly solicit, service or accept competing business from any Daily customers Heidt made contact with or had access to Confidential Information about during his employment with Daily for 24 months after his termination; and (4) not directly or indirectly solicit any Daily employees to leave their employment for 24 months after his termination.  Daily acted in reliance upon the promises Heidt made in the Non-Competition Agreement and Confidentiality Agreement by providing Heidt with access to Daily's Confidential Information.

55.   Daily performed its obligations under the Non-Competition Agreement and Confidentiality Agreement in all material respects. By accepting employment with Gayesco and continuing employment with an entity in the WIKA family of companies in a position with responsibilities virtually identical to the position he held at Daily, Heidt breached his obligations under the Non-Competition Agreement not to accept employment with a competing company for 24 months following the termination of his employment with Daily.  Moreover, Heidt has accepted a position that will, by its nature, involve the use and thus disclosure of Daily's Confidential Information, including but not limited to Daily's sales quotes for hundreds of

customers world-wide, which was obtained by Heidt just days before his resignation.  Daily has suffered, and will continue to suffer damages as a result of Heidt's breach of the Non-Competition and Confidentiality Agreements.

**B.**     **Breach of Confidentiality/Breach of Duty of Confidentiality (Heidt)**

56.     Heidt's conduct violates his common law legal obligations to not use or disclose any confidential or trade secret information, which in this case includes information about Daily's technologies and clients, the services Daily has provided or proposed to provide to those clients, and the costs and profit associated with Daily's business relationships with its clients.

**C.**     **Misappropriation of Trade Secrets (Heidt, WIKA Instrument, WIKA Process and Gayesco)**

57.     During his employment with Daily, Heidt was given access to a great deal of confidential business information and trade secrets and entered into a confidential relationship with Daily.   The confidential information shared with Heidt as a result of his employment relationship with Daily is entitled to trade secret protection.  This information was gathered at a great expense by Daily, is kept confidential by Daily, is not available to the general public, and gives Daily a competitive advantage over those who do not know the information.

58.     Because of the significant investment of time and financial resources by Daily in acquiring, preserving, and processing this information, Daily has made every effort to keep its confidential information from competitors.  The law protects this sort of information to promote business and commerce by allowing Daily to invest significant resources into the development of its business without fear that its investments will be improperly exploited by its agents and employees and used to compete unfairly against it.

59.     On information and belief, Heidt misappropriated Daily's trade secret information by disclosing such information to WIKA Instrument, WIKA Process, Gayesco, and/or other third

parties and/or by using it for his personal benefit and/or the benefit of one or more competitors of Daily, and WIKA Instrument, WIKA Process and Gayesco have improperly acquired and/or used Daily's trade secret information through Heidt's wrongful conduct.  These intentional disclosures or misuses are wholly unauthorized and constitute breaches of confidence to Daily's competitive disadvantage.

**D.**     **Conversion/Civil Theft (Heidt)**

60.     On February 13, 2013, while Heidt was still employed by Daily, the company purchased a plane ticket for Heidt for a business trip from Nashville, Tennessee to Dubai to depart on February 16, 2013.  The cost of this $1,623.50 plane ticket was charged to Daily's American Express Business Platinum card and paid for by Daily.  Although the ticket was canceled upon Heidt's resignation on February 15, 2013, the credit for the cost of the ticket was issued to Heidt as the named passenger on the ticket, thus enabling Heidt to use this credit for future air travel for his own personal benefit.  Despite requests by Daily to Heidt to reimburse the company for the cost of this plane ticket, Heidt has failed to reimburse the cost of the ticket to Daily.  Daily is entitled to recover the value of its expenditure.

**E.**     **Tortious Interference with Employee Relationships (WIKA Instrument, WIKA Process and Gayesco)**

61.     WIKA's actions constitute tortious interference with the employment relationships between Daily and its employees, including Heidt.  Upon information and belief, WIKA Instrument, WIKA Process, and Gayesco were aware of the Non-Competition Agreement and Confidentiality Agreement between Heidt and Daily, and nevertheless proceeded to solicit Heidt and to offer him a position of employment with Gayesco, and later another WIKA entity, that caused Heidt to breach his obligations to Daily contained in the Non-Competition Agreement and the Confidentiality Agreement.  WIKA Instrument, WIKA Process, and Gayesco

acted willfully and intentionally to serve their own interests at the expense of, and in conflict with, the interests of Daily.   Further, the employment relationship would reasonable have continued unabated but for the intentional interference of WIKA Instrument, WIKA Process, and Gayesco.   WIKA Instrument, WIKA Process, and Gayesco's wrongful interference is a proximate cause of financial loss to Daily.

**F.**    **Tortious Interference with Existing and Prospective Business Relations (Heidt, WIKA Instrument, WIKA Process and Gayesco)**

62.     Daily has existing contractual and prospective business relationships with customers and licensors with which Defendants have tortiously interfered or are tortiously interfering.   Upon information and belief, Defendants have misused Daily's confidential and trade secret information to solicit Daily's customers and prospective customers, constituting tortious interference with Daily's contracts and prospective business relations.

## VII.
## REFORMATION

63.     To the extent the Court finds the restrictive covenants contained in the Employment and/or Confidentiality Agreements are too broad to be enforced, or otherwise unenforceable, Daily requests that any such covenants be reformed by the Court so as to make the restrictions enforceable to the maximum extent allowed by law.

## VIII.
## DAMAGES

64.     As a direct and proximate result of Defendants' breaches and violations of common law, contractual and statutory duties, Daily has suffered actual damages within the jurisdictional limits of this Court.   Daily seeks recovery of all actual damages suffered as a result of Defendants' breaches and violations.

65.     Because Defendants' misconduct has been willful and malicious, Daily is entitled

to recover exemplary damages.

## IX.
## ATTORNEYS' FEES

66.     Daily has been forced to retain the undersigned attorneys in connection with this

matter.  Daily asks that this Court award Daily's attorneys' fees and other costs.

## X.
## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

67.     For the harm and loss suffered by Daily, and for the harm and loss that will

continue into the future but for the intervention of the Court, Daily has no adequate remedy at

law.  Accordingly, Daily is entitled to injunctive relief against Defendants.

68.     The elements for obtaining injunctive relief in the Fifth Circuit are well settled.

The moving party must establish: (1) a substantial likelihood of success on the merits; (2) a

substantial threat that failure to grant the injunctive relief will result in irreparable injury; (3) the

threatened injury outweighs any damage that the injunction may cause the opposing party; and

(4) the injunction will not disserve the public interest.  *Lakedreams v. Taylor*, 932 F.2d 1103,

1107 (5th Cir. 1991); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.

1989); *Equibrand Corp. v. Reinsman Equestrian Prods*., No. 3:07-CV-0536-P, 2007 U.S. Dist.

LEXIS 36229, at *11 (N.D. Tex. May 17, 2007).[5]  The party applying for injunctive relief "is not

required to prove that he will prevail at trial but must establish the right to preserve the status quo

pending trial on the merits by proving all of the four elements."  *Propath Servs., L.L.P. v.

Ameripath, Inc*., 2004 U.S. Dist. LEXIS 27846 (N.D. Tex. Oct. 21, 2004) (quoting *Southwest

Research v. Keraplast Techs*., Ltd., 103 S.W.3d 478, 481 (Tex. App.—San Antonio 2003)).

69.     "In Texas, injury resulting from the breach of non-compete covenants is the

epitome of irreparable injury."  *American Express Financial Advisors, Inc., v. Scott*, 955 F. Supp.

---

[5] Copies of unpublished cases cited herein are attached as Exhibit C.

688, 693 (N.D. Tex. 1996).   Where trade secrets and goodwill are involved, "the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable," and damages difficult to calculate.   *Id.* (citing *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F.2d 1098, 1102 n.8 (5th Cir. 1981)).   When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed. *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 196 (Tex. App.—Fort Worth 2005, no pet.); *see also Rugen v. Interactive Business Systems*, 864 S.W.2d 548, 551 (Tex. App.— Dallas 1993, no writ) ("Injunctive relief is recognized as a proper remedy to protect confidential information and trade secrets.") (citing *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223 (1958)).

70.     Likewise, the loss of confidential business information by its dissemination by ex-employees or its use to solicit customers, and the resulting harm to the business's customer goodwill, are particularly acute injuries not susceptible to purely financial compensation. *See Oxford Global Resources, Inc. v. Michelle Weekley-Cessnun*, No. 3:04-CV-0330, 2005 U.S. Dist. LEXIS 1934, at *9-10 (N.D. Tex. February 8, 2005); *see also Molex, Inc. v. Nolen*, 759 F.2d 474, 476 (5th Cir. 1985) ("Texas courts have routinely permitted injunctions to issue barring employees from soliciting the customers of their former employers."); *Pipkin v. JVM Oper., L.C.,* 197 B. R. 47, 55-56 (E.D. Tex. 1996) (holding irreparable injury where economic rights are difficult to calculate, as where injury to party's operations, reputation, and goodwill); *Cho v. Itco, Inc.,* 782 F. Supp. 1183, 1185 (E.D. Tex. 1991) (finding threat of losing customer goodwill may constitute irreparable harm).

71.     Further, when individuals violate the terms of valid employment agreements, the public interest is not disserved by the imposition of an injunction.  *Oxford Global Resources,*

*Inc.*, 2005 U.S. Dist. LEXIS 1934, at *22.  The public's interest is better served by knowing that confidential information will be preserved and legitimate contracts will be enforced. *Lakedreams*, 932 F.2d at 1110; *Allied Mktg. Group, Inc.*, 878 F.2d at 810 n. 1.

72.    Heidt accepted employment with a direct competitor of Daily in violation of his Non-Competition Agreement, misappropriated and is using Daily's confidential, proprietary and/or trade secret information to unlawfully compete against Daily, and is sharing that information with competitors of Daily.  Accordingly, Heidt,WIKA Instrument, WIKA Process and Gayesco have improperly acquired and/or used, and are in a position to continue to use, Daily's confidential and trade secret information, thereby warranting injunctive relief.  Heidt acquired this trade secret and confidential information during his employment with Daily during the course and scope of his employment by way of their positions of trust and confidence.  The dollar value impact this conduct has had and will ultimately have on Daily and its business operations is difficult, if not impossible, to ascertain.  Daily has suffered and will continue to suffer injuries to its operations and goodwill that cannot be calculated in monetary damages or measured by any pecuniary standards.  Daily has no adequate remedy at law for the damage already caused, and threatened to be caused, by Defendants' unlawful conduct.  There is no remedy at law that would give Daily complete relief from Defendants' past actions and threatened future action.  The damages Daily has caused and threatens to cause to Daily's operations, goodwill, and employee and customer relations is extremely difficult to calculate, making damages as a sole remedy inadequate.  Accordingly, Daily has demonstrated a a substantial likelihood of success on the merits and a substantial threat that failure to grant the injunctive relief will result in irreparable injury.  Further, the threatened injury to Daily outweighs any damage that the injunction may cause to Defendants, and the injunction (and

resultant enforcement of the employment agreements between Daily and Heidt and the protection of Daily's trade secrets and confidential information) will not disserve the public interest.

## XI.
## PRAYER

73.     Daily requests preliminary and permanent injunctive relief to restrain acts prejudicial to Daily, in addition to any remedy at law.   For the foregoing reasons, Daily respectfully requests that the Court enjoin Heidt, WIKA Instrument, WIKA Process, Gayesco, and anyone acting under their direction or control, as follows:

A.     As to Heidt, from working for or with a competitor of Daily in the reactor thermometry field, including WIKA, doing business in any country where Daily does business for a period of 24 months following the termination of his employment with Daily;

B.     From directly or indirectly using or disclosing Daily's confidential,  proprietary and trade secret information that Heidt obtained as a result of his employment with Daily, including without limitation: non-public technical information concerning the CatTracker® or related devices; details concerning the construction or welding of the CatTracker®; fabrication techniques; methods of material manipulation, including measuring, cutting, bending, and brazing metal components; "job plans" for the manufacture of the CatTracker®; other confidential drawings and specifications; manufacturing equipment preferences and settings; types of testing and precautions implemented for purposes of quality control; the manner and method of quality control testing, including "in process" quality control testing; details of Daily's sales training process; information concerning reactors where CatTracker® or any other Daily product is installed or used; the identity of customers and potential customers; contact information for persons working for customers; details of past sales; information concerning specific customer needs and information relating to how Daily met those needs; customer credit

and financial data; customer payment history; pricing and pricing methodology; company strategy; customer feedback; technical details concerning the installation of CatTracker®; service requests from any customer; procurement procedures; information regarding preferred or disfavored vendors; details regarding equipment purchased and used, or rejected as a result of quality control efforts; information regarding specifications of components purchased for use in manufacturing; information concerning technical developments or advancements made by Daily, including, without limitation, any pending or potential patent applications; the names of and other information concerning investors, reactor licensors, and business affiliates; plans and strategies for expansion or acquisitions; budgets; research; financial and sales data, history, and forecasts; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; Daily's electronic databases; models; specifications; computer programs; internal business records; contracts benefiting or obligating Daily; bids or proposals submitted to any third party; application engineering knowledge; training methods and training processes; organizational structure; salaries of personnel; and payment amounts or rates paid to consultants or other service providers;

C.     From interfering with Daily's contracts and business relationships, including but not limited to directly or indirectly soliciting, servicing or accepting competing business from any Daily customers that Heidt made contact with or obtained Confidential Information about during his employment with Daily, for a period of 24 months following the termination of Heidt's employment with Daily;

D.     From interfering with employment relationships between Daily and its employees by directly or indirectly soliciting them to leave their employment with Daily or to accept

employment with a competitor of Daily, for a period of 24 months following the termination of Heidt's employment with Daily;

E.   From altering, modifying, tampering, removing, deleting, or destroying documents in their possession, including electronic information or electronic data, relating in any way to Daily's claims, except with the prior express approval of Daily; and

F.   To immediately return to Daily any confidential, proprietary and/or trade secret information of Daily or other property of Daily that Defendants acquired as a result of Heidt's employment with Daily, including all electronic copies of such information and all copies thereof.

74.   Daily requests that application for temporary injunction be set for hearing and that Heidt and WIKA be notified of the date, time and place of the hearing and, upon such hearing, the Court issue a preliminary injunction against Defendants enjoining them as described above.

75.   Upon final trial, Daily seeks an injunction against Defendants permanently enjoining them as described above.

76.   Daily seeks other relief as follows:

a.   For all actual damages;

b.   For exemplary or punitive damages;

b.   For all appropriate equitable relief;

c.   For pre-judgment interest as provided by law;

d.   For post-judgment interest as provided by law;

e.   For attorneys' fees;

f.   For costs of suit; and

g.      For all other relief, in law and in equity, to which Daily may be shown at trial to be entitled.

Respectfully submitted,

*/s/ Gretchen Agena*
Gretchen Agena (Attorney-in-Charge)
Texas State Bar No. 24040396
Federal I.D. No. 38500
Kevin Little
Texas State Bar No. 24070155
Federal I.D. No. 1138412
LITTLER MENDELSON, P.C.
1301 McKinney Street
Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
gagena@littler.com
klittle@littler.com

M. Scott McDonald
Texas State Bar No. 13555505
Federal I.D. No. 9500
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, LockBox 116
Dallas, TX  75201.2931
214.880.8100 (Telephone)
214.880.0181 (Facsimile)
smcdonald@littler.com

**ATTORNEYS FOR PLAINTIFF DAILY INSTRUMENTS CORPORATION d/b/a DAILY THERMETRICS**

## CERTIFICATE OF SERVICE

I hereby certify that, on August 23, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Joseph Y. Ahmad
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING PC
1221 McKinney Street, Suite 3640
Houston, Texas 77010
*Attorneys for Defendant Eric Heidt*

Kenneth M. Krock
RAPP & KROCK, PC
3050 Post Oak Blvd., Suite 1425
Houston, Texas 77056
*Attorneys for Defendant WIKA Instrument, LP*

Felicity A. Fowler
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas 77010
*Attorneys for Defendant WIKA Process Solutions, LP*

*/s/ Gretchen Agena*
Gretchen Agena

# Exhibit A

# CONFIDENTIALITY, NON-SOLICITATION AND NON-COMPETITION AGREEMENT

This Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement") is entered into between the undersigned employee (hereinafter "Employee") and Daily Instruments Corporation (hereinafter "Company").   In consideration of the mutual promises made herein, the Company and Employee agree as follows:

1.     COMPANY PROPERTY.  All written materials, records, data, and other documents prepared or acquired by Employee in the course and scope of Employee's employment with the Company are the Company's property.  All information, ideas, concepts, improvements, discoveries, and inventions that are conceived, made, developed, or acquired by Employee individually or in conjunction with others during Employee's employment (whether during business hours and whether on Company's premises or otherwise) which relate to Company business, products, or services are the Company's sole and exclusive property.  All memoranda, notes, records, files, correspondence, drawings, manuals, models, specifications, computer programs, and all other documents, data, or materials of any type embodying such information, ideas, concepts, improvements, discoveries, and inventions are Company property.  At the termination of Employee's employment with the Company for any reason, Employee shall return all of the Company's documents, data, or other Company property to the Company.

2.     BENEFITS PROVIDED TO EMPLOYEE.   Company will provide Employee with one or more of the following: (a) portions of the Company's Confidential Information and updates thereto; (b) authorization to communicate with customers and prospective customers, and reimbursement of customer development expenses in accordance with Company policy limits, to help Employee develop goodwill for Company; and/or (c) authorization to participate in specialized training related to Company's business.

3.     CONFIDENTIAL INFORMATION; NON-DISCLOSURE.   Employee acknowledges that the business of the Company, and its affiliates (including Daily Thermetrics and Thermocontrol, Inc. and any subsidiaries) is highly competitive and that the Company will provide Employee with access to its ever-changing Confidential Information relating to the business of the Company and its affiliates.  "Confidential Information" means any formula, pattern, device or compilation of information which is used in the Company's or an affiliate's business, and which gives it an opportunity to obtain an advantage over competitors who do not know it or use it.  For instance, it may be a process of manufacturing, a method of installation, a pattern for an instrument, machine or other device, or a list of customers.  Confidential Information includes, by way of example and without limitation, the following:  information regarding customers, employees, contractors, organization charts, strategies, methods, books, records, and documents, technical information concerning the CatTracker® or related devices, details concerning the construction or welding of the CatTracker®, fabrication techniques, methods of material manipulation, including measuring, cutting, bending, and brazing

metal components, "job plans" for the manufacture of the CatTracker®, other confidential drawings and specifications, manufacturing equipment preferences and settings, types of testing and precautions implemented for purposes of quality control, the manner and method of quality control testing, manner and method of "in process" quality control testing, details of the Company's sales training process, information concerning reactors where CatTracker® or any other product of the Company is installed or used, identity of customers and potential customers, contact information for persons working for customers, details of past sales, information concerning specific customer needs, information related to how the Company met those needs, customer credit and financial data, customer payment history, pricing, pricing methodology, company strategy, customer feedback, technical details concerning the installation of CatTracker®, service requests from any customer, procurement procedures, information regarding preferred or disfavored vendors, details regarding equipment purchased and used, or rejected as a result of quality control efforts, information regarding specifications of components purchased for use in manufacturing, information concerning technical developments or advancements made by the Company, including, without limitation, any pending or potential patent applications; the names of and other information concerning investors, reactor licensors and business affiliates, plans and strategies for expansion or acquisitions; budgets; research; financial and sales data, history and forecasts; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; internal business records; contracts benefiting or obligating the Company; bids or proposals submitted to any third party; application engineering knowledge; training methods and training processes; organizational structure; salaries of personnel; payment amounts or rates paid to consultants or other service providers.

Employee acknowledges that Confidential Information constitutes a valuable asset of the Company and its affiliates, which gives the Company the opportunity to obtain a competitive advantage over competitors. Employee further acknowledges that protection of such Confidential Information against unauthorized disclosure and use is of critical importance to the Company and its affiliates in maintaining their competitive position. Employee also may have access to confidential information of third parties, including, but not limited to, actual and potential customers, suppliers, partners, joint ventures, investors, and financing sources of the Company and its affiliates. Employee agrees to treat this information in the same manner as Confidential Information of the Company and its affiliates.

Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized disclosure of any Confidential Information of the Company, its affiliates, or third parties or make any use thereof, except in the carrying out of the Employee's employment responsibilities to the Company. Employee also agrees to preserve and protect the confidentiality of third party Confidential Information to the same extent, and on the same basis, as the Company's Confidential Information.

4.  STEPS TO PROTECT INFORMATION.  At all times, Employee agrees to use all reasonable and available methods to prevent the unauthorized use or disclosure of Confidential Information.  Depending upon the circumstances, available methods may include but are not limited to: marking information "Confidential," sharing information with authorized persons only on a need-to-know basis, maintaining the integrity of password protected computer systems, and otherwise storing information in a manner that prevents unauthorized access.  Employee shall maintain at his or her work station and/or any other place under his or her control, only such Confidential Information as he or she has a current "need to know" in the furtherance of Employer's businesses.  Employee shall return to the appropriate person or location or otherwise properly dispose of Confidential Information once that need to know no longer exists.  Employee shall not make copies of or otherwise reproduce Confidential Information unless there is a legitimate business need of Employer for reproduction.  Employee shall not store electronic data of the Company, including but not limited to Confidential Information, on any electronic storage device that is not owned by the Company without prior written consent of the Company.  If Employee does store electronic data on an electronic storage device that is not owned by the Company, with or without consent of the Company, Employee hereby agrees not to copy or disclose such information to any third party and to immediately surrender upon termination of the period of employment any and all such electronic storage devices to the Company for inspection, data retrieval, and data removal.  Employee should abide by any additional procedures instituted by employer to identify and protect Confidential Information, which are considered by Employer to be safeguards in addition to the protection provided by this Agreement.  Nothing contained in those procedures or in this Agreement is intended to limit the effect of the other.

5.  NON-COMPETITION OBLIGATIONS.  Employee acknowledges that the Company's Confidential Information is growing and increasing over time.  Subsequent to the signing of this agreement, the Company will provide Employee with access to new Confidential Information.  Ancillary to Employee's agreement not to disclose Confidential Information, to protect all of the Company's Confidential Information, and to protect the Company's ongoing development of goodwill, Employee agrees to the following non-competition provisions.  Employee agrees that during Employee's employment with the Company and for a period of twenty-four (24) months after Employee's termination of employment, Employee will not, directly or indirectly, for Employee or others, in the Territory:

> a.  perform for, render advice to, or otherwise assist any Competitor in any position, job, task, function, skill, or responsibility that Employee has provided for, or on behalf of, the Company in the twenty-four (24) month period preceding the termination of Employee's employment; or

> b.  accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects that the Company's Confidential Information to which Employee had access

3

during his employment with the Company, or in the preceding twenty-four (24) month period, would likely assist the Competitor.

As applied to the Non-Competition Obligations herein, the term "Competitor" shall be defined to mean any company that engineers, designs, manufactures, installs, repairs, or services reactor thermometry products for use in the refining, petrochemical, and chemical industries.

As used in this Agreement, "Territory" means (1) the United States of America; (2) any other Countries in which the Company does business; (3) the State of Texas; (4) any other States or State equivalents in which the Company does business; and (5) the County or County equivalents in which the Company does business.

Employee understands that the foregoing restrictions may limit Employee's ability to engage in a very limited scope of businesses in the geographic region(s) during the period provided for above, but Employee acknowledges that these restrictions are necessary to protect the Confidential Information the Company has provided to Employee, as well as the Company's goodwill. It is the intent of the parties that this agreement shall be enforced as written, however, should any restriction be considered unenforceable because it is unreasonable in time, scope of activity, or geographic scope, it is the intent of the parties that the agreement shall be reduced and reformed and enforced to the maximum extent allowed by law.

Employee agrees that this provision defining the scope of activities constituting competition with the Company is narrow and reasonable for the following reasons: (i) Employee is free to seek employment with other companies providing services that do not directly or indirectly compete with any business of the Company; and (ii) there are many other companies that do not directly or indirectly compete with any business of the Company which could utilize Employee's general knowledge, skill and experience. Employee further acknowledges that employees of Daily are highly skilled, and that employment opportunities exist with companies that are not Competitors.

Following the termination of employment, should Employee desire to engage in activities that would be prohibited by this Section 5, Employee may apply to the Company for a written letter amendment that waives or modifies some or all terms of this Section 5. The Company agrees to evaluate all such requests on a case-by-case basis and in good faith and will not unreasonably withheld consent if the Company determines that its legitimate business interests and goodwill will not be harmed by the contemplated activities. Employee agrees that should the Company agree to waive or modify some or all terms, Employee will not use such waiver to argue that other terms of the Agreement are or should be held to be invalid or unenforceable.

6.    NON-SOLICITATION OF CUSTOMERS. For a period of twenty-four (24) months following the termination of employment for any reason, Employee will not directly or indirectly solicit service or accept competing business from customers of the Company or its affiliates with whom Employee, within the previous twenty-four (24)

4

months, (i) had or made contact, or (ii) had access to Confidential Information and files regarding. These restrictions are limited by geography to the specific places, addresses, or locations where a customer is present and available for soliciting or servicing.

7.   NON-SOLICITATION OF EMPLOYEES.   During Employee's employment, and for a period of twenty-four (24) months following the termination of employment for any reason, Employee will not, either directly or indirectly, solicit or induce any other employee or officer of the Company or its affiliates whom Employee had contact with, knowledge of, or association with in the course of employment with the Company to terminate his or her employment for another opportunity in the refining, petrochemical, and chemical thermometry industry with a Competitor, and will not assist any other person or entity in such a solicitation.

8.   EARLY RESOLUTION CONFERENCE. The parties are entering into this Agreement with the express understanding that this Agreement is clear and fully enforceable as written. If Employee ever decides later to contend that any restriction on activities imposed by this Agreement no longer is enforceable as written or does not apply to an activity in which Employee intends to engage on behalf of a competing business, Employee first will notify the Company in writing, addressed to Jeffrey N. Daily, and meet with a Company representative at least fourteen (14) days before engaging in any activity that foreseeably could fall within the questioned restriction to discuss resolution of such claims (an "Early Resolution Conference"). Either party may seek a temporary restraining order, injunction, specific performance, or other equitable relief regarding the provisions of this Section if the other party fails to comply with obligations stated herein.

9.   EQUITABLE RELIEF.  Employee and the Company agree that in the event of a breach or threatened breach by Employee of any covenant contained in paragraphs 1 through 7 of this Agreement, the Company will not have an adequate remedy at law. Thus, in the event of such a breach or threatened breach, the Company will be entitled to such equitable and injunctive relief as may be available to prevent and restrain Employee from breaching the provisions of any covenant contained in paragraphs 1 through 7. The availability to obtain injunctive relieve will not prevent the Company from pursuing any other equitable or legal relief, including the recovery of damages from such breach or threatened breach. If Employee fails to comply with a timed restriction in this Agreement, the time period for that restriction will be extended by one day for each day Employee is found to have violated the restriction, up to a maximum of twenty-four (24) months.

10.   AT-WILL EMPLOYMENT. The Company and Employee acknowledge and agree that Employee's employment is at-will. Nothing in this Agreement alters the employment at-will relationship between the parties.

11.   GOVERNING LAW. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.

12. VENUE/FORUM. The exclusive venue and forum for any legal action arising from this Agreement will be a court of competent jurisdiction located in Harris County, Texas; provided, however, that if no court in Harris County, Texas has jurisdiction over Employee, venue will be proper in the state where Employee last regularly worked for the Company. Employee stipulates and consents to the personal jurisdiction of courts located in Harris County, Texas, over him or her, and waives his or her right to objection to any such court's exercise of jurisdiction over him or her.

13. INTERPRETATION. This Agreement shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against either party.

14. MODIFICATION. This Agreement may be amended only by an agreement in writing signed by Employee and the Company.

15. WAIVER. The failure of either party to insist, in any one or more instances, upon performance of the terms or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right granted under this Agreement or of the future performance of any such term, covenants or condition.

16. INVALIDITY. Should any provision(s) in this Agreement be held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall be unaffected and shall continue in full force and effect, and the invalid, void or unenforceable provision(s) shall be deemed not to be part of this Agreement.

17. VOLUNTARY AGREEMENT. Employee and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and fully understands all provisions of this Agreement, and is voluntarily entering into this Agreement. Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with the legal, tax or other advisor or advisors of such party's choice before executing this Agreement.

18. SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon and inure to the benefit of and shall be enforceable by and against Employee's heirs, beneficiaries and legal representatives. It is agreed that the rights and obligations of Employee may not be delegated or assigned by Employee. The Company may assign its rights and obligations under this Agreement and each assignee shall be deemed to have acquired all rights and assumed all obligations of the Company under this Agreement. The Company's affiliates are intended third-party beneficiaries of this Agreement. Moreover, if Employee becomes employed by a successor-in-interest or an affiliate, this Agreement will be deemed to have been assigned to the successor-in-interest or the affiliate upon the date Employee becomes so employed.

19. COUNTERPARTS. This Agreement may be executed in counterparts and each counterpart, when executed, shall have the validity of a second original. Photographic or facsimile copies of any such signed counterparts may be used in lieu of the original for any purpose.

20. DISCLOSURE OF EXISTENCE OF AGREEMENT. In order to preserve the Company's rights under this Agreement, the Company may advise any third party of the existence of this Agreement and of its terms, and the Company shall have no liability for so doing.

DATED: 10-Nov-2010          By: _____
                                Employee

                            _____
                            Printed Name

DATED: 11 / 10 / 10         By: _____
                                On behalf of Daily Instruments Corporation

Firmwide:97744103.2 052882.1002

Exhibit B

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is entered into between the undersigned employee (hereinafter "Employee") and Daily Instruments Corporation (hereinafter "Company") (collectively, "the parties").

Employee is or will be employed by the Company. In the course of his or her employment, Employee will be given access to certain Confidential Information (as hereinafter defined). Therefore, in consideration of his or her employment with the Company, the receipt of Confidential Information from the Company, and the promises and agreements hereinafter set forth, the adequacy of which are hereby acknowledged, the parties agree as follows:

1. Employee acknowledges that the business of the Company, and its affiliates (including Daily Thermetrics and Thermocontrol, Inc. and any subsidiaries) is highly competitive and that the Company will provide Employee with access to its ever-changing Confidential Information relating to the business of the Company and its affiliates. "Confidential Information" means any formula, pattern, device or compilation of information which is used in the Company's or an affiliate's business, and which gives it an opportunity to obtain an advantage over competitors who do not know it or use it. For instance, it may be a process of manufacturing, a method of installation, a pattern for an instrument, machine or other device, or a list of customers. Confidential Information includes, by way of example and without limitation, the following: information regarding customers, employees, contractors, organization charts, strategies, methods, books, records, and documents, technical information concerning the CatTracker® or related devices, details concerning the construction or welding of the CatTracker®, fabrication techniques, methods of material manipulation, including measuring, cutting, bending, and brazing metal components, "job plans" for the manufacture of the CatTracker®, other confidential drawings and specifications, manufacturing equipment preferences and settings, types of testing and precautions implemented for purposes of quality control, the manner and method of quality control testing, manner and method of "in process" quality control testing, details of the Company's sales training process, information concerning reactors where CatTracker® or any other product of the Company is installed or used, identity of customers and potential customers, contact information for persons working for customers, details of past sales, information concerning specific customer needs, information related to how the Company met those needs, customer credit and financial data, customer payment history, pricing, pricing methodology, company strategy, customer feedback, technical details concerning the installation of CatTracker®, service requests from any customer, procurement procedures, information regarding preferred or disfavored vendors, details regarding equipment purchased and used, or rejected as a result of quality control efforts, information regarding specifications of components purchased for use in manufacturing, information concerning technical developments or advancements made by the Company, including, without limitation, any pending or potential patent applications; the names of and other information concerning investors, reactor licensors and business affiliates, plans and strategies for expansion or acquisitions; budgets; research; financial and sales data, history and forecasts; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; internal business records; contracts benefiting or obligating the Company; bids or proposals submitted to any third party; application engineering knowledge;

training methods and training processes; organizational structure; salaries of personnel; payment amounts or rates paid to consultants or other service providers.

2.      Employee acknowledges that Confidential Information constitutes a valuable asset of the Company and its affiliates, which gives the Company the opportunity to obtain a competitive advantage over competitors. Employee further acknowledges that protection of such Confidential Information against unauthorized disclosure and use is of critical importance to the Company and its affiliates in maintaining their competitive position. Employee also may have access to confidential information of third parties, including, but not limited to, actual and potential customers, suppliers, partners, joint ventures, investors, and financing sources of the Company and its affiliates. Employee agrees to treat this information in the same manner as Confidential Information of the Company and its affiliates. Employee acknowledges that Confidential Information constitutes a valuable asset of the Company and its affiliates, which gives the Company the opportunity to obtain a competitive advantage over competitors. Employee further acknowledges that protection of such Confidential Information against unauthorized disclosure and use is of critical importance to the Company and its affiliates in maintaining their competitive position.

3.      Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized disclosure of any Confidential Information of the Company, its affiliates, or third parties or make any use thereof, except in the carrying out of the Employee's employment responsibilities to the Company. Employee also agrees to preserve and protect the confidentiality of third party Confidential Information to the same extent, and on the same basis, as the Company's Confidential Information.

4.      At all times, Employee agrees to use all reasonable and available methods to prevent the unauthorized use or disclosure of Confidential Information. Depending upon the circumstances, available methods may include but are not limited to: marking information "Confidential," sharing information with authorized persons only on a need-to-know basis, maintaining the integrity of password protected computer systems, and otherwise storing information in a manner that prevents unauthorized access. Employee shall maintain at his or her work station and/or any other place under his or her control, only such Confidential Information as he or she has a current "need to know" in the furtherance of Employer's businesses. Employee shall return to the appropriate person or location or otherwise properly dispose of Confidential Information once that need to know no longer exists. Employee shall not make copies of or otherwise reproduce Confidential Information unless there is a legitimate business need of Employer for reproduction. Employee shall not store electronic data of the Company, including but not limited to Confidential Information, on any electronic storage device that is not owned by the Company without prior written consent of the Company. If Employee does store electronic data on an electronic storage device that is not owned by the Company, with or without consent of the Company, Employee hereby agrees not to copy or disclose such information to any third party and to immediately surrender upon termination of the period of employment any and all such electronic storage devices to the Company for inspection, data retrieval, and data removal. Employee should abide by any additional procedures instituted by employer to identify and protect Confidential Information, which are considered by Employer to

2

be safeguards in addition to the protection provided by this Agreement. Nothing contained in those procedures or in this Agreement is intended to limit the effect of the other.

5. Upon termination of his or her employment with the Company, the Employee agrees to promptly deliver to the Company, within five days, in whatever form, of all Confidential Information of the Company which is in the Employee's possession or within his control, including, without limitation, memoranda, records, notes, plans, manuals, notebooks, documentation, program listings, flow charts, magnetic media, disks, diskettes, tapes and all other materials containing any Confidential Information irrespective of the location or form of such material. The return of Confidential Information does not affect the Employee's obligation to hold the Confidential Information in confidence.

6. If an Employee becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process or is advised by counsel to disclose any of the Confidential Information pursuant to applicable law, rule, regulation, order or the like, that Employee shall undertake reasonable efforts to provide the Company with prompt notice of such requirement or advice prior to disclosure so that the Company may seek a protective order or other appropriate remedy. The Employee shall cooperate with the Company in all reasonable respects to keep the Confidential Information confidential. Nothing herein is intended to prohibit or discourage any lawful and protected reporting of, or opposition to, an illegal act.

7. The Employee's obligations under this Agreement shall continue during employment and for so long thereafter as the information within the Employee's knowledge or possession is Confidential Information as defined in Section 1.

8. Should any provision(s) in this Agreement be held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall be unaffected and shall continue in full force and effect, and the invalid, void or unenforceable provision(s) shall be deemed not to be part of this Agreement.

9. The Employee acknowledges that a breach of this Agreement would cause irreparable injury to the Company. Accordingly, if the Employee breaches or threatens to breach the provisions of this Agreement, the Company shall be entitled, without the posting of bond or other security, to equitable relief, including (a) a restraining order or injunction restraining and enjoining the Employee from further violation of this Agreement; and (b) orders for specific performance. The availability of injunctive relieve will not prevent the Company from pursuing any other equitable or legal relief, including the recovery of damages from such breach or threatened breach..

10. The Company and Employee acknowledge and agree that Employee's employment is at-will. Nothing in this Agreement alters the employment at-will relationship between the parties.

11. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas.

12. The exclusive venue and forum for any legal action arising from this Agreement will be a court of competent jurisdiction located in Harris County, Texas; provided, however, that if no court in Harris County, Texas has jurisdiction over Employee, venue will be proper in the state where Employee last regularly worked for the Company. Employee stipulates and consents to the personal jurisdiction of courts located in Harris County, Texas, over him or her, and waives his or her right to objection to any such court's exercise of jurisdiction over him or her.

13. This Agreement shall be interpreted in accordance with the plain meaning of its terms and not strictly for or against either party.

14. This Agreement may be amended only by an agreement in writing signed by Employee and the Company.

15. The failure of either party to insist, in any one or more instances, upon performance of the terms or conditions of this Agreement shall not be construed as a waiver or a relinquishment of any right granted under this Agreement or of the future performance of any such term, covenants or condition.

16. Employee and the Company represent and agree that each has reviewed all aspects of this Agreement, has carefully read and fully understands all provisions of this Agreement, and is voluntarily entering into this Agreement. Each party represents and agrees that such party has had the opportunity to review any and all aspects of this Agreement with the legal, tax or other advisor or advisors of such party's choice before executing this Agreement.

17. This Agreement shall be binding upon and inure to the benefit of and shall be enforceable by and against Employee's heirs, beneficiaries and legal representatives. It is agreed that the rights and obligations of Employee may not be delegated or assigned by Employee. The Company may assign its rights and obligations under this Agreement and each assignee shall be deemed to have acquired all rights and assumed all obligations of the Company under this Agreement. The Company's affiliates are intended third-party beneficiaries of this Agreement. Moreover, if Employee becomes employed by a successor-in-interest or an affiliate, this Agreement will be deemed to have been assigned to the successor-in-interest or the affiliate upon the date Employee becomes so employed.

18.    This Agreement may be executed in counterparts and each counterpart, when executed, shall have the validity of a second original.  Photographic or facsimile copies of any such signed counterparts may be used in lieu of the original for any purpose.

19.    In order to preserve the Company's rights under this Agreement, the Company may advise any third party of the existence of this Agreement and of its terms, and the Company shall have no liability for so doing.


DATED: __10 - Nov - 2010__          By: _____
                                           Employee

                                      _____
                                           Printed Name
                                           Eric Heinz


DATED: __11/10/10__                 By: _____
                                    On behalf of Daily Instruments Corporation


5

# Exhibit C

LEXSEE



Positive
As of: Aug 21, 2013

**EQUIBRAND CORPORATION, Plaintiff, v. REINSMAN EQUESTRIAN
PRODUCTS, INC. and DALE R. MARTIN, Defendants.**

**3:07-CV-0536-P**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS, DALLAS DIVISION**

**2007 U.S. Dist. LEXIS 36229**

**May 17, 2007, Decided
May 17, 2007, Filed**

**CORE TERMS:** trademark, intellectual property, saddle, registered, secondary meaning, equestrian, registration, consumer, protectable, goodwill, right to use, additionally, tack, abandonment, reply, citations omitted, injunction, Lanham Act, trade name, advertising, irreparable, distinctive, register, marketing, preliminary injunction, written consent, descriptive, customers, rebut, wholesale

**COUNSEL:** [*1] For Equibrand Corporation, Plaintiff: James R Nelson, LEAD ATTORNEY, Eliot T Burriss, Tania Conroy, DLA Piper US LLP - Dallas, Dallas, TX.

For Reinsman Equestrian Products Inc, Defendant: Travis R McDonough, LEAD ATTORNEY, Kyle W Eiselstein, Stephen J Stark, Miller & Martin PLLC, Chattanooga, TN.; Arthur F Selander, David L Hoffmann, Michael J Quilling, Quilling Selander Cummiskey & Lownds PC, Dallas, TX.

For Dale R Martin, Defendant: David L Hoffmann, LEAD ATTORNEY, Arthur F Selander, Michael J Quilling, Quilling Selander Cummiskey & Lownds PC, Dallas, TX.

For Reinsman Equestrian Products Inc, Counter Claimant: Travis R McDonough, LEAD ATTORNEY, Kyle W Eiselstein, Stephen J Stark, Miller & Martin

PLLC, Chattanooga, TN.; Arthur F Selander, David L Hoffmann, Michael J Quilling, Quilling Selander Cummiskey & Lownds PC, Dallas, TX.

For Equibrand Corporation, Counter Defendant: James R Nelson, LEAD ATTORNEY, Eliot T Burriss, Tania Conroy, DLA Piper US LLP - Dallas, Dallas, TX.

For Dale R Martin, Counter Claimant: David L Hoffmann, LEAD ATTORNEY, Arthur F Selander, Michael J Quilling, Quilling Selander Cummiskey & Lownds PC, Dallas, TX.

**JUDGES:** JORGE A. SOLIS, UNITED [*2] STATES DISTRICT JUDGE.

**OPINION BY:** JORGE A. SOLIS

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Plaintiff Equibrand Corporation's ("Equibrand" or "Plaintiff") Application for Temporary Restraining Order and Preliminary Injunctive Relief, filed March 26, 2007. [1] After reviewing the briefing and applicable law, the Court GRANTS

Page 1

Plaintiff's Motion. [2]

1    Pursuant to the Court's Order of March 26, 2007, Defendants filed a Response on April 2, 2007, and Plaintiff filed a Reply on April 6, 2007.
2    On April 9, 2007, Defendants filed a Motion for Leave to File Defendants' Joint Surreply Brief. This Court has stated:

> The purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard, and to rebut the nonmovants' response, thereby persuading the court that the movant is entitled to the relief requested by the motion. A surreply is appropriate by the non-movant only when the movant raises new legal theories or attempts to present new evidence at the reply stage.

*Murray v. TXU Corp.*, No. 3:03-CV-0888-P, 2005 U.S. Dist. LEXIS 10298, at *13 (N.D. Tex. May 27, 2005) (internal citations and quotation marks omitted). Because Plaintiff presents new evidence with its Reply, the Court GRANTS Defendants' Motion for Leave and deems the proposed surreply submitted with Defendants' Motion filed as of the date of this Order.

[*3] **I. Background and Procedural History**

Equibrand is a provider of various equestrian products, including saddles, bridles, headstalls, reins, curb straps, breast collars, stirrups, ropes, boots, cinches, spurs, blankets, and other accessories. (Bray Decl. P 3, Mar. 23, 2007 (Pl.'s App. in Supp. of Application ("Pl.'s App.") at 1).) Equibrand did not initially participate in the saddle and tack industry, but eventually sought to expand its business into the saddle and tack arena. (*Id.*) In September of 1997, Equibrand began discussions with Defendant Dale Martin to purchase Martin's custom saddle manufacturing business, Dale Martin Saddlery. (*Id.*)

Dale Martin is a former professional roper whose "life experiences have uniquely prepared [him] to be a highly skilled designer of saddles and tack." (Dale Martin Decl. P 23 (Defs.' App. at 12).) Prior to the negotiations

with Equibrand in 1997, Martin was the sole proprietor of Dale Martin Saddlery and engaged in the business of "selling manufacturing, marketing and distributing saddles." (Pl.'s Ex. A-1 at 1 (Pl.'s App. at 21).) At that time, Dale Martin Saddlery was in its infancy, with no national brand presence and [*4] "virtually no marketing." (Bray Decl. PP 4-5, Mar. 23, 2007 (Pl.'s App. at 2); Defs.' Br. at 2.) According to Plaintiff, Equibrand was interested in purchasing Dale Martin Saddlery to grow and expand the business. (Bray Decl. P 5, Mar. 23, 2007 (Pl.'s App. at 2).)

In January of 1998, Equibrand and Martin entered into an Asset Purchase Agreement (the "Agreement"). (*See generally* Pl.'s Ex. A-1 ("Agreement") (Pl.'s App. at 19-139).) Significantly, the Agreement states that after the purchase, Equibrand intended to operate Dale Martin Saddlery under that name, and that Martin agreed "not to operate any business with a similar name which could reasonably be expected to confuse the public." (Agreement § 5.6 (Pl.'s App. at 43).) Additionally, the Agreement allowed Martin to continue to operate another business entitled Martin's Saddlery and Western Wear, where he allegedly sold his own saddles labeled "Martin Saddlery." (Dale Martin Decl. P 4 (Defs.' App. at 8); Agreement § 5.6 (Pl.'s App. at 43).)

On or about November 22, 1999, Equibrand filed an application to register the trademark "Dale Martin Saddlery" with the United States Patent and Trademark Office, Registration No. 2,647,797. [*5] (*See* Pl.'s App. at 322.) In conjunction with the trademark registration, Martin signed a "Consent to Registration" that stated: "I, Dale Martin, hereby consent to the use and registration by Equibrand Corporation of my name as a trademark, as part of the trademark, DALE MARTIN SADDLERY, for equestrian related goods, namely tack, bridles and saddles." (*Id.* at 323.)

Additionally, at the time Martin sold Dale Martin Saddlery to Equibrand, Martin became Vice-President of Equibrand. (Dale Martin Decl. P 5 (Defs.' App. at 9).) According to Martin, by 2001 his relationship with Equibrand had soured and his employment was terminated. (*Id.* P 7 (Defs.' App. at 9).) Martin claims that, despite Equibrand's averment that it has always used and intends to use the "Dale Martin" name in relation to its products, after his employment was terminated, Equibrand informed Martin that it planned to dissociate itself from Martin and remove all reference to "Dale

Martin" from its products. (*Id.* P 8 (Defs.' App. at 9).) On July 16, 2001, Equibrand filed the trademark "Martin Saddlery" with the United States Patent and Trademark Office, Registration No. 2,569,990. (Pl.'s App. at 324.) According [*6] to Defendants, Equibrand liquidated, gave away, or destroyed all products that bore the name "Dale Martin." (Thomas Decl. PP 3-4 (Defs.' App. at 1-2).) Defendants contend that Equibrand has not used the "Dale Martin Saddlery" mark since the events in 2001. (Thomas Decl. PP 3-4; Phifer Decl. PP 2-5 (Defs.' App. at 1-4).)

Equibrand counters that, over the course of nine years since the purchase of Dale Martin Saddlery, Equibrand has worked to build the business and create a national presence in the custom saddle market. (Bray Decl. P 7, Mar. 23, 2007 (Pl.'s App. at 2).) Equibrand maintains that, by offering custom-made equestrian products to wholesalers, who then offer the custom-made product to the end consumer, it created an incredibly successful business using the Dale Martin name. (*Id.* P 8 (Pl.'s App. at 3).) As a result of Equibrand's efforts, the terms "Dale Martin," "Dale Martin Saddlery," "Martin Saddlery," and "Martin" have purportedly become synonymous with the name Equibrand and deeply branded with the consumer as a "brand that is trusted for both quality and performance." (*Id.* P 12 (Pl.'s App. at 4).) Equibrand also avers that, at all times since 1998, it has used [*7] and continues to use the names "Dale Martin," "Dale Martin Saddlery," "Martin Saddlery," and /or "Martin" to endorse and promote its products. (*Id.* P 13 (Pl.'s App. at 4); *see also* Pl.'s Ex. A-2, A-3, A-4 (Pl.'s App. at 140-49).)

Martin maintains that he never surrendered the use of his name with regard to endorsement of equestrian products and, what is more, he has, for several years, continued to use his name on his own equestrian products with Equibrand's knowledge; however, prior to the instant action, Equibrand has not complained of Martin's use of his name in the endorsement of equestrian products. (Dale Martin Decl. PP 9-14 (Defs.' App. at 9-10).) Specifically, in 2003, Martin moved to Oklahoma and, for approximately six months, produced saddles and tack stamped "Martin's Saddlery" and "Dale Martin." (*Id.* P 9 (Defs.' App. at 9); Defs.' Ex. D-1 (Defs.' App. at 13-14).) He then moved to Salado, Texas and began "Wildfire Saddlery," through which he promoted saddles as "by Dale Martin," "Dale Martin," and "made by Dale Martin." (Dale Martin Decl. P 9 (Defs.' App. at 9); Defs.'

Ex. D-2 (Defs.' App. at 15-16).) Martin additionally authorized the use of his name on saddles [*8] promoted by Crossfire Saddlery during 2005 and 2006. (Dale Martin Decl. P 11 (Defs.' App. at 10); Defs.' Ex. D-3 (Defs.' App. at 17-18).) According to Martin, Equibrand was fully aware of the use of his name in marketing such products and Kenneth Bray, Equibrand's CEO, even visited Wildfire Saddlery and Crossfire Saddlery and saw the products marked with the Dale Martin name; however, Equibrand never objected to such use. (Dale Martin Decl. PP 10-12 (Defs.' App. at 9-10).)

In 2006, Martin moved to Cleveland, Tennessee and went to work for Reinsman Equestrian Products, Inc. ("Reinsman") as the Vice President of Sales and Marketing. (*Id.* P 15-16 (Defs.' App. at 10).) In his new position, Martin was responsible for designing saddles and tack. (*Id.* P 15 (Defs.' App. at 10).) Equibrand states that, in 2007, it became aware that Reinsman had hired Martin and they were developing a line of saddles and tack called the "Dale Martin Collection." (Bray Decl. P 17, Mar. 23, 2007 (Defs.' App. at 5).) In January of 2007, Bray saw a sampling of Defendants' products. (*Id.;* Pl.'s Ex. A-6 (Pl.'s App. at 293-98).) Additionally, Defendants placed an ad to run in the March 2007 issue of [*9] *The Trail Rider Magazine,* which advertised the "Dale Martin Collection" and stated "Imitations are everywhere. . . . Take a closer look at Reinsman." (Bray Decl. P 18 (Pl.'s App. at 5); Pl.'s Ex. A-7 (Pl.'s App. at 299-300).) Defendants also placed a similar ad in the March 2007 issue of *Western World Magazine.* (Brandon Decl. P 5 (Defs.' App. at 5).) Defendants maintain that, at the time they arranged for this advertising, Reinsman was not aware of any claim that Martin was not allowed to use his name in connection with any other equestrian products. (*Id.*)

Equibrand claims that, with the arrival of Defendants' Dale Martin products on the market, complaints, questions and confusion regarding the origin of Defendants' products have begun to arise among Equibrand's customers; specifically, wholesale customers have inquired as to whether Reinsman has taken over Martin Saddlery, if they should now contact Reinsman to order Martin products, if Defendants' "Dale Martin Collection" is the same as Equibrand's Martin products, and how the wholesale distributors should explain the different products bearing the same or similar name to end consumers. (Bray Decl. P 19, Mar. 23, 2007 (Pl. [*10] 's App. at 5-6).) On February 6, 2007, Equibrand

sent Defendants a cease and desist letter, demanding that Defendants immediately discontinue all use of the Dale Martin mark and name. (Bray Decl. P 21 (Pl.'s App. at 6); Pl.'s Ex. A-8 (Pl.'s App. at 301-03).) Equibrand's counsel then allegedly contacted Reinsman's counsel and the parties attempted to resolve the issues in the letter. (Pl.'s Br. at 5.) Despite these attempts to reconcile, Defendants filed a petition to cancel Equibrand's "Dale Martin Saddlery" mark on March 19, 2007, "which solidified Equibrand's need to seek immediate injunctive relief" (*Id.*)

Equibrand contends that Defendants' actions constitute trademark infringement under both Texas law and the Lanham Act, unfair competition, and a breach of the Agreement. (Pl.'s Br. at 6.) Equibrand now seeks a preliminary injunction forbidding Defendants to use the Dale Martin name or any derivation thereof in conjunction with the sale or offer for sale of any saddle, bridles, tack, or other equestrian related products. (Pl.'s Application for TRO and Prelim. Inj. P 13.) Defendants state that, during the resolution of this dispute, Reinsman intends to continuing providing saddles [*11] and tack exclusively under the "Reinsman" trademark with additional descriptive phrases such as "Designed by Dale Martin," "By Dale Martin," and "Made by Dale Martin." (Brandon Decl. P 7 (Defs.' App. at 6).) Reinsman agrees not to further advertise using the phrase "Dale Martin Collection" until after resolution of this dispute. (*Id.* P 6 (Defs.' App. at 5-6).)

## II. Preliminary Injunction

To obtain a preliminary injunction, the moving party must demonstrate to the Court that: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened injury to the defendant; and (4) granting of the preliminary injunction serves the public interest. *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). If the moving party cannot prove all four of these elements, a court must deny the injunctive relief since "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985). [*12]

## A. Likelihood of Success on the Merits: Lanham Act

The Lanham Act states:

(1) Any person who shall, without the consent of the registrant--

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1)(a) (2007). To prevail under the Lanham Act, a plaintiff must first show that the word or phrase in dispute is registerable or protectable. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790 (5th Cir. 1983); *March Madness Athletic Ass'n v. Netfire, Inc.,* 310 F. Supp. 2d 786, 806 (N.D. Tex. 2003). After protectability is established, the plaintiff must prove that a likelihood of confusion exists between the marks at issue. *March Madness Athletic Ass'n,* 310 F. Supp. 2d at 806 (citing *Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs,* 41 F.3d 223, 224 (5th Cir. 1995)). [*13]

### i. Protectability of Equibrand's Registered Trademarks

"A mark is protectable if it *'either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning.'" *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992) (emphasis in original). Additionally,

[a]ny registration issued . . . and owned by a party . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein.

15 U.S.C. § 1115(a). Under this premise, courts have held that "federal registration of a mark, including a surname,

creates a presumption that the mark is distinctive." *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 876 (9th Cir.1999); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir. 1986) (because registered trademarks are presumed distinctive, [*14] they should be afforded the utmost protection); *E. & J. Gallo Winery v. Spider Webs Ltd.,* 129 F. Supp. 2d 1033, 1038 (S.D. Tex.2001) (registered marks are presumed distinctive). Therefore, if a plaintiff can show that a mark is validly registered, it is presumed distinctive and therefore protectable.

It is undisputed that Plaintiff registered trademarks for both "Dale Martin Saddlery" and "Martin Saddlery." (*See* Pl.'s App. at 322-24.) Thus, both marks are presumed to be valid and distinctive and are entitled to protection under federal trademark law, which satisfies Plaintiff's burden for the first element of this claim. Plaintiff argues that, even absent the presumption of validity a registered trademark receives, the marks "Dale Martin Saddlery" and "Martin Saddlery" are among a family of marks that have acquired a secondary meaning that affords them protection under the law.

A trademark has successfully acquired a secondary meaning when "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Two Pesos, Inc.,* 505 U.S. at 766 n.4 (internal citations [*15] omitted). A family of marks may gain such a secondary meaning. "A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1462 (Fed. Cir. 1991). To gain protection, the common characteristic in the family of marks must be indicative in the mind of the consumer of the origin of the goods. *Chauvin Int'l, Ltd. v. Goldwitz,* 927 F. Supp. 40, 48 (D. Conn. 1996) (citing *J & J Snack Foods Corp.,* 932 F.2d at 1462). Such protection extends to any mark containing the family name that evokes such a reaction in the consumer, even if that particular mark or combination of words is not used by the owner. *Id.*

Furthermore, it is well established that survey evidence is the preferred and most persuasive manner in which to establish secondary meaning. *March Madness Athletic Ass'n, L.L.C.,* 310 F. Supp. 2d at 809 (citing

*Sugar Busters, L.L.C. v. Brennan,* 177 F.3d 258, 269 (5th Cir. 1999); [*16] *Zatarains, Inc.,* 698 F.2d at 795). However, other factors, taken together, may also establish that a mark has achieved a secondary meaning; these factors include:

> (1) the length and manner of use of the mark by the plaintiff; (2) the nature and extent of advertising and promotion of the mark; (3) efforts made to promote a conscious connection, in the consumer's mind, between the mark and a particular product or service; and (4) the defendant's intent in copying the mark.

*Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F. Supp. 1513, 1539 (S.D. Tex. 1996) (internal citation omitted), *aff'd,* 155 F.3d 526 (5th Cir. 1998).

Although Equibrand now primarily operates under the name "Martin Saddlery," Equibrand states that, since the Agreement in 1998, it has used the names "Dale Martin," "Dale Martin Saddlery," "Martin Saddlery" and/or "Martin" to promote its line of Martin products. (Bray Decl. PP 13-14, Mar. 23, 2007 (Pl.'s App. at 4).) In fact, the Martin name, or some variation thereof, is included on Plaintiff's products, mailing labels, and website. (*Id.* P 14 (Pl.'s App. at 4); Pl.'s Exs. A-2, A-3, A-4 (Defs.' App. at [*17] 140-48).) Although, as Defendants point out, Plaintiff does not present evidence of when and in what manner Plaintiff used each form of the Dale Martin name in relation to its products, Defendants do not rebut that Plaintiff has, in fact, used some variation of the Dale Martin name in connection with its equestrian products since 1998. Thus, it appears that Equibrand has used some form of the Dale Martin name on their products and in association with their business since 1998, a factor that weighs in favor of finding secondary meaning and is also indicative of a family of names protectable under trademark law.

Additionally, with respect to the second and third factors, Equibrand has provided a detailed explanation of its expenditures on advertising and promotion of its products connected to the Dale Martin name, which amount to over $ 2.7 million. (*See* Pinder Decl. PP 3-5, Apr. 5, 2007, Ex. B-1, B-2 (Pl.'s App. in Supp. of Reply at 4-8).) Specifically, Equibrand advertises Martin products in six national publications and on RFD TV. (Bray Decl. P 10, Mar. 23, 2007 (Pl.'s App. at 3).) Last

year, Equibrand sold Martin products to over 1300 stores, its total sales surpassing $ 7.5 [\*18] million. (*Id.* P 11.) Equibrand maintains that its efforts since 1998 were part of a deliberate plan to grow the Martin product line and create a connection between the Martin name and Equibrand's products in the minds of consumers, which has evidently succeeded due to the alleged confusion caused between Equibrand's products and Reinsman's new "Dale Martin Collection." (Bray Decl. P 16, 19, Mar. 27, 2007 (Pl.'s App. at 5-6).) Considering that the parties agree that Equibrand purchased Dale Martin Saddlery as a start-up company with "virtually no marketing," the effort and money Equibrand has expended advertising and promoting the Martin line in an effort to associate Equibrand products with the Dale Martin name also weighs in favor of finding a secondary meaning.

Finally, when observing evidence of Defendants' intent, the Court finds Reinsman's advertisement of the "Dale Martin Collection," which states: "Imitations are everywhere . . . Take a closer look at Reinsman" coupled with Defendants' insistence on using the Dale Martin name on their products is at least some evidence of Defendants' intent to reap the benefit of the Dale Martin name, which is undoubtedly more recognizable [\*19] and profitable after Equibrand's nationwide promotion efforts than it was in 1998 when used in connection with a small, local business. If Reinsman's intent was truly only to recruit Dale Martin to design products based on his unique life experience, an activity which is not prohibited or contested by Plaintiff, it would be content with employing Dale Martin as a designer and not be disputing whether or not it can include the "Dale Martin" name on its products.

Defendants argue that Dale Martin's use of his name in connection with his own products since 2003 militates against a finding of secondary meaning. However, Dale Martin apparently marketed such products in the retail market through isolated retails stores where Equibrand did not compete.[3] (Pl.'s Reply at 6.) Dale Martin's use of the Martin name on his own products, in what appears to a different market and on a smaller scale, is not enough to outweigh the factors discussed above that lean in favor of finding that Equibrand's use of the Martin name in the wholesale market of equestrian related products has given the Martin marks a secondary meaning among consumers in that market. Although Plaintiff has not provided survey [\*20] evidence demonstrating a connection between Equibrand and the Martin name, Defendants have not

rebutted all other factors that clearly lean in favor of finding that Equibrand's family of marks, the common factor being the Martin name, are indicative of Equibrand as such products' source and therefore have acquired a secondary meaning.

> 3   To boot, as discussed in more detail below, there is some question as to what rights Dale Martin retained under the Agreement in using his name or a variation thereof; it is clear, however, that Reinsman was not afforded any rights in the Dale Martin name as it had no part in the Agreement.

In sum, the Court finds Plaintiff's "Dale Martin Saddlery" and "Martin Saddlery" marks protectable both as registered trademarks and as part of a family of marks that have acquired a secondary meaning. Even assuming these findings, Defendants attempt to show that the marks are not protectable by arguing that: (1) Equibrand abandoned the "Dale Martin Saddlery" mark after it allegedly fired [\*21] Dale Martin in 2001; and (2) Dale Martin did not give Equibrand the required consent to register the "Martin Saddlery" trademark.

### a. Abandonment

"A mark shall be deemed to be 'abandoned' . . . when its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." *15 U.S.C. § 1127*; *see also Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 99 (5th Cir. 1983).* "Use" is defined as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *15 U.S.C. § 1127.* Abandonment requires complete discontinuance of use of the trademark; that is, even minor or sporadic uses of a mark will defeat the defense of abandonment. *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc., 458 F.3d 931, 938 (9th Cir. 2006)* ("Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith.") (internal citation omitted); *Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 823 (3d Cir. 2006)* [\*22] (finding no abandonment although trademark owner had not used the mark personally because another company had used the mark with the owner's permission); *Cumulus Media, Inc. v. Clear Channel Communs., Inc., 304 F.3d 1167, 1173-74 (11th Cir. 2002)* ("evidence of [the owner's] use of [the

mark] . . . was limited, consisting largely of a logo on a billboard, some business cards, and a few promotional materials, but it was sufficient to enable the trial court to reject [the defendant's] abandonment defense"). To boot, the party claiming abandonment has the burden of proof. *Exxon Corp., 695 F.2d at 99* (internal citations omitted).

Defendants maintain that Equibrand has not used the "Dale Martin Saddlery" mark since 2001, which constitutes prima facie evidence of abandonment. Defendants support this contention with Martin's sworn declaration in which he states that, after his termination in 2001, Equibrand informed him that it intended to remove all references to "Dale Martin" from its product line. (Dale Martin Decl. P 8 (Defs.' App. at 9).) Additionally, Martin alleges that the pictures of products bearing the "Dale Martin Saddlery" mark provided [\*23] by Equibrand in this action are of products offered by Equibrand before 2001. (*Id.* P 19 (Defs.' App. at 11).) Further, no products or shipping labels Dale Martin received from Equibrand since 2001 have contained the "Dale Martin Saddlery" mark. (*Id.* P 20-21.) Finally, Defendants provide a sworn declaration of Scott Thomas, the previous saddle production manager of Equibrand from approximately 1999 to 2003, in which he states that, in 2001, he and other employees were instructed to remove all stamps from products that included the mark "Dale Martin." (Thomas Decl. PP 2-3 (Defs.' App. at 1).) According to Thomas, inventory bearing the words "Dale" or "Dale Martin" was discontinued from advertising and was either liquidated, given to employees, or destroyed, and *all use* of the mark "Dale Martin" was discontinued. (*Id.* P 4 (Defs.' App. at 1-2).) Defendants offer this evidence to prove that Plaintiff had no intent to resume use of the "Dale Martin Saddlery" mark, and thus it has been abandoned by Plaintiff and is not entitled to protection.

Plaintiffs provide contradictory evidence that, from 1998 until the present, Equibrand has used and continues to use the "Dale Martin [\*24] Saddlery" mark; specifically, Equibrand has, at all times since 1998, sold products bearing this mark. (Bray Decl. P 3, Apr. 5, 2007 (Pl.'s App. in Supp. of Reply at 1); Joe Martin Decl. PP 5, 7 (Pl.'s App. in Supp. of Reply at 9-10); Irick Decl. P 3 (Pl.'s App. in Supp. of Reply at 12).) Plaintiffs also provide pictures of products and address labels bearing the Dale Martin Saddlery mark that are currently sold and used by Equibrand. (Pl.'s Ex. A-2 (Pl.'s App. at 140-46); Pl.'s Ex. A-4 (Pl.'s App. at 148); Bray Decl. PP 5-6, Apr.

5, 2007 (Pl.'s App. in Supp. of Reply at 1-2).) Equibrand's General Manager avers, under oath, that:

> [I]n 2001, Equibrand began stamping its products with the 'Martin Saddlery' name instead of using the full name 'Dale Martin Saddlery.' However, at no time in 2001, or thereafter, did Equibrand abandon the use of the Dale Martin name, nor did it destroy, liquidate or give away products that bore the name Dale Martin Saddlery. Rather, Equibrand continued to use and ship products to customers that bore the Dale Martin Saddlery name . . . .

(Joe Martin Decl. PP 4-5 (Pl.'s App. in Supp. of Reply at 9-10).) In effect, the parties have presented [\*25] conflicting evidence through the use of directly contradictory affidavits that creates a factual dispute as to whether Equibrand had some use of "Dale Martin" or "Dale Martin Saddlery" in commerce after 2001. The Court cannot resolve this factual dispute from the briefing alone. However, even if Plaintiff did not specifically use the "Dale Martin Saddlery" mark on its products or in relation to its equestrian business after 2001, because the mark "Dale Martin Saddlery" has acquired a secondary meaning as part of a family of marks using the Martin name, it is still afforded protection under trademark law; accordingly, the Court will not negate the element of protectability based on Defendants' defense of abandonment.

### b. Lack of Consent

Defendants next argue that the "Martin Saddlery" mark is not protectable because Dale Martin did not give Equibrand his consent to register such a mark. Section 2(c) of the Lanham Act does not allow registration of a trademark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent . . . ." 15 U.S.C. § 1052(c). Similar to Defendants' argument of abandonment, [\*26] because the Court has found "Martin Saddlery" protectable among a family of marks that have acquired a secondary meaning, its protectability is not dependent on a valid trademark registration; therefore, the Court will not find that this particular mark is not protectable for lack of consent. Plaintiffs contend, however, that even if Dale Martin's consent was required for the trademark to be valid and the mark protectable, Martin granted such

consent to Equibrand by implication. The Court agrees.

The Trademark Trial and Appeal Board evaluated a factually similar situation in *In re Kaplan,* 225 U.S.P.Q. (BNA) 342 (TTAB 1985). In *Kaplan,* Don Kaplan sold his interest in the business D.B. Kaplan Delicatessen, Inc. to the party seeking to register the name Don Kaplan as a trademark. *Id.* The agreement between the parties provided that "the trade name and service mark 'D. B. Kaplan Delicatessen' and any name or mark confusingly similar thereto is the property of D.B. Kaplan Delicatessen, Inc. . . . and that Donald Kaplan cannot use it in any subsequent business." *Id.* The Trademark and Appeal Board held that a reasonable reading of the agreement implied the requisite [*27] consent to register a mark including Don Kaplan's name. The Board reasoned, in part, that the purpose of Section 2(c) is to protect individuals from the commercial exploitation of their own name, and here, Kaplan clearly relinquished his right to use his name or any confusingly similar name in any future business and also indicated that the mark "D.B. Kaplan Delicatessen" was the property of the purchasing party.

Similarly, as discussed in more detail below, it appears from the evidence currently before the Court that Dale Martin sold all rights and interest he owned in Dale Martin Saddlery, including any registered and common law trademarks and intellectual property associated with the business, to Equibrand and agreed not to operate a business with such name or any confusingly similar name. Additionally, Dale Martin signed a written consent letter to allow Equibrand to register the trademark "Dale Martin Saddlery." Dale Martin voluntarily gave Equibrand the right to use his name as a trademark, giving Equibrand the right to prevent all others from using such mark. Dale Martin was fully aware of such use and therefore does not need protection from the commercial exploitation of his [*28] name by another. Defendants argue that, because the registration of the initial trademark was not technically registered at the time of the "Martin Saddlery" application, the written consent for the first trademark cannot serve as written consent for the second trademark. Although the Patent and Trademark Office may require a complete application in order to grant registration of a trademark, including a separate valid written consent for a second trademark if the first trademark's application is pending at the time of the second application, *see, e.g.,* In re McKee Baking Co, 218 U.S.P.Q. 287, 288 (TTAB 1983), the

Court sees no reason to make such a distinction in this context. After all, both trademarks were eventually registered, and Dale Martin clearly gave written consent for the initial registration of his name as a trademark and was compensated for his business and the use of the Dale Martin name via the Agreement. When considering the purpose for obtaining such consent, it appears the written consent to register "Dale Martin Saddlery" implies consent to also register "Martin Saddlery." For the foregoing reasons, the Court finds that, even if Dale Martin's consent [*29] was required to register the mark "Martin Saddlery," it was properly obtained. Thus, the Court will not find that the "Martin Saddlery" mark is not protectable on the basis that Dale Martin did not consent to its registration.

In sum, because both trademarks were validly registered and Plaintiff's have given sufficient evidence that such marks have most likely acquired a secondary meaning, the Court finds that Equibrand has shown that the trademarks are protectable, and therefore has shown a likelihood of success on the merits with respect to the first element of its claims under the Lanham Act.

### ii. Likelihood of Confusion

The "touchstone" of a trademark infringement inquiry is whether or not a defendant's use creates confusion as to the "source, affiliation, or sponsorship" of the defendant's goods because of its purported likeness to the plaintiff's goods. *Pebble Beach Co. v. Tour 18 I, Ltd.,* 155 F.3d 526, 543 (5th Cir. 1998). The Fifth Circuit has enumerated the following list of non-exhaustive factors, no single one being dispositive, to determine whether a likelihood of confusion exists: "(1) the type of mark allegedly infringed, (2) the similarity between [*30] the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion." *Id.* (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1122 n.9 (5th Cir. 1991), *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.* 505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992); *Conan Props., Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 149 (5th Cir.1985).)

The first element, the type of mark infringed, focuses on the strength of the mark. "The strength of a service mark for the purposes of analyzing likelihood of confusion is dependent upon both the placement of the mark on the spectrum of distinctiveness, from arbitrary to

generic, [4] and the extent to which consumers in the relevant marketplace recognize the mark as an indicator of source." *Pebble Beach Co.,* 942 F. Supp. at 1542; (citing *Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Ass'n,* 651 F.2d 311, 315-16 (5th Cir. 1981)); *see also Elvis Presley Enters. v. Capece,* 950 F. Supp. 783, 791 (S.D. Tex. 1996),* [\*31] *rev'd,* 141 F.3d 188, 201 (5th Cir. 1998).

4 "To determine whether a mark is protectable, a court must assign the mark into one of five categories, which, arranged in order of increasing distinctiveness, are: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *March Madness Ath. Ass'n,* 310 F. Supp. 2d at 807 (citing *Two Pesos, Inc.,* 505 U.S. at 768); *see also Sport Supply Group, Inc. v. Columbia Cas. Co.,* 335 F.3d 453, 461 (5th Cir. 2003). A generic mark describes an entire class of products (such as "computer") and is not protected under trademark law. *Sport Supply Group, Inc.,* 335 F.3d at 461 (internal citations omitted). A "descriptive" mark, however, describes certain features or characteristics of a product, but is not "inherently distinctive." *Id.* (internal citations omitted). "A 'suggestive mark' 'merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods.'" *Id.* (quoting *Lane Capital Mgmt. v. Lane Capital Mgmt.,* 192 F.3d 337, 344 (2d Cir. 1999)). Arbitrary marks apply an unfamiliar word in an uncommon way, and a fanciful mark is not a real word, but is invented only for its use as a mark. *Lane Capital Mgmt.,* 192 F.3d at 344. Suggestive, arbitrary, and fanciful marks are deemed "inherently distinctive" and are, thus, entitled to protection under trademark law. *Sport Supply Group, Inc.,* 335 F.3d at 461 (citing *Two Pesos, Inc.,* 505 U.S. at 768).

[\*32] "Martin" is a surname and generally regarded by the Fifth Circuit as a "descriptive" mark, which is distinctive only if it has acquired a secondary meaning. *Conan Props.,* 752 F.2d at 155. The Court has previously found that Equibrand's marks have acquired a secondary meaning, which indicates that consumers identify the mark with the source of the goods. As discussed in detail above, Equibrand has provided evidence of the effort it has put forth to create a connection in the minds of

consumers of the Martin name and Equibrand products. Additionally, Equibrand has registered both "Dale Martin Saddlery" and "Martin Saddlery" which afford them a presumption of distinctiveness. Accordingly, the disputed marks are considered strong under the applicable law, which leans in favor of finding a likelihood of confusion.

The second element, the similarity of the marks, is determined by "comparing the marks' appearance, sound, and meaning." *Elvis Presley Enters.,* 141 F.3d at 201 (internal citation omitted). "The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely [\*33] to believe that the two users are somehow associated." *Id.* (internal quotation and citations omitted). When making this determination, it is appropriate to consider the context in which the trademark is used, such as on labels, packaging, and advertising. *Id.* (internal citations omitted). Additionally, when evaluating the third element, "the greater the similarity between products and services, the greater the likelihood of confusion." *Id.* at 202. It is undisputed that both Plaintiff and Defendants sell custom-made high-quality saddles and tack; this factor alone weighs in favor of finding a likelihood of confusion. Additionally, Reinsman and Equibrand are both stamping their products with some form of the name "Dale Martin" or "Martin." Reinsman has recently advertised using the phrases "Designed by Dale Martin" and the "Dale Martin Collection." Although not identical, all of these phrases carry the Martin name as the dominant feature. Although Reinsman claims that its products are clearly labeled with the Reinsman mark in addition to the Dale Martin name, the Court fails to see how such an addition clearly sets apart Reinsman's products from Equibrand's products. [\*34] *See id.* at 202 (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:44 (4th ed. 1997) (noting that it is proper for a Court to give greater effect to the dominant feature of a mark in the comparison)). Thus, the Court finds that both the parties' products and marks are similar, which weigh heavily in favor of finding a likelihood of confusion.

Defendants also assert that confusion at the point of sale is unlikely for consumers because Equibrand markets primarily to its authorized wholesale dealers. Defendants also point out that Equibrand has failed to provide evidence that Equibrand and Reinsman advertise through the same media outlets or target the same purchasers. Although no specific evidence is presented, Equibrand

states affirmatively that both Equibrand and Reinsman advertise in the same media outlets and target the same wholesale dealers and distributors. (Bray Decl. P 20, Mar. 23, 2007 (Pl.'s App. at 6).) Defendants do not rebut or deny this assertion, but merely point to Equibrand's lack of specifics. More persuasive than this is the evidence of actual confusion Reinsman's use of the Dale Martin name has caused among dealers [\*35] Equibrand markets to. Bray, Equibrand's CEO, has stated that, since Reinsman began selling and advertising products stamped with the "Dale Martin" name,

> Equibrand's wholesale customers [have] contacted Equibrand, asking if Reinsman took over Martin Saddlery; if the dealers now need to contact Reinsman to order Martin Products; if Defendants' products bearing the Dale Martin name were the same as Equibrand's products; and how they were supposed to explain the distinction to the end consumer, who thinks they are the same line of products since they both bear the Martin name.

(Bray Decl. P 19, Mar. 23, 2007 (Pl.'s App. at 5-6).) Again, Defendants do not rebut these statements, but argue that because Dale Martin has been using similar marks bearing his name since 2003 with no actual confusion, Plaintiff's cannot meet their burden on this element. However, as noted above, Reinsman appears to be marketing the same products to the same customers as Equibrand, which Dale Martin was not doing when he was using his name on his own products in the retail market. Thus, the potential for actual confusion that Plaintiff's assert may not have arisen until Dale Martin joined with [\*36] Reinsman. The Court cannot accept Defendants' argument of "concurrent use" when the use by Dale Martin alone appears to be of a different nature than the use by Dale Martin in conjunction with Reinsman. Therefore, without some affirmative evidence from Defendants rebutting Plaintiff's assertion, the Court finds that Plaintiff's have presented evidence of actual confusion among consumers, which is highly probative of a likelihood of confusion.

Defendants also state that the care consumers in the equestrian market exercise when purchasing products weighs in favor of finding that there is no likelihood of confusion. Even if this were true, which is questionable considering the allegations of actual confusion Plaintiff

has asserted, the Court finds that this does not outweigh the host of reasons discussed above that lean in favor of a finding of likelihood of confusion. For the foregoing reasons, the Court finds that Plaintiff's have also established probable success on the element of likelihood of confusion with respect to its claims under the Lanham Act.

### iii. Fair Use

Defendants next assert that the use of the Dale Martin name in association with Reinsman's products designed [\*37] by Dale Martin is a fair use of the term. Under the Lanham Act, a party can assert the defense of "fair use," which means that the term is not used as a trademark, but rather is descriptive and used "in good faith only to describe the goods or services of such party." *15 U.S.C. § 1115(b)(4)*. "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Soweco, Inc. v. Shell Oil Co., 617 F.2d 1178, 1185 (5th Cir. 1980)*.

With respect to a surname, even when it acquires a secondary meaning and becomes a trademark, the surname generally "continues to serve the important function to its bearer of acting as a symbol of that individual's personality, reputation and accomplishments as distinguished from that of the business, corporation or otherwise, with which he has been associated." *Madrigal Audio Labs., Inc. v. Cello, Ltd., 799 F.2d 814, 822 (2d Cir. 1986)* (internal citation omitted). Accordingly, "though an individual may sell the right to use his personal name . . . a court will not [\*38] bar him from using that name unless his intention to convey an *exclusive* right to the use of [his] own name is clearly shown." *Id. at 822-23* (internal quotations and citations omitted) (emphasis added). Whether or not such exclusive right was granted depends on the terms of the sale. *Id. at 823*. Significantly, "the fact that an alleged infringer has previously sold his business with its goodwill to the plaintiff makes a sweeping injunction more tolerable." *Taylor Wine Co. v. Bully Hill Vineyards, Inc., 569 F.2d 731, 735 (2d Cir. 1978)*.

Defendants assert that describing the Reinsman products as "Designed by Dale Martin" is the "only way for Mr. Martin to reap the benefits of the value of this name he built up outside his short tenure at Reinsman." (Defs.' Resp. at 17.) Defendants further argue that Dale

Martin's life experience, not Equibrand's promotion and marketing, have given him a well-known name in the industry, a name which he never intended to surrender the rights to. However, if Dale Martin did in fact sell the exclusive right to use his name in relation to equestrian products to Equibrand, attempting to now use [*39] his name with respect to products sold by Reinsman is not a "fair use" of the Dale Martin name, even if it is an accurate description of the products. Exactly what rights Dale Martin retained in his name, if any, and whether or not he intended Equibrand to own the exclusive right to use the name Dale Martin in a trademark or trade name are dependent upon the terms of the Agreement.

The Agreement is governed by Texas law. (Agreement § 6.7 (Pl.'s App. at 47).) Under Texas law, a contract is ambiguous if its meaning is uncertain and doubtful, or it is reasonably susceptible to more than one interpretation. *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 394. "'Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract.'" *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. S. Plains Switching, Ltd. Co.*, 174 S.W.3d 348, 358 [*40] (Tex. App.--Fort Worth 2005, no pet.)).

The Agreement states that Equibrand purchased "all right, title and interest in and to all of the assets, business, goodwill and rights of [Dale Martin] used in and/or produced by [Dale Martin Saddlery] . . . ." (Agreement § 1.1 (Pl.'s App. at 21).) The assets purchased in relation to Dale Martin Saddlery included "all Intellectual Property (including, without limitation, the trademarks, patents and copyrights listed on Schedule 3.11(a)), [and] the goodwill associated therewith . . . ." (Agreement § 1.1(d) (Pl.'s App. at 22); *see also* Bill of Sale § 1(d) (Pl.'s App. at 93).) Section 3.11 of the Agreement states that "Schedule 3.11(a) identifies (i) all Intellectual Property used in connection with the Business . . . ." (Agreement § 3.11(a) (Pl.'s App. at 34).) However, Schedule 3.11(a) of the Agreement defines the Intellectual Property of Dale Martin Saddlery, without qualification, as "None." (Agreement Schedule 3.11(a) (Pl.'s App. at 76).) Section 3.11(b), in further specifying the Intellectual Property Dale Martin owned at the time of the Agreement, reads as

follows:

> Except as set forth on Schedule 3.11(b) [*41] . . . [Dale Martin] owns, has the right to use, sell, license and dispose of, and has the right to bring actions for the infringement of, and, where necessary, has made timely and proper application for, all Intellectual Property rights . . . necessary or required for the conduct of [Dale Martin Saddlery] as currently conducted and as proposed to be conducted . . . .

(Agreement § 3.11(b)(ii) (Pl.'s App. at 34).) Likewise, Schedule 3.11(b) defines all Intellectual Property excepted from Dale Martin's ownership at that time as "None." (Agreement Schedule 3.11(b) (Pl.'s App. at 76).) "Intellectual Property" is later defined in the Agreement to include "all registered and unregistered trademarks, service marks, trade dress, logos, trade names, and corporate names, including all goodwill associated therewith . . . ." (Agreement Ex. A (Pl.'a App at 54).) Finally, the Agreement includes a separate "Assignment of Intellectual Property" in which Dale Martin assigned to Equibrand:

> all of his worldwide right, title and interest in and to all federally registered (if any) and common law trademarks, servicemarks and tradenames owned by [Dale Martin] in connection with the [*42] Business [Dale Martin Saddlery] (collectively, the Trademark Rights), together with all of the goodwill of [Dale Martin Saddlery] associated with the use of and symbolized by the Trademark Rights.

(Assignment of Intellectual Property P 1 (Pl.'s App. at 101).)

The parties dispute over whether or not the Agreement transferred to Equibrand the exclusive right to use the Dale Martin name. The Agreement, in more than one section, transfers all intellectual property then associated with Dale Martin Saddlery, including goodwill, trademarks, and trade names, both registered and common law, to Equibrand; the Agreement then defines the Intellectual Property of Dale Martin Saddlery at the time of the transfer as "None." However, the Agreement also states that Dale Martin owned all

goodwill, trademarks, and trade names associated with Dale Martin Saddlery, which would include any trade names, trademarks, and goodwill built up over the year the business was operating prior to the time Equibrand purchased it. Thus, although the Agreement defines the intellectual property of Dale Martin Saddlery as "None," it appears some intellectual property was transferred, or the other relevant [*43] sections and the separate assignment would be meaningless.

Exactly what rights were transferred is unclear from the four corners of the document; however, the Court need not finally resolve this ambiguity to make a preliminary determination. Even though the schedule indicates that the intellectual property of the Business at that time of sale was "None," this is the only provision that implies that Dale Martin owned no intellectual property associated with the Business at the time of sale. 5 On the other hand, the provisions noted above in the Agreement, the Bill of Sale, and the Assignment of Intellectual Property, read together with the entire contract indicate that Dale Martin both owned intellectual property in Dale Martin Saddlery, including any goodwill associated with that business via the Dale Martin name, and intended to transfer to Equibrand all intellectual property associated with Dale Martin Saddlery; this would implicitly include the exclusive right to use "Dale Martin Saddlery" as a trade name of a business or as a trademark on a product. Further, it is undisputed that Dale Martin received valuable consideration of $ 800,000 in exchange for Dale Martin Saddlery, a [*44] small saddle manufacturing business in its infancy. (Agreement § 2.1 (Pl.'s App. at 26-27).); *cf. Madrigal, 799 F.2d at 825* (noting that the defendant's business was purchased for a "token amount," which indicated that the plaintiff had not sold the exclusive right to use his name); *see also Guth v. Guth Chocolate, 224 F. 932, 934 (4th Cir. 1915)* (finding that a defendant who sold the use of his surname for the purpose of manufacturing candy and then started selling candy with packaging displaying his full name was attempting to "keep for himself the essential thing he sold, and also keep the price he got for it."). Finally, Dale Martin consented to the use of his name in the registered "Dale Martin Saddlery" trademark, which, by definition, prevents all others except for the owner of the trademark from using the mark "Dale Martin Saddlery." Dale Martin's statement in his affidavit that he never intended to give up the right to use his own name to market or endorse equestrian products coupled with the notation in Agreement that Dale Martin Saddlery had no

intellectual property at the time of the sale cannot overcome the numerous other provisions [*45] of the Agreement and other factors that indicate the opposite-that Dale Martin sold all intellectual property, including trademarks, associated with Dale Martin Saddlery to Equibrand, which impliedly includes the "Dale Martin" name. If Dale Martin sold the exclusive right to use his name for valuable consideration, he cannot claim that any subsequent use of his name not provided for by the Agreement 6 is fair, even under the guise of an accurate description of the product. Accordingly, although an ambiguity exists in the Agreement as to what rights Dale Martin retained, if any, with respect to the use of his name in relation to equestrian products, the evidence indicates that Defendants will not likely be able to succeed on a fair use defense. Thus, Defendants' fair use argument will not successfully rebut Plaintiff's showing of a likelihood of success on the merits. Because Plaintiff has made a successful showing of a likelihood of success on the merits with respect to its Lanham Act claims, the Court now turns to whether or not Plaintiff has made a sufficient showing of irreparable injury.

5 The Court notes that Section 5.6 allows Dale Martin to continue operating the business "Martin Saddlery & Western Wear" and forbids Dale Martin to use any other confusingly similar business name. (Agreement § 5.6 (Pl.'s App. at 43).) This provision says nothing about any intellectual property associated with that business or the use of any business name, trade name, or trademark by any party other than Dale Martin. Thus, this provision is unhelpful with respect to what intellectual property rights, if any, Dale Martin owned or retained in connection with Dale Martin Saddlery.

[*46]

6 The Court notes that the Agreement did allow Dale Martin to continue operating Martin Saddlery & Western Wear and that Dale Martin did, in fact, use his name personally on products in the retail market with Plaintiff's knowledge. However, any personal use Dale Martin retained in his name or any acquiescence of Plaintiff in Dale Martin's use of his own name in his individual capacity does not negate or diminish any exclusive transfer of intellectual property under the Agreement. After all, the Agreement does not clearly grant Dale Martin the right to join

with a third party such as Reinsman and use his name, but rather indicates that such use of the Dale Martin name belongs to Equibrand, with a possible limited use retained for Dale Martin in his individual capacity. (*See* Agreement § 5.6 (Pl.'s App. at 43).)

## B. Irreparable Injury

In a trademark case, a plaintiff may show irreparable injury by establishing a substantial likelihood of confusion. *Ramada Franchise Sys. v. Jacobcart, Inc.,* No. 3:01-CV-0306-D, 2001 U.S. Dist. LEXIS 6650, at *8 (N.D. Tex. May 17, 2001)* [*47] (citing *KFC Corp. v. Goldey,* 714 F. Supp. 264, 267 (W.D. Ky. 1989)); *see also Joy Mfg. v. CGM Valve & Gauge Co.,* 730 F. Supp. 1387, 1394 (S.D. Tex. 1989)* ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods. The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill.")

As discussed above, the Court has found that Plaintiff has established a likelihood of confusion, evidenced by the alleged actual confusion between Plaintiff's and Defendants' products bearing the Dale Martin name. As a result, Plaintiff has lost control over the quality of the goods produced bearing such name and has also potentially lost customers and goodwill associated with its company. Such a loss is difficult to quantify; thus, Plaintiff has met its burden of establishing irreparable harm. Defendants argue that, because Equibrand allowed Dale Martin to use the Dale Martin name on his own products since 2003, only Plaintiff rebuts any presumption of irreparable harm. *See Amicus Commc'ns, L.P. v. Hewlett-Packard Co. Inc.,* 1999 WL 495921, at *18 (W.D. Tex. Jun. 11, 1999) [*48] (unpub.). As discussed above, Dale Martin's prior use appears to be on a smaller scale in a different market than Reinsman's current use of the Dale Martin name. Equibrand is seeking to enjoin use by Reinsman and Dale Martin acting in his capacity as an employee of Reinsman, not use by Dale Martin personally. With respect to these Defendants, use of the Dale Martin name on Reinsman's products began in early 2007, which resulted in communications between the parties and the filing of this motion in late March. It appears that Plaintiff did not delay with respect to the particular

offensive conduct by Reinsman. This distinguishes the instant facts from the cases finding that delay warranted denial of an injunction when the plaintiff delayed in taking action against one party's continuous course of conduct. *See, e.g. Gonannies, Inc. v. Goaupair.com, Inc.,* 464 F. Supp. 2d 603, 606-09 (N.D. Tex. 2006); *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.,* No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS 36590, at *13-14 (N.D. Tex. June 6, 2006); *Amicus Commc'ns, L.P. v. Hewlett-Packard Co. Inc.,* 1999 WL 495921, at *18-19 (W.D. Tex. Jun. 11, 1999); [*49] Accordingly, the Court will not find a lack of irreparable harm based on delay; rather, Plaintiff has met its burden with respect to this element.

## C. Balancing of Hardships

The balancing of hardships also appears to lean in Plaintiff's favor. Plaintiff's have previously established that, if Defendants are able to continue allegedly infringing on its trademarks, Plaintiff will suffer harm to its goodwill and sales that is difficult, if not impossible, to quantify. Defendants argue that Reinsman has invested time and money into recruiting and designing products with Dale Martin, and an injunction requiring Reinsman to pull such products from the market will result in a loss of revenue and goodwill. However, the fact that Defendants will suffer lost profits from not being able to market likely infringing products is not a factor that tips the scales in favor of Defendants. *See Lakedreams v. Taylor,* 932 F.2d 1103, 1110 n.12 (5th Cir. 1991) (noting the First Circuit's holding that "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense [*50] 'merits little equitable consideration.'" *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir. 1988)). Additionally, Defendants state that granting an injunction would "wholly deprive Mr. Martin of his property right of publicity" and also "the key to his ability to earn a living." (Defs.' Br. at 23-24.) However, an injunction would not prevent Dale Martin from continuing to design saddles and tack for Reinsman. Furthermore, as noted above, Plaintiff is not seeking to enjoin Dale Martin personally. An injunction will only prevent the inclusion of the Dale Martin name on Reinsman's products, an activity that has been found to likely be infringing. Reinsman repeatedly states it recruited Dale Martin to design products because of his unique position to do so based on his life experience; an injunction will not

prevent such goals from coming to fruition. Thus, Defendants have not shown hardships that outweigh the likelihood of confusion and irreparable injury presented by Plaintiff

**D. Public Interest**

The Fifth Circuit has held that, "the public has an interest in preventing confusion about the origin of the products that it buys. [*51] " *Lakedreams, 932 F.2d at 1110; see also Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., L.L.C., 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999)* ("The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks.") Thus, the public interest will be served through an injunction by decreasing the risk for confusion as to the origin of Reinsman's products and also by enforcing federal and state infringement laws. Defendants again assert that Dale Martin's right to publicity in his own name will be harmed, which disserves the greater public policy supporting one's right to publicity. As noted above, the Court is not enjoining Dale Martin from designing equestrian relating products and holding such products out as his own. Instead, the Court is enjoining use of his name on Reinsman products in a manner violative of trademarks and trade names he consented to

and was, in fact, paid consideration for. Therefore, the Court rejects this argument and finds that the public interest will be served by granting an injunction.

**IV. Conclusion**

Because the Court finds Plaintiff [*52] has met its burden on each of the four required elements warranting a preliminary injunction, the Court GRANTS Plaintiff's Application for Temporary Restraining Order and Preliminary Injunctive Relief. As of the date of this Order, Defendants Reinsman and Dale Martin, in his capacity as the Vice President of Reinsman, shall immediately cease any and all use of the name and / or logo "Designed by Dale Martin," the "Dale Martin Collection," the name "Dale Martin" or any derivation thereof in conjunction with the sale or offer for sale of any saddle, bridles, tack, or other equestrian related products.

**IT IS SO ORDERED.**

Signed this 17<th> day of May 2007.

JORGE A. SOLIS

UNITED STATES DISTRICT JUDGE

LEXSEE



Cited
As of: Aug 21, 2013

**PROPATH SERVICES, L.L.P. and PROPATH ASSOCIATES, Plaintiffs, v. AMERIPATH, INC. and BRADLEY W. BAKOTIC, D.O., Defendants.**

**CIVIL ACTION NO. 3:04-CV-1912-P**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**2004 U.S. Dist. LEXIS 27846**

**October 21, 2004, Decided
October 21, 2004, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employer sued defendant current employer seeking a preliminary injunction against the current employer and defendant employee to protect its trade secrets and confidential and proprietary information. A temporary restraining order was granted.

**OVERVIEW:** The employee, a skin pathologist, signed an employment contract with the former employer that included an invalid non-competition agreement. The employee later resigned and took a job with the current employer, a direct competitor. The former employer claimed that the employee took a copy of a diagnostic manual in a clandestine fashion, while the current employer maintained that he was ignorant of any improprieties. The former employer also asserted that the employee illicitly acquired other confidential information including client lists, marketing strategies, and patient information. The court held, inter alia, that all factors for issuing the preliminary injunction were met. The diagnostic manual was a trade secret that deserved protection. Power Point presentations and any newsletter material prepared during the employee's tenure with the former employer, and any list of the former employer's

patients (not to include the employee's ancillary patients) also remained the former employer's property. The court issued a preliminary injunction protecting the proprietary and confidential information and trade secrets.

**OUTCOME:** The court granted in part and denied in part the application for preliminary injunction.

**CORE TERMS:** confidential information, trade secrets, preliminary injunction, confidential, patient, proprietary, injunction, customer, irreparable, manual, diagnostic, employment agreement, marketing, supplemental, disclosure, email, temporary, briefing, former employee, confidentiality, patient records, confidential relationship, former employer, non-competition, classified, indirectly, covenant, secret, aff, newsletter

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements > Public Interest*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1]In ruling on a motion for a preliminary injunction, the court must consider whether: (1) there is a substantial

likelihood of success on the merits; (2) there is a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened injury to the defendant; and (4) granting of the preliminary injunction serves the public interest. These factors must be balanced to determine whether they collectively favor the issuance of an injunction. If a party cannot prove all four elements, a court must deny the injunctive relief since the decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2]At the hearing for the preliminary injunction, the applicant is not required to prove that he will prevail at trial but must establish the right to preserve the status quo pending trial on the merits by proving all of the four elements.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN3]Texas courts have long recognized that even without an enforceable contractual restriction a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment.

*Trade Secrets Law > Breach of Contract > Breach of Confidence > Confidential Relationships*
*Trade Secrets Law > Misappropriation Actions > Elements > Confidentiality*
*Trade Secrets Law > Misappropriation Actions > Elements > Existence & Ownership*
[HN4]The United States Court of Appeals for the Fifth Circuit listed the requisites to prevail on a claim for misappropriation of trade secrets. To wit, plaintiffs must show: (1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; and (3) use of the trade secret without

authorization.

*Trade Secrets Law > Factors > Business Use*
*Trade Secrets Law > Protected Information > General Overview*
*Trade Secrets Law > Protection of Secrecy > Absolute & Relative Secrecy*
[HN5]A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. It maybe a list of customers. However, the word "secret" implies that the information is not generally known or readily ascertainable by independent investigation.

*Trade Secrets Law > Breach of Contract > Breach of Confidence > Confidential Relationships*
*Trade Secrets Law > Protection of Secrecy > Duty to Safeguard*
*Trade Secrets Law > Protection of Secrecy > Reasonable Measures > Confidentiality Agreements*
[HN6]While it is true that outside any confidential relationship, one who voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN7]Similar to confidential information and trade secrets, Texas courts have long recognized that even absent a non-solicitation agreement, former employees cannot use confidential or proprietary information to contact the customers of their former employers. Such

actions are considered to be improper.

**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements**
**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets**
[HN8]As a general rule, in the absence of an enforceable agreement not to compete, an employer is not entitled to an injunction preventing a former employee from soliciting the employer's clients.

**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets**
**Trade Secrets Law > Factors > Generally Known**
**Trade Secrets Law > Protected Information > Know-How**
[HN9]When money and time are invested in the development of a procedure or device which is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist.

**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets**
**Trade Secrets Law > Nonprotected Information > Public Domain**
[HN10]Publicly displayed newsletters do not deserve confidential status and protection.

**Healthcare Law > Business Administration & Organization > Patient Confidentiality > General Overview**
**Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets**
**Trade Secrets Law > Nonprotected Information > Public Domain**
[HN11]Previously published information, including research papers and patents is not confidential because of its public nature.

**Civil Procedure > Remedies > Injunctions >**

**Preliminary & Temporary Injunctions**
[HN12]The second prong of the preliminary injunction test asks whether Plaintiffs will suffer any irreparable harm. When deciding this question, it is not so much the magnitude of the harm claimed by the plaintiff but the irreparability that counts for purposes of a preliminary injunction. The United States Court of Appeals for the Fifth Circuit has found an injury to be irreparable if it cannot be undone through monetary relief. The key word is irreparable, and an injury is irreparable only if it cannot be undone through monetary remedies. Thus, the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. Hence, the court's equitable powers will be invoked only upon a showing that monetary damages will be insufficient to remedy the injury the movant is presently suffering.

**Trade Secrets Law > Civil Actions > Remedies > Damages > General Overview**
**Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Irreparable Harm**
[HN13]Damages are incalculable when determining the exploitation of an employer's clientele.

**Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Irreparable Harm**
**Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Preliminary & Temporary Injunctions**
**Trade Secrets Law > Misappropriation Actions > General Overview**
[HN14]In a situation where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable. Finally, it is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a single trade secret may be disclosed is enough, and an injunction is usually the only way use of the trade secret by the former employee can be prevented.

**COUNSEL:** [*1] For Propath Services, L.L.C., Plaintiff: Craig A Haynes, Douglas C Heuvel, Lauren C Hornsby, Thompson & Knight - Dallas, Dallas, TX.

For Propath Associates, Plaintiff: Craig A Haynes, Douglas C Heuvel, Lauren C Hornsby, Thompson &

Knight - Dallas, Dallas, TX.

For Ameripath, Inc, Defendant: Roland M Juarez, Stephanie K Osteen, W Richmond Malone, Akin Gump Strauss Hauer & Feld - Dallas, Dallas, TX. Andrew Gould, Wick Phillips, Dallas, TX. William O Ashcraft, Ashcraft Law Firm, Dallas, TX.

For Bradley W Bakotic, D.O., Defendant: William O Ashcraft, Ashcraft Law Firm, Dallas, TX. Roland M Juarez, Stephanie K Osteen, Akin Gump Strauss Hauer & Feld - Dallas, Dallas, TX.

**JUDGES:** JORGE A. SOLIS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JORGE A. SOLIS

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Plaintiffs ProPath Services, L.L.P. and ProPath Associates' (collectively "ProPath") Application for Preliminary Injunction, filed September 30, 2004. Defendants AmeriPath, Inc. ("AmeriPath") and Bradley W. Bakotic, D.O. ("Dr. Bakotic") (collectively "Defendants") filed a Joint Brief in Support of Denial of Temporary Injunction ("Joint Brief") on September 30, 2004, and [*2] each party filed a response on October 6, 2004. After considering the parties' arguments and briefing, and the applicable law, the Court GRANTS in PART and DENIES in PART Plaintiffs' Application for Preliminary Injunction.

**I. Background and Procedural History**

Dr. Bakotic is a skin pathologist previously employed by ProPath in Dallas, Texas. [1] While in that employment, Dr. Bakotic signed an Employment Contract with ProPath that included a non-competition agreement. Dr. Bakotic later resigned from that employment on August 20, 2004, and subsequently took a job with AmeriPath beginning August 23, 2004. Defendant AmeriPath is a direct competitor of ProPath.

> 1 Although this Memorandum Opinion and Order essentially repeats the factual details of the Court's Order (filed September 17, 2004) that denied Plaintiffs' Emergency Motion to Remand,

the Court finds such details necessary to determine the preliminary injunction.

The facts of Dr. Bakotic's resignation are now a source of deep dispute. While both [*3] parties agree that he took a copy of a Diagnostic Manual from ProPath when he left, Plaintiffs claim Dr. Bakotic did so in a clandestine fashion, while Defendants maintain Dr. Bakotic was ignorant of any improprieties. Additionally, Plaintiffs assert Dr. Bakotic acquired illicitly other confidential information including client lists and marketing strategies, as well as patient information.

After discovering Dr. Bakotic's actions, Plaintiffs filed suit on August 17, 2004, and obtained a temporary restraining order ("TRO") that prohibited: (1) Defendants using and disseminating Plaintiffs' confidential information; (2) Dr. Bakotic soliciting ProPath customers with whom he had worked; (3) Dr. Bakotic recruiting ProPath employees; (4) Dr. Bakotic violating any other restrictive covenants in his Employment Agreement; (5) Defendants deleting or destroying any documents or emails containing any ProPath related information and requiring such material to be segregated; and (6) Dr. Bakotic accessing AmeriPath's email system. [2]

> 2 The TRO also brought five claims against Defendants: (1) breach of contract; (2) tortious interference with contract; (3) breach of duty of loyalty and fiduciary duties; (4) misappropriation of confidential information; and (5) Texas theft liability act violation.

[*4] On August 26, 2004, the parties extended the TRO by agreement until September 7, 2004, 11:59 p.m., and a hearing on the temporary injunction was set for September 7, 2004, 1:30 p.m. Defendants then removed this case to federal court on September 1, 2004, based on diversity. [3] On September 7, 2004, this Court issued an Order extending the TRO to September 18, 2004, and modified the original TRO to allow Dr. Bakotic access to AmeriPath's email system. [4] At that time, the Court also issued a briefing schedule to determine the validity of a preliminary injunctions [5] . Thereafter, on September 17, 2004, the Court issued yet another Order extending the TRO to October 8, 2004, in order to allow the parties to submit supplemental briefing. [6] Subsequently, on September 28, 2004, the Court extended the TRO to October 15, 2004. [7] Following the September 28, 2004, Order, Plaintiffs filed a Motion for Leave to File Supplement to their Preliminary Injunction Response

**Page 4**

Briefing ("Motion for Leave") on October 7, 2004, and Defendants filed a Joint Opposition to Plaintiffs' Motion for Leave on October 12, 2004. [8] Finally, on October 15, 2004, the Court extended the TRO to October 22, 2004.

> 3  Additionally, Plaintiffs filed an Emergency Motion to Remand on September 2, 2004. Defendants then filed their Response on September 10, 2004. On September 17, 2004, the Court issued an Order denying Plaintiffs' Emergency Motion to Remand.

[*5]

> 4  This allowance was made provided that AmeriPath produce to ProPath a list identifying all documents segregated on the confidential server, and that Dr. Bakotic produce to ProPath a list of all ProPath related documents that Dr. Bakotic transferred to any location outside of ProPath. All such documents were to be provided within two days of the Order.

> 5  That Order required Plaintiffs to file their Reply to Defendants' Response to Plaintiffs' Emergency Motion to Extend Temporary Restraining Order ("Pls.' Mot. to Extend TRO") on or before September 8, 2004. (Defendants filed their Response ("Defs.' Resp. To TRO") to Pls.' Mot. to Extend TRO on September 3, 2004.)

> 6  The Court's September 17, 2004, Order allowed each party to file a supplemental brief on or before September 27, 2004, and for each party to file a responsive brief on or before October 1, 2004.

> 7  Additionally, the Court modified the briefing schedule to allow each party to file a supplemental brief on or before September 30, 2004, and for each party to file a responsive brief on or before October 6, 2004.

> 8  In light of the ruling in this Memorandum Opinion and Order, the Court finds it unnecessary to address Plaintiffs' Motion for Leave. To the extent that Plaintiffs believe Defendants violated the TROs, Plaintiffs may assert such allegations in a motion for contempt, as well as through any other appropriate legal avenue.

[*6]

## II. Preliminary Injunction

[HN1]In ruling on a motion for a preliminary injunction, the Court must consider whether: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened injury to the defendant; and (4) granting of the preliminary injunction serves the public interest. *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). These factors must be balanced to determine whether they collectively favor the issuance of an injunction. *DSC Communications Corp. v. DGI Tech., Inc.,* 898 F. Supp. 1183, 1187 (N.D. Tex. 1995), *aff'd* 81 F.3d 597 (5th Cir. 1996). [9] If a party cannot prove all four elements, a court must deny the injunctive relief since "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

> 9  Additionally, [HN2]"at the hearing for the [preliminary] injunction, the applicant is not required to prove that he will prevail at trial but must establish the right to preserve the status quo pending trial on the merits" by proving all of the four elements. *Southwest Research v. Keraplast Technologies, Ltd.,* 103 S.W.3d 478, 481 (Tex.App.-San Antonio 2003)(citing *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218, 11 Tex. Sup. Ct. J. 194 (Tex. 1968)).

[*7] **a. Success on the Merits**

Except where noted, the Court finds that Plaintiffs have a substantial likelihood of success on the merits of their claims. Defendants, however, argue that injunctive relief must fail due to the alleged unenforceability of the non-competition agreement, among other reasons. They maintain all such agreements for licensed physicians must provide for access to medical records, contain a buy-out of the restrictive covenant, and provide for arbitration to determine the reasonableness of the buy-out, as required by state law. [10] As Dr. Bakotic's non-competition agreement is devoid of such provisions, Defendants argue there is no cause for injunctive relief. Plaintiffs attempt to rebut this argument by asserting that state law regarding restrictive covenants was never intended to apply to pathologists. [11] While such an issue presents a question of first impression, the Court finds it unnecessary to undertake this analysis.

> 10  Defs.' Resp. to TRO at p. 4 (citing Tex. Bus. & Com. Code Ann. § 15.50(b)(1)-(3)).

11 Pls.' Reply to TRO at p. 6-7.

[*8] **1. Confidential Information and Trade Secrets**

[HN3]Texas courts have long recognized that "even without an enforceable contractual restriction 'a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information or trade secrets acquired by or imparted to him in the course of his employment.'" *Rugen v. Interactive Bus. Sys.,* 864 S.W.2d 548, 551 (quoting *Johnston v. American Speedreading Academy, Inc,* 526 S.W.2d 163, 166 (Tex.Civ.App.-Dallas 1975, no writ)); *Collins v. Ryon's Saddle & Ranch Supplies, Inc.,* 576 S.W.2d 914, 915 (Tex.Civ.App. 1979, no writ); *Lason Servs. v. Rathe,* 2003 U.S. Dist. LEXIS 3947, 2003 WL 21728184 at *5 (N.D. Tex. March 14, 2003); *Zoecon Indus. v. The Am. Stockman Tag Co.,* 713 F.2d 1174, 1176 (5th Cir. 1983).

In *Guy Carpenter & Co., Inc. v. Provenzale,* 334 F.3d 459 (5th Cir. 2003), [HN4]the Fifth Circuit listed the requisites to prevail on a claim for misappropriation of trade secrets. To wit, Plaintiffs in this case "must show: (1) the existence of a trade secret; (2) a breach of a confidential relationship or improper [*9] discovery of the trade secret; and (3) use of the trade secret without authorization." *Id.* at 467 (citing *Phillips v. Frey,* 20 F.3d 623, 627 (5th Cir. 1994). While Defendants maintain the absence of any trade secrets or confidential information, the Court finds the evidence thus presented to indicate otherwise.

As stated in *Rugen,* [HN5]"[a] trade secret may consist of 'any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. It maybe...a list of customers.'" 864 S.W.2d at 552 (citing *Hyde Corp.,* 158 Tex. 566, 314 S.W.2d 763, 776, 1 Tex. Sup. Ct. J. 286 (Tex. 1958)). However, *Rugen* also states that "the word 'secret' implies that the information is not generally known or readily ascertainable by independent investigation." *Id.* Plaintiffs assert they have taken "appropriate steps to keep [their] confidential information out of the hands of [their] competitors" through non-disclosure agreements, secured building access and camera monitoring, computer username and password access with applicable policies and procedures, [*10] and confidentiality clauses and covenants not to compete. 12

12 Pls.' Application for Prelim. Inj. at p. 5.

Despite Plaintiffs' protective measures, Defendants maintain that Plaintiffs shared, exposed or gathered all alleged confidential information with or from public sources, and therefore have lost any shield of protection. The Court finds this to be a dubious proposition in light of all the facts, but nevertheless examines the larger group of confidential information under the three sub-categories of: (1) the diagnostic manual; (2) client lists and marketing stragegies; and (3) patient information.

**i. Diagnostic Manual**

Of all the confidential information, the most recognizable piece is Plaintiffs' Diagnostic Manual. Although Defendants purport that "the manual overwhelmingly consists of nothing more than material that was taken from textbooks and articles that are available to the public," this statement ignores the whole of the facts. 13 Clearly, the Diagnostic Manual consists of more than a [*11] conglomeration of public facts and common knowledge. Indeed, Plaintiffs present evidence that another employee of ProPath, Dr. Rodney Miller ("Dr. Miller"), supplemented the public information with professional and clinical observations that he collected over the course of his career. 14 Such a combination can hardly be classified as fodder for the masses. Nonetheless, Defendants respond that Plaintiffs further destroyed any possibility of confidentiality by disseminating the Diagnostic Manual to third parties and outside sources. Such an assertion, if taken on its face, would indeed destroy the protective bubble of confidentiality.

13 Joint Brief at p. 17.
14 Miller Aff. PP 2-3 (App. to Application for Prelim. Inj. at pp. 403-04).

However, in this case, all "outside" individuals who received a copy of the Diagnostic Manual also received instructions to keep such information confidential. 15 In essence, Plaintiffs did not lose any trade secret protection through limited disclosure *because* those disclosures [*12] came with a duty "not to disclose or use the secret." *Phillips v. Frey,* 20 F.3d 623, 630 (5th Cir. 1994). As the Fifth Circuit emphasized:

[HN6]While it is true that outside any confidential relationship, one who

voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure *made within the periphery of a confidential relationship* eliminates the need to take further precautions to secure the trade secret.

*Id.* at 630-31 (emphasis added) (internal citations omitted). As Plaintiffs disclosures fall within the gambit of "confidential periphery," the Diagnostic Manual qualifies as a trade secret that deserves protection.

> 15  Miller dep. at p. 21, l. 1 to p. 24, l. 25; p. 50, ll. 1-17; p. 51, l. 22 to p. 52, l. 15 (App. to Application for Prelim. Inj. at pp. 115, 120).

[\*13] **ii. Client Lists and Marketing Strategies**

[HN7]Similar to confidential information and trade secrets, Texas courts have long recognized that even absent a non-solicitation agreement, former employees cannot use confidential or proprietary information to contact the customers of their former employers. Such actions are considered to be improper. "In *Galtney v. Underwood Neuhaus & Co.,* 700 S.W.2d 602, 604 (Tex.App. 1985, no writ), the court upheld the issuance of a temporary injunction prohibiting a former employee from using her former employer's information to solicit or contact, directly or indirectly, all persons who placed orders with her former employer during the employee's term of employment." *Merril Lynch, Pierce, Fenner & Smith, Inc. v. Wright,* 1993 WL 13036199 at \*4 (N.D. Tex. July 2, 1993). Fifth Circuit precedent further verifies this holding of employer client list protection. *E.g., Zoecon,* 713 F.2d at 1176 (finding it unnecessary to address the validity of the non-competition agreement because the employee breached a confidential relationship by using the employer's customer list).

To be sure, Defendants do not [\*14] maintain directly that Plaintiffs' client list is not confidential information, but instead assert that an injunction regarding such information is unnecessary as "Plaintiffs have no evidence Dr. Bakotic took their client list with him, downloaded it, or ever printed it." [16] Again, such an assertion appears to take liberties with the facts, as even Dr. Bakotic cannot definitively state whether he may

have copies of such confidential lists. [17] What is known is that he accessed the client list shortly before tendering his resignation while he contemporaneously burned CDs and sent emails that may have contained Plaintiffs' confidential or proprietary information. [18] Additionally, Defendants cannot conclusively state if any of Plaintiffs' confidential or proprietary data resides on Dr. Bakotic's home computer. The uncertainty of these facts coupled with the value of the client list, leads the Court to resolve the conflicting evidence in favor of the Plaintiffs. *Cf. Gibson v. Canfield,* 2001 Tex. App. LEXIS 133, 2001 WL 21491, at \*1 (Tex.App. 2001) ("Because there was conflicting evidence on the issue of whether the customer list was confidential, we conclude the trial court did not abuse its [\*15] discretion in granting the temporary injunction.").

> 16  Defs.' Reply in Opp'n to Pls.' Application for Prelim. Inj. at p. 5.
> 17  Bakotic dep. at p. 185, 1.13 to p. 190, 1.22 (App. to Application for Prelim. Inj. at pp. 38-39).
> 18  *Id.* at p. 181, 1.11 to p. 205, l. 12; p. 39, l. 12 to p. 44, l. 10 (App. to Application for Prelim. Inj. at pp. 37-42; 11-12).

On the other hand, while Dr. Bakotic may not utilize Plaintiffs' confidential or proprietary information, the Court will not allow Plaintiffs to enforce the noncompetition agreement through a backdoor approach. To be sure, Plaintiffs must still address the mandate of *Rugen* that [HN8]"as a general rule, in the absence of an enforceable agreement not to compete, an employer is not entitled to an injunction preventing a former employee from soliciting the employer's clients." 864 S.W.2d at 551. As Plaintiffs present no alternative to the general decree, *Rugen* must be followed. Therefore, the combination of *Rugen* with *Galtney* [\*16] results in the following: that Dr. Bakotic must not use Plaintiffs' confidential or proprietary information to solicit Plaintiffs' clients. This amalgamation of holdings complies with all precedent and results in protection that is neither overbroad nor underinclusive.

In a similar fashion to the client list, Defendants assert that Plaintiffs' marketing strategies cannot be classified as a trade secret or confidential information because such information is available in the public domain. However, Plaintiffs present contrasting evidence proving such data is far from common knowledge. Specifically, Plaintiffs' marketing strategies include

"months for advertising placement and privately negotiated rates for [Plaintiffs'] advertising campaign, . . . information regarding [Plaintiffs'] marketing partners" and details on "where and when [Plaintiff] plans to market." [19] Therefore, in accordance with Texas law, such marketing strategies qualify as confidential information. *Cf. Gonzales v. Zamora, 791 S.W.2d 258, 264 (Tex.App.-Corpus Christi 1990)* [HN9]("When money and time are invested in the development of a procedure or device which is based on an idea which is not new [\*17] to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist.") (citing *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service,* 158 Tex. 594, 314 S.W.2d 782, 785, 1 Tex. Sup. Ct. J. 295 (Tex. 1958)).

> 19   2nd Crews Aff. P at 17 (Supplemental App. to Application for Prelim. Inj. at p. 416).

Conversely, the PowerPoint materials Dr. Bakotic uses in his presentations cannot be classified as confidential because they have been shared previously in public settings. Nevertheless, such a conclusion does not equate to unlimited use of such materials. Although Defendants orchestrate a formidable attack on the enforceability of the noncompetition agreement, such a strategy fails to destroy the whole of the employment agreement.

Specifically, while Plaintiffs rely heavily on their confidentiality argument, they also reference other portions of the employment agreement. Notably, Plaintiffs state that "in his Employment Agreement with ProPath, [Dr.] Bakotic agreed to the terms [\*18] that required him 'to abide by all the policies and procedures of the [ProPath] Group.'" [20] Furthermore, "the Handbook states that 'information obtained and documents produced during [Dr. Bakotic's] employment are the property of ProPath' and that 'it is against Company policy to remove Company information and/or documents, either physically or electronically transmitted without prior authorization.'" [21] Thus, Plaintiffs' reliance on the employment agreement as a whole illustrates the fact that ProPath may also protect its *proprietary* data, as well as its confidential information. Nonetheless, Defendants infer that Dr. Bakotic created portions of these materials prior to his ProPath employment. [22] As such, the PowerPoint materials as they existed before Dr. Bakotic's ProPath employment will not receive injunction

protection.

> 20   Pls.' Supplemental Resp. Briefing and Evidence in Support of Application for Prelim. Inj. ("Pls.'s Supplemental Resp.") at p. 3 (quoting Employment Agreement at p. 4 (App. to Application for Prelim. Inj. at 207)).
>
> 21   Pls.' Reply to TRO at p. 2 (quoting Handbook at p. 17 (Attach. to Pls.' Reply to TRO, Exhibit A)).

[\*19]

> 22   Defs.' Reply in Opp'n to Pls.' Application for Prelim. Inj. at p. 5.

Therefore, in accordance with these findings, the Court concludes that while the PowerPoint materials may not receive confidential protection, any portions of those materials that Dr. Bakotic produced during his ProPath tenure, or any modifications he made during that time, remain the property of ProPath, and will be protected by the preliminary injunction. In making this determination, the Court emphasizes that it places its focus on the whole of the employment agreement, rather than on the individual competition clause.

Additionally, Defendants assert that [HN10]publicly displayed newsletters do not deserve confidential status and protection. The Court agrees with this contention. However, once again, the question becomes one of proprietary information. The Handbook mandates that information obtained and produced during employment remain the property of ProPath. Defendants' arguments regarding confidentiality cannot defeat this contention. Therefore, the Court concludes that any newsletter material Dr. Bakotic produced during [\*20] his ProPath tenure, or any modifications he made during that time, remain the property of ProPath and will be protected by the preliminary injunction.

### iii. Patient Information

Lastly, Defendants claim that non-identifying patient information, including pictures of patients, patient slides and pathology reports, cannot be classified as confidential because that information has already been shared with the public. Indeed, to the extent such an assertion is true, Plaintiffs cannot now claim such information deserves confidential protection. *See, e.g., Southwest Research, 103 S.W.3d at 482* (finding that "a large body of [HN11]previously published information, including research papers and patents" was not confidential because

of its public nature). Plaintiffs, however, claim that federal regulations prohibit Dr. Bakotic from accessing and using any type of patient information whatsoever. While it is true that a "laboratory must retain stained slides at least ten years from the date of examination and retain specimen blocks at least two years from the date of examination," such a regulation does not automatically equate to confidential status. 42 C.F.R. § 493.1259(b). [\*21] Moreover, Plaintiffs references to other statutory and regulatory authority confuses the real issue of whether Defendants have or are using Plaintiffs' confidential information.

However, as was the case with the PowerPoint materials and the newsletters, patient information still receives protection through the Employment Agreement. That document specifically references patient records and notes: "All patient records are the property of [ProPath]. Upon termination of your employment, all patient records shall be retained by [ProPath]. [23] Although not defined in the Employment Agreement, the Court interprets the phrase "all patients" to mean *ProPath* patients, and not Dr. Bakotic's ancillary patients who failed to become ProPath clients. Therefore, in accordance with that definition, the Court finds that Defendants may not retain or utilize any ProPath patient information, including patients who subsequently became ProPath clients during Dr. Bakotic's ProPath employment.

> 23  It further states that "[ProPath] will honor the written request of any patient that a copy of such patient's records be forwarded to you."

[\*22] **b. Irreparable Injury**

[HN12]The second prong of the preliminary injunction test asks whether Plaintiffs will suffer any irreparable harm. When deciding this question, "it is not so much the magnitude of the harm claimed by Plaintiff but the irreparability that counts for purposes of a preliminary injunction." *Danden Petroleum, Inc. v Northern Natural Gas Co., 615 F. Supp. 1093, 1098-99 (N.D. Tex. 1985)* (internal citations omitted). The Fifth Circuit has found an injury to be irreparable if it cannot be undone through monetary relief. *Enter. Intl, Inc. v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472-73 (5th Cir. 1985).*

> The key word . . . is *irreparable,* and an injury is irreparable only if it cannot be undone through monetary remedies. Thus,

> the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[]s heavily against a claim of irreparable harm.

*Id.* (internal citations omitted). Hence, the Court's equitable powers will be invoked only upon a showing that monetary damages will be insufficient to remedy the injury the [\*23] movant is presently suffering.

Notably, the Fifth Circuit stated that [HN13]damages are incalculable when determining the exploitation of an employer's clientele. *Merrill Lynch, Pierce, Fenner & Smith, 658 F.2d 1098, 1102 n. 8 (5th Cir. 1981).* Furthermore, [HN14]"[i]n a situation where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable...." *Am. Express Fin. Advisors, Inc. v. Scott, 955 F. Supp. 688, 693 (N.D. Tex. 1996).* Finally, "it is not the number of trade secrets taken that determines whether the threat of irreparable harm exists. The fact that a single trade secret may be disclosed is enough," *FMC Corp. v. Varco Intl., Inc., 677 F.2d 500, 503 (5th Cir. 1982),* and "an injunction 'is usually the only way use of the [trade] secret by the former employee can be prevented.'" *Picker Int'l, Inc. v. Blanton, 756 F. Supp. 971, 983 (N.D. Tex. 1990)* (quoting *Williams v. Compressor Engineering Corp., 704 S.W.2d 469, 472 (Tex.App.-Houston [14th Dist.] 1986, writ refd n.r.e.)).* Therefore, in [\*24] light of the client lists, trade secrets and other highly confidential information, the Court finds Plaintiffs have met the burden of proving irreparable injury.

**c. Balancing of Injury**

In this case, the threatened harm to Plaintiffs outweighs the threatened harm to Defendants. Plaintiffs conceded to removing the restriction to let Dr. Bakotic access his email, and the Court has altered the preliminary injunction to prevent overbroad injuries to Defendants. While it is possible Defendants will still suffer some harm because of the injunction, Plaintiffs stand to suffer greater losses through exposed secrets, lost customers and other breaches of protected data. The balance therefore tips in favor of Plaintiffs.

**d. The Public Interest**

The Court finds no reason to believe that granting the

preliminary injunction will disserve the public interest. Consequently, the Court finds that all factors for issuing the preliminary injunction have been met and thereby GRANTS in PART and DENIES in PART Plaintiffs' Application for Preliminary Injunction.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Application for Preliminary Injunction is GRANTED in PART and [\*25] DENIED in PART.

Therefore, it is hereby ORDERED that AmeriPath and Dr. Bakotic are immediately restrained and enjoined from doing any of the following:

(1)

Disclosure or Misuse of Confidential Information. Defendants shall not, directly or indirectly, view, disseminate, transfer, forward, or use any of Plaintiffs' "Confidential Information." "Confidential Information" is defined as ProPath's "Diagnostic Manual" (detailed in Plaintiffs' Petition), as well as all other ProPath customer lists, price lists or information, customer information, vendor information, proprietary data, descriptions of proprietary processes, contracts, internal memoranda and documents, and all other ProPath or ProPath related documents, including email or other documents that Dr. Bakotic has transferred electronically or otherwise, to any location or computer outside of ProPath. "Confidential Information" does not include information that ProPath shares, or has shared, or uses, or has used, in public fora.

(2) Disclosure or Misuse of

Proprietary Information. Defendants shall not, directly or indirectly, view, disseminate, transfer, forward, or use any of Plaintiffs' "Proprietary Information. [\*26] " "Proprietary Information" includes ProPath client patient records, as well as presentations and newsletters Dr. Bakotic obtained, produced or modified during the context of his ProPath employment.

(3) Non-solicitation of Customers. Dr. Bakotic shall not use confidential or proprietary information of ProPath to, directly or indirectly, solicit the trade or patronage of any ProPath customer that Dr. Bakotic worked with during his employment at ProPath. The Court limits such customers to the clients of the podiatric and dermatopathologic divisions, and more specifically to the 976 clients for which Dr. Bakotic interpreted cases. [24]

(4) Defendants shall not delete, destroy, or alter any document, e-mail or computer drive containing any ProPath or ProPath related information, but shall segregate said items into a confidential file not to be used in their business.

24    *See* 2nd Crews Aff. at P 8 (Supplemental App. to Application for Prelim. Inj. at p. 416).

It is so ordered.

Signed this [\*27] 21st day of October 2004.

JORGE A. SOLIS

UNITED STATES DISTRICT JUDGE

LEXSEE



Analysis
As of: Aug 21, 2013

**OXFORD GLOBAL RESOURCES, INC., Plaintiff, v. MICHELLE
WEEKLEY-CESSNUN, et al., Defendants.**

**Civil Action No. 3:04-CV-0330-N**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS, DALLAS DIVISION**

**2005 U.S. Dist. LEXIS 1934**

**February 8, 2005, Decided
February 8, 2005, Filed**

**DISPOSITION:** Plaintiff's motion for preliminary injunction granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employer filed a motion for preliminary injunction, seeking to enjoin defendant former employees from engaging in activities that were alleged to violate their employment agreements with the former employer.

**OVERVIEW:** The former employer claimed that the employees had been blatantly violating their noncompetition, nonsolicitation, and nondisclosure covenants and that another defendant, their current employer, tortiously enticed them to do so. The employees argued that the covenants were unenforceable. The court found that the former employer was not entitled to an injunction prohibiting the former employees from using or disclosing contact information or other confidential information to the extent it was committed to memory. However, the court found that it was substantially likely that the employer could prevail on claims against the employees based on violations of the nondisclosure agreements' prohibitions against copying, removing, or disclosing the employer's confidential

documents. Next, the court found that the former employer was not substantially likely to prevail in enforcing the nonsolicitation clause in the separate agreement signed by three of the employees because that nonsolicitation covenant was not ancillary to or a part of the otherwise enforceable agreement at the time the agreement was made.

**OUTCOME:** The former employer was entitled to limited nondisclosure injunctions against the employee. The former employer was entitled to a nonsolicitation injunction against one employee only. The former employer was not entitled to noninducement injunctions against any of the employees.

**CORE TERMS:** covenant, injunction, former employees, nonsolicitation, nondisclosure, enforceable, customer, preliminary injunction, confidential information, confidential, noncompetition covenants, noninducement, proprietary, contractor, ancillary, prevail, unenforceable, disclosing, tangible, confidentiality, disclose, compete, candidate, noncompetition agreements, irreparable injury, trade secrets, customer lists, disclosure, wording, substantial likelihood

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements > Public Interest*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1]A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. The movant must establish that (1) it has a substantial likelihood of prevailing on the merits; (2) there is a substantial threat that it will suffer irreparable injury if the preliminary injunction is denied; (3) the potential injury to the movant outweighs the potential injury posed by the injunction to the party proposed to be enjoined; (4) granting the preliminary injunction will not disserve the public interest.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN2]Nondisclosure agreements are generally not considered to be restraints of trade under Texas law. Accordingly, they are not subject to the stringent requirements that Texas law places upon noncompetition agreements. The distinction, however, depends upon the exact requirements of the covenant. If a nondisclosure covenants has the practical effect of prohibiting the former employee from using, in competition with the former employer, the general knowledge, skill, and experience acquired in former employment, then it is more properly characterized as a noncompetition agreement.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN3]The network of acquaintances one comes to know through employment is an aspect of the general knowledge and experience acquired in former employment that one can utilize in competition with one's former employer. An agreement prohibiting a former

employee in this field from disclosing his acquaintances would therefore be a noncompetition agreement in disguise, and would be unenforceable as such.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Protected Information > Customer Lists*
[HN4]Texas courts consider customer lists to constitute trade secrets when (1) an employer has taken substantial steps to maintain confidentiality of the lists; (2) the departing employee contractually acknowledges the confidentiality of the lists; and (3) the content of the lists is not readily ascertainable.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN5]Provisions restricting solicitation of former employees and customers restrain trade and constitute covenants not to compete. Tex. Bus. & Com. Code Ann. § 15.50 governs the enforcability of covenants not to compete. As interpreted by the Texas Supreme Court, § 15.50 makes covenants not to compete enforceable when (1) there is an otherwise enforceable agreement between the parties; (2) the noncompetition covenant is ancillary to or a part of the otherwise enforceable agreement at the time the agreement is made; and (3) the noncompetition covenant contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. In addition, the following elements must be satisfied in order for a noncompetition covenant to be ancillary to or a part of the otherwise enforceable agreement: (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; (2) the noncompetition covenant must be designed to enforce the employee's consideration in the otherwise enforceable agreement.

*Contracts Law > Performance > Illusory Promises*
*Contracts Law > Types of Contracts > Bilateral Contracts*

*Labor & Employment Law > Employment Relationships > Employment at Will > General Overview*
[HN6]When illusory promises are all that support a purported bilateral contract, there is no contract.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Breach*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Formation*
[HN7]Under the United States Court of Appeals for the Fifth Circuit's interpretation of Texas law, a contemporaneous exchange of promises (to grant access to information and correspondingly not to disclose it) constitutes an otherwise enforceable agreement at the time the agreement is made.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
*Trade Secrets Law > Ownership Rights > Covenants Not to Compete*
[HN8]If an employer gives an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Rights of Partners > General Overview*
*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN9]The fundamental legitimate business interest that may be protected by nonsolicitation covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship of representing a firm to take the firm's customers with him.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
[HN10]In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > General Overview*
[HN11]Tex. Bus. & Com. Code Ann. § 15.51 expressly provides for injunctions as a remedy for the violation of noncompetition covenants.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN12]The requirements for being ancillary to or a part of an otherwise enforceable agreement are (1) that the consideration given by the employer in the otherwise enforceable agreement give rise to the employer's interest in restraining the employee from competing; and (2) that the noncompetition covenant be designed to enforce the employee's consideration in the otherwise enforceable agreement.

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN13]A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements.

**COUNSEL:** [*1] For Oxford Global Resources, Inc, Plaintiff: Daniel K Craddock, Stumpf Craddock Massey & Pullman -- Austin, Austin, TX.

For Michelle L. Weekley-Cessnun, Frederick J. Obert,

Management Alliance Group of Independent Consultants, J Michael Moore, Defendants: Jeffrey R Seckel, McGuire Craddock & Strother, Dallas, TX.

For Bryce Shields, Counter Claimant: Jeffrey R Seckel, McGuire Craddock & Strother, Dallas, TX.

**JUDGES:** David C. Godbey, United States District Judge.

**OPINION BY:** David C. Godbey

**OPINION**

MEMORANDUM OPINION, ORDER, AND INJUNCTION

Before the Court is Plaintiff Oxford Global Resources, Inc.'s ("Oxford Global") motion for preliminary injunction, filed on June 10, 2004. [1] Oxford Global asks the Court to enjoin four of its former employees from engaging in activities that are alleged to violate their employment agreements with Oxford. Because the former employees do not deny that they are violating these agreements, and because Oxford meets its burden to establish probable enforceability and other injunction requirements with respect to some but not all of the covenants at issue, the motion is granted in part and denied in part.

> 1    The Court will address Plaintiff's simultaneously filed Motion for Expedited Discovery in a separate order.

 [*2]  I. BACKGROUND

Plaintiff Oxford Global Resources, Inc. ("Oxford") provides technical staffing services. Oxford's employees maintain relationships with companies that regularly require the services of information technology professionals ("Clients") for discrete projects or time periods, and with computer service professionals ("Contractors") who offer services to such companies. Oxford claims that its goodwill, contact lists, and familiarity with the organizational structure of its Clients allow it to efficiently to match Clients with Contractors.

Toward this end, Oxford invests substantial resources in computer databases and written materials containing information about Clients and Contractors,

and in training its personnel to utilize this information. Oxford claims in addition to possess confidential methods for conducting practically every aspect of its business, and to invest substantial resources in training its personnel to implement these methods. Oxford requires its employees to accede to noncompetition, nonsolicitation, and nondisclosure covenants in connection with their employment agreements.

Defendants Michelle Weekley-Cessnun, Frederick J. Obert, Bryce Shields, [*3] and Jared Fannin (the "Former Employees") were formerly employed in Oxford's Euless, Texas office, but are currently employed by Defendant Management Alliance Group of Independent Consultants ("MAGIC") in Dallas, Texas. Oxford claims that the Former Employees have been blatantly violating their noncompetition, nonsolicitation, and nondisclosure covenants, and that MAGIC tortiously enticed them to do so. The Defendants do not deny that in their capacity as MAGIC employees, they are directly competing with Oxford for the business of Clients and Contractors they formerly serviced as Oxford employees. They do argue, however, that the covenants are unenforceable.

In the motion presently under consideration, Oxford seeks a preliminary injunction against each of the Former Employees. The relief sought varies among the four Former Employees in accordance with the wording in their respective contracts, [2] but the essence of the relief sought is the same for each of them. Oxford asks the Court to enjoin Weekley-Cessnun, Obert, Shields, and Fannin from:

> 1. Disclosing or utilizing Oxford's confidential and proprietary information.

> 2. For 12 months from the date of the injunction, [*4] calling on contractors whom they came to know through their employment at Oxford.

> 3. For 12 months from the date of the injunction, soliciting or providing services to any client company they came to know through their employment at Oxford.

> 4. For 12 months from the date of the injunction, persuading or inducing any current or recent Oxford employees to leave Oxford.

The Former Employees object to the imposition of these conditions.

2    Obert's nondisclosure, nonsolicitation, and noncompetition covenants are contained in his employment agreement (the "Incorporated Agreement"). Fannin and Shields' nondisclosure, nonsolicitation, and noncompetition covenants are contained in agreements entitled "Confidentiality, Non-Solicitation and Non-Competition Agreement" (the "Separate Agreement"). Oxford Originally employed Weekley-Cessnun under the terms of a contract identical to that of Obert. Upon promotion to a new position, however, she later entered into a "Confidentiality, Non-Solicitation and Non-Competition Agreement" with wording substantially identical to that of Fannin and Shields. For purposes of the present motion, the only difference between the wording of Fannin and Shields' agreements and that of Weekley-Cessnun is that Weekley-Cessnun's agreement includes additional consideration as discussed *infra*, note 8.

 [*5] II. PRELIMINARY INJUNCTION STANDARD

[HN1]A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris County v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999). The movant must establish that (1) it has a substantial likelihood of prevailing on the merits; (2) there is a substantial threat that it will suffer irreparable injury if the preliminary injunction is denied; (3) the potential injury to the movant outweighs the potential injury posed by the injunction to the party proposed to be enjoined; (4) granting the preliminary injunction will not disserve the public interest. *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003).

III. OXFORD IS ENTITLED TO A LIMITED INJUNCTION ENFORCING NONDISCLOSURE AGAINST EACH OF THE FORMER EMPLOYEES

Both the Incorporated Agreement signed by Obert and Weekley-Cussnun, and the Separate Agreement signed by Weekley-Cessnun, Fannin, and Shields, contain clauses prohibiting disclosure, use, copying, and removal of Oxford's trade secrets and confidential

information. [*6] [3] Oxford now seeks nondisclosure injunctions corresponding to these provisions. The Former Employees do not dispute Oxford's contention that they agreed to these conditions, and that proper consideration was called for and delivered in the form of disclosure of the confidential information.

3    Paragraph 4 of the Incorporated Agreement non-exclusively defines confidential information to include "candidate lists, candidate resumes, customer lists, customer job orders and related information, employee lists, personnel records, proposals, marketing strategies, policies and procedures, training and operating materials, business and operating methods, and financial information." The Separate Agreement contains comparable wording.

[HN2]Nondisclosure agreements are generally not considered to be restraints of trade under Texas law. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459 at 463. Accordingly, they are not subject to the stringent requirements that Texas law places upon noncompetition agreements. The distinction, however, [*7] depends upon the exact requirements of the covenant. If a nondisclosure covenants has the practical effect of "prohibit[ing] the former employee from using, *in competition with the former employer*, the *general* knowledge, skill, and experience acquired in former employment," then it is more properly characterized as a noncompetition agreement. *ZEP Manufacturing Co. v. Harthcock, 824 S.W.2d 654, 663 (Tex. App.- Houston [1st Dist.] 1988, no writ)* (emphasis in original).

As an initial matter, the Court concludes that on the basis of the nondisclosure covenants, Oxford is not entitled to an injunction prohibiting the Former Employees from using or disclosing contact information or other confidential information to the extent it is committed to memory. [4] In the employment context presently under consideration, the Court considers [HN3]the network of acquaintances one comes to know through employment to be an aspect of the "general knowledge . . . and experience acquired in former employment" that one could utilize in competition with one's former employer. An agreement prohibiting a former employee in this field from disclosing his acquaintances would therefore [*8] be a noncompetition agreement in disguise, and would be unenforceable as such. [5] Some of the other categories of confidential

information -- for example, financial information -- might present different problems, but the present motion does not accuse the Former Employees of disclosing anything other than information held to Clients and Contractors. Accordingly, Oxford is not entitled to an injunction with respect to disclosure of information committed to memory.

 4  Oxford's motion is not clear as to whether they construe the nondisclosure clauses in this manner. Similarly, the facts asserted by Oxford are inconsistent as to the importance of tangible customer lists in conducting Oxford's day-to-day business. The declaration of Lina Gallotto indicates that "it is not uncommon for Recruiters to know by memory the names and significant details of most, if not all, of the Oxford's [sic] Contractors with whom they are working, which can be in the hundreds." The declaration of Eddie Windebank, however, insinuates that Defendant Weekley-Cessnun took a written list of Contractors and their significant personal data with her when she left Oxford, and asserts that Defendant Fannin tried to do the same.

[*9]

 5  Such a noncompetition covenant would not be ancillary to or a part of an otherwise unenforceable agreement. *Cf.* Part IV.B., *infra*.

The situation is different with respect to tangible documents or computer files produced by Oxford or created through or copied from its databases or other materials. Such tangible or virtual documents do not constitute general knowledge and experience. To the contrary, the fact that a Former Employee took the steps necessary to remove such a file or document from Oxford's premises would support Oxford's characterization of its confidential information, including Client and Customer lists, as proprietary and difficult to duplicate. 6 As such, the nondisclosure clauses as applied to such documents would not constitute noncompetition covenants, and would not be subject to the stringent requirements placed on such covenants.

 6  This in turn supports Oxford's additional contention that these lists constitute trade secrets. [HN4]Texas courts consider customer lists to constitute trade secrets when (1) an employer has taken substantial steps to maintain confidentiality of the lists; (2) the departing employee

contractually acknowledges the confidentiality of the lists; and (3) the content of the lists is not readily ascertainable. *Provenzale*, 334 F.3d at 468. The former two requirements are clearly met in this case, and the willingness of departing employees to risk confrontation and litigation by removing customer list documents from Oxford's premises would suggest that the information on those lists was not readily ascertainable by other means.

 [*10]  Under normal principles of the law of contracts, the Court considers it substantially likely that Oxford could prevail on claims against the Former Employees, based on violations of the nondisclosure agreements' prohibitions against copying, removing, or disclosing Oxford's confidential documents. Such documents clearly fall under the relevant contractual definitions of confidential information, and each of the agreements is structured so that access to such confidential information serves as consideration for confidentiality. Moreover, the Former Employees' response to the present motion does not dispute Oxford's contention that several of them removed or attempted to remove paper or computer documents containing Oxford's confidential information. Instead, it takes the position that the nondisclosure covenants are unenforceable.

The other prerequisites for a preliminary injunction are also met. There is a substantial likelihood that Oxford would suffer irreparable injury through the Former Employees' disclosure or continued utilization of any confidential documents under their control, because loss of confidential information is a harm that is difficult to verify and to quantify. [*11] *See American Express Financial Advisors v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996). Additionally, The balance of potential harms favors injunction. If the Former Employees do not have Oxford's documents under their control, then they will not be harmed by the injunction. Conversely, if the Former Employees do have such documents, and if they -- contrary to the Court's expectation -- ultimately prevail in establishing that they are within their rights to use and disclose them, nothing in the parties' factual representations suggests that they will be more than minimally harmed by the loss of their use for the duration of this case. It appears likely that Oxford, on the other hand, would be harmed on an ongoing basis by illegitimate use of such documents through gradual

integration of their data into MAGIC's information systems and through potential loss of customers who might otherwise not have been solicited by the Former Employees. Finally, the Former Employees have presented no arguments as to why such an injunction would disserve the public interest, and the Court is aware of none.

IV. OXFORD IS ENTITLED TO AN INJUNCTION ENFORCING THE NONSOLICITATION COVENANTS [*12] AGAINST OBERT, BUT NOT TO ANY OTHER RELIEF UNDER THE NONSOLICITATION AND NONINDUCEMENT CLAUSES

[HN5]Provisions restricting solicitation of former employees and customers restrain trade and constitute covenants not to compete. *See Miller Paper v. Roberts Paper Co., 901 S.W.2d 593, 599)(Tex. App. -- Amarillo 1995, no writ). TEX. BUS. & COM. CODE § 15.50* governs the enforceability of such covenants. [7] As interpreted by the Texas Supreme Court in *Light v. Centel Cellular Co. of Texas, 883 S.W.2d 642, 647, 37 Tex. Sup. Ct. J. 838 (Tex. 1994), section 15.50* makes covenants not to compete enforceable when (1) there is an otherwise enforceable agreement between the parties; (2) the noncompetition covenant is ancillary to or a part of the otherwise enforceable agreement at the time the agreement is made; and (3) the noncompetition covenant contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. *See Light, 883 S.W.2d at 644*. In addition, the following elements must be satisfied in order for [*13] a noncompetion covenant to be "ancillary to or a part of the otherwise enforceable agreement: "(1) The consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; (2) The noncompetition covenant must be designed to enforce the employee's consideration in the otherwise enforceable agreement. *Id.* at 647.

> 7    The parties' dispute over choice of law is controlled by *DeSantis v. Wackenhut, 793 S.W.2d 670, 33 Tex. Sup. Ct. J. 517 (Tex. 1990)*, where the Texas Supreme Court held that a Texas resident's ability to conduct business within the State of Texas is a matter of such overriding

importance as to subject a noncompetition agreement to Texas law despite the choice of law provision to the contrary. Oxford makes no attempt to distinguish *DeSantis*.

*A. Oxford is Not Entitled to an Injunction Based on the Nonsolitation Clauses in the Separate Agreement*

Oxford is not substantially likely to prevail in enforcing [*14] the nonsolicitation clause in the Separate Agreement signed by Weekley-Cessnun, Fannin, and Shields, because that nonsolicitation covenant was not ancillary to or a part of the otherwise enforceable agreement at the time the agreement was made. The preliminary inquiry under *Light* is whether there exists some otherwise enforceable agreement between the parties. Here, as the Court has already determined, Oxford is substantially likely to prevail in establishing that it has enforceable nondisclosure agreements with each of the Former Employees. However, due to differences in wording between the nondisclosure agreements in the Separate Agreement and the Incorporated Agreement, the former cannot support a covenant to compete.

[HN6]"When illusory promises are all that support a purported bilateral contract, there is no contract." *Light, 883 S.W.2d at 645*. The Separate Agreement contains only illusory promises from Oxford. It obligates the employee signatory not to compete with Oxford, and indicates that the consideration for these obligation consists of (1) continued at will employment and (2) "[the] Company's disclosure of such Confidential information to Employee as [*15] is necessary for the performance of Employee's duties." [8] Each of Oxford's promises is illusory because each "fails to bind the promisor who always retains the option of discontinuing employment in lieu of performance." *Id.* The Separate agreement can therefore form the basis for a valid nondisclosure agreement as a unilateral contract only -- as an offer by the employee to keep confidential such information as the employer elects to disclose. *See id.* at *645 n.6.* Such a contract does not bind each of the parties at the time they enter into the noncompetition agreement, and therefore cannot constitute the "otherwise enforceable agreement at the time the agreement is made" that is necessary to support a covenant not to compete. *Id.* *See also Tom James of Dallas, Inc. v. Cobb, 109 S.W.3d 877 (Tex. App. -- Dallas 2003, no pet.)* ("If the underlying promise is illusory *at the time* the covenant is

agreed to, the covenant is unenforceable even if the underlying promise later becomes enforceable as a unilateral contract.") (emphasis in original). Accordingly, Oxford is unlikely to prevail in enforcing nonsolicitation covenants contained in these [\*16] agreements, and is not entitled to an injunction to that effect.

8    The Separate Agreement signed by Weekley-Cessnun additionally indicates that a grant of stock options constitutes consideration for her noncompetition covenants. An agreement based on such consideration is not ancillary to noncompetition covenants, because stock options do not give rise to an employer's interest in restraining competition or solicitation.

*B. Oxford is Entitled to an Injunction against Obert only, Based on the Nonsolicitation Clauses in the Incorporated Agreement*

In contrast to its conclusion with respect to the Separate Agreement, the Court concludes that the nonsolicitation clauses in the Incorporated Agreement are, upon ultimate determination, substantially likely to be held enforceable. In addition, the Court concludes that the prerequisites are met for a preliminary injunction, against Obert only, on the basis of this agreement.

As a preliminary matter, the Court cannot conclude that Oxford is substantially likely to [\*17] prevail in establishing that the Incorporated Agreement applies to Weekley-Cessnun, who signed such an agreement in 1998. Paragraph 6 prohibits solicitation for 12 months "following the termination of [Weekley-Cessnun's] employment *under this Agreement*" (emphasis added). In 2001, in connection with a promotion, Weekley-Cessnun entered into the second agreement, whose nonsolicitation covenants this Court has already determined are not likely to be enforceable. That agreement, according to paragraph 5.2, "constitutes the entire understanding and agreement of Employee and [Oxford] with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements. . . ." It appears from these provisions that the nonsolicitation covenants of the Incorporated Agreement do not presently bind Weekley-Cessnun, and Oxford has offered no alternative interpretation of the agreements. Accordingly, the Incorporated Agreement does not provide a basis for a preliminary injunction against Weekley-Cessnun. [9]

9    Notwithstanding this analysis, the Court rejects

the Former Employees' general contention that their noncompetition and nondisclosure agreements are unenforceable because some of them eventually assumed positions with titles other than those indicated on the agreements. The Former Employees direct the Court to no passage of either agreement that would make the relevant covenants inapplicable in the event of a promotion or redesignation of job title.

[\*18]    As applied to Obert, however, the Incorporated Agreement's nondisclosure provisions create an otherwise enforceable agreement between the parties. The agreement provides that "Oxford has provided and will continue to provide [Obert] with access to certain proprietary, trade secret and other confidential information . . .," and imposes nondisclosure obligations on the employee "in consideration of Oxford's having provided and continuing to provide employee with Confidential company information." Disregarding the reference to past consideration, this language creates a bilateral contract. In contrast to the Separate Agreement, Oxford would breach this agreement were it to fire the contracted employee without ever having given him access to confidential information. Moreover, [HN7]under the Fifth Circuit's interpretation of Texas law, this contemporaneous exchange of promises (to grant access to information and correspondingly not to disclose it) constitutes an otherwise enforceable agreement "at the time the agreement is made." *See Olander v. Compass Bank*, 363 F.3d 560, 566 n.15 (5th Cir. 2004); *Provenzale*, 334 F.3d at 466.

The nonsolicitation covenants [\*19] also satisfy *Light's* conditions for being "ancillary to or a part of" the otherwise enforceable nondisclosure agreement. Indeed, the relationship between these covenants exactly tracks the example in *Light*: [HN8]"If an employer gives an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement." 883 S.W.2d at 647 n.14. The consideration given by the employer in the enforceable nondisclosure agreement gives rise to the employer's interest in restraining the employee from competing in a manner that would encourage him to utilize or disclose Oxford's confidential information. *Cf. id.* Likewise, the nonsolicitation covenant is designed to enforce the employee's consideration -- nondisclosure -- in that it

seeks to prevent a situation where the employee might be tempted to breach the nondisclosure covenant, and where enforcement of that covenant would be difficult. *Cf. id.*

Although it is a closer issue, the Court additionally concludes that Oxford is substantially likely to establish [\*20] that the time, geographical area, and scope of activity restrained by this nondisclosure covenant is reasonable and imposes restraints no greater than is necessary to protect the goodwill or other business interest of the promisee. The Texas Supreme Court has explained that [HN9]"the fundamental legitimate business interest that may be protected by [nonsolicitation] covenants is in preventing employees or departing partners from using the business contacts and rapport established during the relationship of representing the accounting firm to take the firm's customers with him." *Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381, 34 Tex. Sup. Ct. J. 784 (Tex. 1991).* The limitations in the Incorporated Agreement appear reasonably calculated to protect a comparable interest. The one year time period is the same as that approved for nonsolicitation clauses in *American Express Financial Advisors v. Scott, 955 F. Supp. 688, (N.D. Tex. 1996)* and in numerous additional cases cited by Oxford. Also as in *Scott,* the nonsolicitation covenants contain no geographic limitations. They concern themselves only with particular customers, and the Former Employees do not contest Oxford's representation [\*21] that numerous alternative customers exist. With regard to scope, the Court's only concern stems from the fact that Oxford's customers are also Oxford's product -- Oxford "sells" Clients to Contractors and vice versa. The economic issues presented by nonsolicitation covenants in this industry may therefore be distinguishable from those presented in cases such as *Peat Marwick.* The submissions thus far suggest, however, that if there is any difference, it is that the economic necessity of using limited nonsolicitation covenants to protect and encourage investment and innovation is even greater in such an industry. Accordingly, the Court concludes that there is a substantial likelihood that Oxford can establish the reasonableness and appropriateness of the nonsolicitation covenants, and that it can thereby prevail on the merits of its nonsolicitation claim based on the Incorporated Agreement.

The other prerequisites for preliminary injunction are also met. There is a substantial likelihood that Oxford would suffer irreparable injury through the Former Employees' violation of valid nonsolicitation clauses. *See Scott, 955 F. Supp. at 693* [HN10]("In Texas, injury resulting [\*22] from the breach of non-compete covenants is the epitome of irreparable injury"); [HN11]TEX. BUS. & COM. CODE § 15.51 (expressly providing for injunctions as a remedy for the violation of noncompetition covenants). With respect to balance of potential harms, if Obert continues to violate valid nonsolicitation covenants, he will injure Oxford on an ongoing basis in ways that are difficult to verify, quantify, and rectify. Conversely, if Obert is incorrectly enjoined from soliciting his prior customers, he will still have the opportunity to expand his customer portfolio by soliciting business from a broad range of alternative customers. In such circumstances, the balance of harms favors protection of the employer. *Scott, 955 F. Supp. at 693; Ruscitto v. Merrill Lynch, Pierce, Fenner & Smith, 777 F. Supp. 1349, 1354 (N.D. Tex. 1991).* Finally, the public interest is not disserved by the imposition of an injunction in circumstances such as this. *See 955 F. Supp. at 693-94; 777 F. Supp. at 1354.*

Oxford is therefore entitled to a preliminary injunction against Obert, in accordance with the terms of the nonsolicitation covenant in [\*23] the Incorporated Agreement. Although the covenant by its own terms only runs 12 months from Obert's January 30, 2004 departure from Oxford, the injunction shall run for 12 months from the date of this Order, or until the final disposition of this case if earlier. This is in accordance with paragraph 6 of the Incorporated Agreement, which tolls the 12 month nonsolicitation period for any period when Obert is in violation of a noncompetition covenant, and with the Court's equitable power to extend a contractual expiration date to compensate for its own delay in addressing a motion for preliminary injunction. *See Provenzale, 334 F.3d at 464.*

### C. Oxford is Not Entitled to a Noninducement Injunction Based on Either Agreement

Both the Incorporated Agreement and the Separate Agreement contain covenants prohibiting the Former Employees from inducing other Oxford Employees to leave their employment. The noninducement clause in the Separate Agreement is likely to be unenforceable for the reason already discussed: the otherwise enforceable nondisclosure agreement on which it rests is a unilateral contract that does not constitute an "otherwise enforceable agreement at the [\*24] time the agreement is

made." *See* Part IV.A., *supra*. Oxford is therefore not entitled to a noninducement injunction against Fannin, Shields, or Weekley-Cessnun. [10] The remaining question is whether Oxford is entitled to an injunction against Obert. Paragraph 6 of his contract -- the Incorporated Agreement -- provides that "during the period of employment and up until one year after the termination of employment, [the employee] will not induce or attempt to induce any other employee of Oxford to leave Oxford's employ for the purpose of entering employment with a competing business."

> 10 Only the Separate Agreement applies to Weekley-Cessnun. *See* Part IV.B., *supra*.

Oxford has not shown that it is substantially likely to prevail on the merits on the basis of this provision. As an initial matter, the noninducement agreement does not satisfy *Light's* [HN12]requirement for being ancillary to or a part of an otherwise enforceable agreement. Those requirements are (1) that the consideration given by the [\*25] employer in the otherwise enforceable agreement give rise to the employer's interest in restraining the employee from competing; and (2) that the noncompetition covenant be designed to enforce the employee's consideration in the otherwise enforceable agreement. *Id.* at 647. Oxford does not explain how its delivery of confidential information to Obert gives rise to an interest in preventing him from inducing other Oxford employees to leave. Oxford likewise does not explain how a prohibition on raiding Oxford's other employees "enforces" Obert's obligation not to disclose information already in his possession. While a company could conceivably view noninducement contracts as reciprocally reinforcing the nondisclosure covenants of similarly situated employees governed by identical contracts, the noninducement covenant at issue is not tailored to that purpose, and Oxford does not explain how the agreement as written can satisfy the requirements of *Light*.

Additionally, Oxford present no arguments or authority concerning the reasonableness and necessity of imposing these obligations on top of the other noncompetition covenants, and likewise none concerning likelihood of irreparable [\*26] injury, balance of harms, and disservice of public interest as they specifically relate to the noninducement covenant. Because of the relatively attenuated connection between the act of inducement and the legitimate interests Oxford seeks to protect, its

arguments with respect to nondisclosure and nonsolicitation are insufficient to meet Oxford's burden of demonstrating that it is entitled to preliminary relief with respect to noninducement. *See Provenzale*, 334 F.3d 459 [HN13]("A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements."). Accordingly, Oxford is not entitled to a preliminary injunction with respect to inducement.

## V. CONCLUSION AND INJUNCTION

Oxford is entitled to limited nondisclosure injunctions against Obert, Weekley-Cessnun, Fannin, and Shields. Oxford is entitled to a nonsolicitation injunction against Obert only. Oxford is not entitled to noninducement injunctions against any of the Defendants. Accordingly, the Court hereby ORDERS and ENJOINS as follows, conditioned upon delivery of $ 5,000 security in conformity with Federal Rule of Civil Procedure 65(c).

 [\*27] *A.*

In accordance with the applicable provisions of the Confidentiality, Non-Solicitation and Non-Competition Agreement, referenced in the present Order as the "Separate Agreement," Weekley-Cessnun, Fannin, and Shields shall refrain from possessing or using any tangible or electronic documents containing confidential or proprietary information of Oxford, or which were copied or derived from tangible or electronic documents containing confidential or proprietary information of Oxford, and shall refrain from furnishing, disclosing, divulging, or making accessible the contents of such documents to any party outside of Oxford. For purposes of this paragraph, confidential or proprietary information of Oxford shall be defined as specified in paragraph 1.3 of the Separate Agreement, and shall accordingly extend without limitation to Oxford's employee lists, to candidate and contractor lists as well as resumes and related information, and to information on Oxford's customers and prospective customers, including their identity, special needs, job orders, preferences, transaction histories, contacts, characteristics, agreements and prices. In the event that Oxford, [\*28] Weekley-Cessnun, Fannin, or Shields possesses documents covered by this injunction, they shall not destroy such documents but shall turn them over to counsel for Oxford, to be made available to opposing counsel as required in the ordinary course of discovery.

*B.*

In accordance with the applicable provisions of his "Employment Agreement," referenced in the present Order as the "Incorporated Agreement," Obert shall refrain from using, copying, removing, or disclosing the contents of any tangible or electronic documents containing confidential or proprietary information of Oxford, or which were copied or derived from tangible or electronic documents containing confidential or proprietary information of Oxford. For purposes of this paragraph, confidential or proprietary information of Oxford shall be defined as specified in paragraph 4.a. of the Incorporated Agreement, and shall accordingly extend without limitation to Oxford's candidates lists, candidate resumes, customer lists, employee lists, and customer job orders and related information. In the event that Oxford or Obert possesses documents covered by this injunction, they shall not destroy such [*29] documents but shall turn them over to counsel for Oxford, to be made available to opposing counsel as required in the ordinary course of discovery.

*C.*

In accordance with paragraph 6 of the Incorporated Agreement, Obert shall refrain, for a period of twelve (12) months from the date of this Order and Injunction, from calling on any temporary employee candidate or corporate customer with whom Obert directly or indirectly worked or in any way communicated during the 12 month period prior to cessation of his employment at Oxford.

SIGNED this 8 day of February, 2005.

David C. Godbey

United States District Judge