IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAILY INSTRUMENTS CORPORATION     §
d/b/a DAILY THERMETRICS,          §
                                  §
      Plaintiff,                  §
                                  §
v.                                §      CIVIL ACTION NO. H-13-2189
                                  §
ERIC HEIDT, WIKA INSTRUMENT,      §
LP, WIKA PROCESS SOLUTIONS, LP,   §
and GAYESCO INTERNATIONAL, LP,    §
                                  §
      Defendants.                 §

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
## ON HEARING FOR PRELIMINARY INJUNCTION

        Pending is Plaintiff's Motion for Preliminary and Permanent
Injunction (Document No. 18), to which Defendants have filed their
responses in opposition.  On January 28, 2014, the Court conducted
an evidentiary hearing at which the parties by and through their
counsel presented witnesses, additional witnesses by deposition,
and offered exhibits that were received in evidence.  After having
considered the motion, responses, reply, the evidence received at
the hearing, the arguments of counsel, the parties' supplemental
briefing, and the applicable law, the Court makes the following
findings of fact and conclusions of law.

**<u>Findings of Fact</u>**

**From a preponderance of the evidence received at the evidentiary hearing, the Court finds, for purposes of the pending motion only, as follows:**

<u>The Business of Daily Instruments
and its Employee Eric Heidt</u>

1.   Plaintiff Daily Instruments Corporation d/b/a Daily Thermetrics ("Daily") is a privately-owned company headquartered in Houston, Texas, which designs, manufactures, and sells electrical temperature measurement ("ETM") products and provides related services.  Daily has approximately 100 employees and specializes in the narrow field of reactor thermometry, which involves ETM devices used in reactors for the refining, chemical, and petrochemical industries.  Reactor thermometry makes up approximately 50 percent of Daily's business.  Daily's primary reactor thermometry product is the CatTracker device.

2.   At the beginning of 2008, Daily hired Eric Heidt ("Heidt"), a recent college graduate and resident of Nashville, Tennessee, for Daily's sales department.  Heidt had no prior sales experience in this field, and Daily taught him the business and trained him in the specialized area of selling ETM products.

3.   Heidt performed well and, in 2010, Daily promoted him to the position of Regional Sales Manager and conferred upon him broad

responsibilities for sales territories that included all of Europe, Russia, and parts of the United States and Canada.  Heidt also was given responsibility for relationships with licensors in the United States who licensed Daily's products in other parts of the world.

4.    Heidt's promotion elevated him into a small group of key employees to whom Daily provided access to confidential trade secrets, sensitive pricing information, and updates thereto, and gave authority to communicate and meet with customers and prospective customers at Daily's expense as part of developing goodwill and sales for Daily.  Heidt's promotion enabled him also to participate in additional specialized training related to Daily's business.

5.    In consideration for his promotion by Daily and the concomitant benefits of receiving confidential information as a key employee, Heidt on November 10, 2010, executed a Confidentiality, Non-Solicitation and Non-Competition Agreement (the "Non-Competition Agreement") and a separate Confidentiality Agreement (the "Confidentiality Agreement") with Daily.

6.    The Non-Competition Agreement contains a non-competition clause, which provides:

> Employee agrees that during Employee's employment with the Company and for a period of twenty-four (24) months after Employee's termination of employment, Employee will not, directly or indirectly, for Employee or other, in the Territory:

(a)   perform for, render service to, or otherwise assist any Competitor in any position, job, task, function, skill, or responsibility that Employee has provided for, or on behalf of, the Company in the twenty-four (24) month period preceding the termination of Employee's employment; or

(b)   accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects that the Company's Confidential Information to which Employee had access during his employment with the Company, or in the preceding twenty-four (24) month period, would likely assist the competitor.

A "Competitor" is defined by the Non-Competition Agreement to mean "any company that engineers, designs, manufactures, installs, repairs, or services reactor thermometry products for use in the refining, petrochemical and chemical industries."   "Territory" is defined by the Non-Competition Agreement to include the United States and any country in which Daily does business.

7.   The Non-Competition Agreement provides that "Employee acknowledges that these restrictions are necessary to protect that Confidential Information the Company has provided to Employee, as well as the Company's goodwill."   The Non-Competition Agreement further provides:

Employee agrees that this provision defining the scope of activities constituting competition with the Company is narrow and reasonable for the following reasons: (i) Employee is free to seek employment with other companies providing services that do not directly or indirectly compete with any business of the Company; and (ii) there are many other companies that do not directly or indirectly compete with any business of the Company which could utilize Employee's general knowledge, skill

4

and experience.  Employee further acknowledges that
employees of Daily are highly skilled, and that
employment opportunities exist with companies that are
not Competitors.

8.   The Non-Competition Agreement also prohibits Heidt during
the 24 months following termination of his employment with Daily
from directly or indirectly soliciting Daily employees to work for
a competitor, and from directly or indirectly soliciting or
accepting competing business from customers with whom he had made
contact or regarding whom he had accessed confidential information
in the previous 24 months.

9.   The Non-Competition Agreement provides that if Heidt
"ever decides later to contend that any restriction on activities
imposed by this Agreement is no longer enforceable as written or
does not apply to an activity in which Employee intends to engage
on behalf of a competing business," Heidt will first notify Daily
in writing and meet with a Daily representative at least fourteen
days before "engaging in any activity that foreseeably could fall
within the questioned restriction."

10.  Both the Non-Competition Agreement and the Confiden-
tiality Agreement provide that Heidt "will not, at any time during
or after [his] employment with the Company, make any unauthorized
disclosure or any Confidential Information of the Company . . . or
make any use thereof, except in carrying out [his] employment
responsibilities to the Company."  "Confidential Information" is

5

defined as "any formula, pattern, device or compilation of information which is used in the Company's or an affiliate's business, and which gives it an opportunity to obtain an advantage over competitors who do not know it or use it." This includes information about Daily's customers and employees, marketing and sales strategies, product details, and pricing information.

11. In the reactor thermometry field, projects frequently take years to move from initial bidding to selection of a bid and execution of the project. Although a company's bids, as the evidence shows is at least sometimes the case with Daily, may remain firm for only 90 days if not extended or modified, knowledge of Daily's confidential bids for and its approach to bidding particular projects may be of significant value well beyond a 90-day period when the competition is bidding against Daily.

12. The Confidentiality Agreement requires Heidt upon termination of his employment with Daily to return to Daily within five days all confidential information in his possession.

13. In reliance on the promises Heidt made in the Non-Competition Agreement and the Confidentiality Agreement, Daily provided Heidt access to its confidential information, provided him with access to Daily's customers, suppliers, contractors, employees, and licensors, and paid him to develop, cultivate, and maintain favorable relationships with them in Daily's behalf. Heidt was therefore given access to confidential information

6

regarding Daily's customers and potential customers located both in
the United States and in many foreign countries, and Heidt had
significant interactions with those customers and potential
customers.

14.   In addition, Daily provided Heidt with access to Daily's
marketing strategies, including Daily's specific market research
concerning its products and industry, and knowledge of the
selection process for attending trade shows and other speaking
engagements, including the target audience, and the specific
messaging strategies Daily uses when addressing different potential
customers (such as how to tailor the information provided about
Daily's products depending on the position of the specific
individual receiving the information).

15.   Daily also gave to Heidt access to Daily's confidential
future plans within Daily's narrow market segment, including hiring
strategies and methods, growth strategies, discussions with
potential buyers and joint venturers, and future plans for adding
manufacturing facilities.

16.   During Heidt's more than five years as a Daily employee
and particularly during his years as a key employee in the
Company's inner circle who was privy to highly confidential
information, Heidt formed favorable relationships with Daily's
customers throughout the world and became familiar with Daily's

worldwide customer base, including customers throughout the United States, Europe, Asia, and the Middle East.

17.  Daily rewarded Heidt with sales credit for 10% of the total dollar value for projects sold worldwide by licensors for whom he was responsible.  Thus, in 2012, Heidt received sales credits for projects in Singapore, India, Australia, Korea, China, and Thailand, as well as other countries such as Columbia and Brazil, all outside of his geographical sales territories.

18.  Daily also designated Heidt to represent Daily at various conferences around the world, including a three-day conference in Indonesia in September, 2012, where Heidt met with licensors and end users.

## WIKA Process and Gayesco Target and Solicit Heidt

19.  The primary competing device to Daily's CatTracker is the Flex-R produced by Defendant Gayesco International, LP ("Gayesco").[1]  In late 2012, Gayesco was acquired by the WIKA family of companies (the "WIKA Group"), which is comprised of over 80 sister companies, including WIKA Instrumentation, PTE, LTD ("WIKA Singapore") and Defendant WIKA Process Solutions, LP ("WIKA Process").[2]  The WIKA Group along with Gayesco now market Gayesco's

---

[1] Gayesco is a Georgia limited partnership.

[2] WIKA Process is a Georgia limited partnership.  The WIKA Group also includes WIKA Instruments, LP ("WILP"), which was originally a defendant in this case but by agreement of all parties

Flex-R device around the world through its member companies, including WIKA Process and WIKA Singapore.

20.   The field of reactor thermometry consists of only six major competitors, including Daily, Gayesco, and two other entities that are part of the WIKA Group.   Daily and Gayesco have the largest market shares among these competitors, and most major licensors for reactor thermometry products list only Daily and Gayesco as pre-qualified authorized vendors.   Aside from Daily's three direct competitors in the WIKA Group, approximately 60 of the other 80 companies within the WIKA Group compete against Daily by marketing and selling ETM products produced by Daily's direct competitors.

21.   In late 2012, after the acquisition of Gayesco by the WIKA Group, the WIKA Group's executives in Germany directed WIKA Process President Paul Lemmens ("Lemmens") to triple WIKA Process's sales in 2013.   Lemmens sought immediately to increase his sales force with sales persons well acquainted in the industry in order to comply with the corporate directive.

22.   Lemmens turned to Gayesco Vice President of Sales Bob Poteet ("Poteet"), who had been a sales executive at Daily until he was hired away by Gayesco.   They came up with the names of three key Daily sales managers, Heidt, Daily Vice President of Sales

---

was dismissed from the suit.   Document No. 52.

Walter Tijmes ("Tijmes"), and Kevin Kirksmith ("Kirksmith") who, like Heidt, was also a regional sales manager for Daily.

23.   Lemmens directed WIKA Process executive assistant Lori Ann Gerken ("Gerken") to reach out to Heidt at his personal email address, to invite him to discuss an employment opportunity as an account manager, which she did on December 20, 2012.  During late 2012, WIKA Process's Gerken also contacted Tijmes and Kirksmith with the same or similar offers.

24.   Tijmes, who liked his job at Daily, made no response but observed that moving to WIKA Process or Gayesco would violate his Daily non-competition agreement.  Kirksmith likewise did not reply to Gerken.

25.   But Heidt, in contrast, the day after receiving Defendants' overture, replied to Gerken that he was interested in the offer.

26.   Gerken promptly informed Gayesco President Dale Dutcher ("Dutcher"), Poteet, and Lemmens that Heidt was "interested in a position with WIKA/Gayesco."  Dutcher, in turn, reported up to Dave Wannamaker ("Wannamaker"), a member of the Board of Directors of WIKA Process's parent company in Germany, that "We asked Lori Ann to contact two of their top sales guys through LinkedIn.  It looks like Eric took the bait."  As if to make sure that corporate headquarters understood the significance of such a recruitment,

Dutcher added, "This could be a significant addition to our international sales team and a severe body blow to Daily."

27.  Heidt and Gerken continued their exchanges over the next couple of weeks and into the new year.  Heidt told her that he was concerned that someone in "WIKA/Gayesco" had been "loose lipped," and accordingly asked her not to disclose broadly within the organizations the fact that Heidt was communicating with her colleagues.

28.  Heidt also informed Defendants about his "non-disclosure and non-compete agreements," which he accurately described as being "specifically focused at preventing future departures to competing companies."  On January 2, 2013, Heidt sent to Gerken an unsigned copy of his Non-Competition Agreement "so that your legal persons can review."   Gerken then informed Lemmens that "Eric Heidt is interested in relocating from Nashville but his non-compete could be a factor if we hire him as he wants WIKA to accept full responsibility for any legal consequences."

29.  On January 7, 2013, Lemmens, Dutcher, and Poteet conducted a pre-arranged interview of Heidt over Skype.  Heidt affirmed his interest in accepting WIKA-Gayesco's employment offer but insisted that Defendants bear all the consequences and risks of his breaching his non-disclosure and non-competition agreements.

30.  Lemmens then reported to Wannamaker Heidt's interest, but also that "We will have to fight the non compete clause in his

11

contract with Daily." Lemmens added, "Eric would be an excellent fit for the WIKA-GAYESCO team in Houston to further develop the temperature business in the US. Daily would suffer a serious hole in their sales organization with the departure of Eric."

31. On January 15 and 16, 2013, Heidt interviewed in person with Lemmens and others at WIKA Process's office in Houston. Lemmens afterwards reported to Dutcher that Heidt was interested in "the COE position for Asia," was willing to move to Singapore, and "is willing to leave Daily tomorrow if we can provide detailed job description and employment agreement."

## Heidt Makes His Deal with Defendants

32. Heidt and Defendants continued their negotiations and planning, and by late January, 2013, arrangements were made for Heidt to meet in Houston with Kelvin Tan ("Tan"), a representative from WIKA Singapore, the day before Heidt planned to surprise Daily with his resignation. Heidt was scheduled to represent Daily at an important conference in Dubai beginning just after February 15, 2013, so he asked to meet with Tan on February 14, the day before he would resign from Daily on Friday, February 15, enabling him to avoid the trip to Dubai. Heidt explained to Tan that he "would prefer a meeting before [the trip] so that I may avoid presenting a paper promoting Daily at a very well attended international event."

33.   Heidt also discussed plans for his impending resignation from Daily with Poteet, Lemmens, and Wannamaker, advising Poteet a week beforehand that "if all goes correctly, I will be resigning from Daily Thermetrics very early on Friday morning, Feb. 15th."

34.   On February 8, WIKA Singapore delivered to Heidt a letter of appointment describing his new position as "Product Manager (ETM), Pacific Rim," with a start date of March 16, 2013.  Heidt executed the agreement on February 15, 2013, the date he resigned from Daily.

35.  Defendants also acceded to Heidt's demand for indemnity for all losses he sustained as a result of breaching his Non-Competition Agreement and Confidentiality Agreement with Daily, which was memorialized by a written agreement, signed for Defendants by both Wannamaker and Tan, and by Heidt.  The agreement provided that if any legal actions were brought against Heidt as a result of his [Daily] Non-Competition Agreement, WIKA Singapore would indemnify Heidt for all damages, attorney's fees, and legal costs.  The agreement further provides that if Heidt is prevented from working for WIKA Singapore for a period of two years because of the Non-Competition Agreement, WIKA Singapore will continue to pay him as described in his employment agreement.

<u>Heidt's Last Days at Daily</u>

36.  By February 8, with his new employment appointment from Defendants in hand and the exact timing of his surprise resignation from Daily set with the full abetment of Defendants, Heidt began gathering up Daily's most up-to-date worldwide sales and pricing information, and customer lists.

37.  On February 11, four days before his planned resignation day, Heidt requested John Becker ("Becker"), a Daily employee who had custody of Daily's highly confidential "CatTracker log," to send to Heidt "the latest CatTracker log."  The CatTracker log is an Excel spreadsheet that contains detailed information on all orders for the CatTracker that have ever been filled in any country, along with all price quotes for the CatTracker ever given by Daily, including open quotes.  Daily maintains the CatTracker log as a highly confidential record and a trade secret, as the information it contains would be extremely valuable to a competitor, allowing the competitor to undercut Daily's bids. Becker complied with Heidt's request by sending to him the updated CatTracker log on February 12.

38.  That same day, just three days before his planned resignation day, Heidt requested Daily employee Andy Puetz ("Puetz") to update the Master Account List over the next two days, and plan to go over it with Heidt at 1:00 p.m. on Friday, February 15.  Heidt set this deadline to have the Master Account

14

List updated, but without revealing to Puetz that Heidt would resign that morning--and no meeting would occur.  The Master Account List, to which Heidt had access as a trusted key employee, and which he attached to his email to Puetz, is a list of Daily's clients, which Daily considers confidential.

39.  The day after he received the updated CatTracker log, Heidt on February 13 attached five USB devices to his Daily work laptop.  These included an Alcatel cell phone, a Sony USB drive, an SMI USB drive, a SanDisk USB drive, and a Western Digital external USB drive.  These devices are capable of storing large amounts of information.

40.  The SMI and Western Digital devices were produced by Heidt during accelerated discovery in preparation for the preliminary injunction hearing in this case and were turned over to Plaintiff's forensic examiner, who did not find evidence that they had contained Daily's confidential information.  Heidt has not produced the other devices and claims not to know their whereabouts.

41.  Heidt testified that he attached the devices to his Daily laptop for the purposes of downloading personal photographs, music, and other personal data and to ensure that he did not retain Daily's confidential logs, lists, and information on the devices.  However, given the clear and convincing evidence of Heidt's successful deceit and deception at Daily for approximately six

weeks immediately preceding his resignation, and uncontroverted documentary proof of his repeated disclosures of Daily's confidential information to Defendants since joining the WIKA Group, Heidt is not a credible witness on the crucial issues in controversy.

42.   Exactly as planned, on the morning of February 15, 2013, Heidt met with his supervisor, Tijmes, and resigned his employment with Daily.  Heidt returned Daily's cell phone and laptop, and told Tijmes that he would be working for WIKA Singapore.  Tijmes told Heidt that Heidt would be violating his Non-Competition Agreement by working for WIKA Singapore.

43.   Heidt was well aware of his Daily Non-Competition Agreement, and before the day was out he had in hand his indemnity agreement from Defendants, signed by both Wannamaker and Tan, guaranteeing to Heidt his full salary if he is enjoined from working for Daily's competition for two years, and agreeing to indemnify Heidt for all costs of Daily's suit to enforce Heidt's Non-Competition Agreement.

<u>Heidt's Disclosures of Daily</u>
<u>Confidential Information to the WIKA Group</u>

44.   Heidt began work for WIKA Singapore in March, 2013, made his first trip to Singapore in April, and has since continued to make frequent trips throughout Asia.  Heidt began officing in Singapore in July, and his wife moved there in late December, 2013.

45.   Heidt's job description as Product Manager (ETM) for WIKA Singapore makes him responsible to promote sales of electrical temperature measurement devices that compete with Daily's CatTracker and requires travels to countries where Daily does business, including Singapore, Australia, China, Indonesia, Japan, Malaysia, New Zealand, the Philippines, South Korea, Taiwan, Thailand, and Vietnam.

46.   Apart from whatever formal job description Heidt has at WIKA Singapore, his employment there fully engages him in advancing the worldwide sales of Gayesco's competing Flex-R devices and sales of the WIKA Group's other competing devices, all to the disadvantage of Daily.

47.   Even before his formal start date for WIKA Singapore, Heidt began to share Daily's confidential information with Gayesco and WIKA Process.   On March 10, 2013, Heidt sent to Poteet information concerning upcoming Daily projects, including one in Singapore and several in his former Daily territory, and wrote, "We can go down the list for all I know about Europe next week to make sure we are both aware of everything."

48.   That same month Heidt provided Poteet with one of Daily's confidential price quotes for a project in Russia, critical information that enabled Gayesco to lower its bid to undercut Daily.

49.   On March 18, Heidt provided to Gayesco information about the specific types of CatTrackers and the price range that Daily would quote for a project involving a licensor for whom Heidt had been responsible at Daily.

50.   On March 25, Heidt furnished to WIKA Process's President Lemmens contact information for an employee at Bechtel Houston, one of Heidt's accounts at Daily.  Lemmens advanced this information to arrange "a WIKA GAYESCO introduction meeting at Bechtel" with the contact.

51.   On March 26, Heidt supplied to Gayesco's Vice President of Sales Bob Poteet information about Daily's marketing strategy and suggested that Gayesco modify its own strategy accordingly.

52.   On March 28, Heidt provided to Gayesco's Poteet personal contact information of a Daily employee for whom the WIKA Group was unable to find contact information other than his Daily business address.

53.   On April 11, Heidt sent to Gayesco's Poteet and others in the WIKA Group an email discussing Daily's marketing efforts, and concluding, "I have just about finished my outline of 'what Daily says' and will send it over to be reviewed.  I would recommend that [it] would then be a tool for Gayesco sales/WIKA CoE persons when training."

54.   That same day Heidt disclosed to Poteet and others information about problems Daily had encountered on a specific prior installation.

55.   On April 16, upon being informed of an important job in India where the customer was "about to place the order to Daily" and that "we have not days but hours to work against them," Heidt immediately replied with advice to work "directly with Gayesco in Houston, likely Bob Poteet," to get what was needed, and then made recommendations--copied to Poteet--based on his inside knowledge from his Daily employment on how to undermine Daily's bid.

56.   On April 19, Heidt summarized for Tan and others a meeting with a prospective WIKA/Gayesco agency in which Heidt described Daily's sales strategy, the management style of certain Daily personnel, and specific issues related to Daily's Asia operations.

57.   On May 2, Heidt alerted Gayesco personnel that Daily was working to change the way specifications are written for UOF hydroprocessing reactors, which Heidt disclosed that he had written trying to "to make it lean towards Daily" when he worked for Daily.

58.   On the same day Heidt reported to Gayesco personnel that Daily was working hard to shape favorable specifications at CD Tech in Houston and in Bloomfield, prompting a Gayesco sales person to spend more time with CD Tech.

59.  On May 16 and 17, Heidt provided Poteet with information about a prospective customer Daily had been pursuing for a few years.  Gayesco's Poteet thanked Heidt for his good information and asked him "what would Daily quote for a dual CLG unit?"  Heidt immediately divulged to Poteet what Daily would bid on a product "if they think it will win the business," along with Daily's other pricing and bid strategies.

60.  On May 27, Heidt wrote to Gayesco's President Lemmens, with a copy to his boss Wannamaker, to share "[s]omething I remembered from my previous life" as a Daily employee.  Heidt disclosed an opportunity for a series of projects that Daily was pursuing and nearing finalization on one, and suggested that WIKA would be a better fit.  Heidt supplied the information needed to follow up on the opportunity.  Lemmens passed on the information to other WIKA Process and Gayesco employees, directing, "We have to jump on opportunities like this!"

61.  On May 29, Heidt informed Gayesco's Poteet about a problem a Daily customer had with one of Daily's CatTracker assemblies, identified the Daily customer and its Hydroprocessing Manager, and told how to approach the manager, which Heidt urged be done "soon."

62.  On May 31, Heidt provided to Gayesco's Tom Smith, with a copy to Poteet, the exact price that Daily would quote on an item and recommended that Gayesco "price accordingly."

63.  On June 26, Poteet requested Heidt to send to him a summary on "Daily success/strategy for Russia," which had been one of Heidt's assigned sales territories for Daily.  Heidt responded by naming Daily's "excellent" Russian agency, describing its size and personnel, explaining how Daily employs its Russian agency, and going on to detail Daily's business strategy, and its pricing and margins objectives in Russia.

<u>A Very Narrow Field of Business</u>
<u>Conducted on a Global Scale</u>

64.  The field of reactor thermometry is very narrow, with a commensurately narrow customer base and limited number of major licensors, and it is common for much of that customer base as well as the licensors who compose the market to do business on a global scale.  Likewise, Daily and its few competitors--principally Defendants and others in the WIKA Group--who manufacture and sell reactor thermometry devices such as the CatTracker and Flex-R, do business on a global scale.

65.  Daily, as a small company, the largest portion of whose business is exclusively in the reactor thermometry field, expects its top sales managers to engage with customers, build goodwill, and advance the sales of its CatTracker on a global basis even though they may be assigned primary sales responsibilities in certain regions of the world, and Daily compensates its sales managers--as it did Heidt--for doing so on a global basis.  For

example, while employed for Daily, Heidt traveled to a conference in Indonesia in part to meet with clients from the United States, and worked with licensors in the United States on projects in Singapore and Australia.

66.   Evidencing the imprecision of geographical boundaries in the industry, Daily gave to Heidt access to its confidential information about customers and projects in all countries where it does business, and the WIKA/Gayesco companies have sought and obtained from Heidt Daily's confidential information pertinent to sales and business possibilities in various parts of the world without regard to the particular sales territories assigned to Heidt during his employment by Daily, and without regard to the particular sales territories now assigned to him by WIKA Singapore.

<u>Daily Investigates and Files Suit</u>

67.   Daily, a small company with no in-house attorney, did not engage a forensic expert to examine Heidt's returned work laptop until June 11, 2013.  Shortly thereafter, Daily filed this suit in state court alleging several causes of action and seeking injunctive relief to enforce Heidt's Non-Competition Agreement, and requested expedited discovery.  Defendants removed the case to this Court based on diversity of citizenship, and unsuccessfully opposed Daily's motion for expedited discovery to prepare for the preliminary injunction hearing.  The expedited discovery was then

conducted and Plaintiff's Motion for Preliminary Injunction came on for an evidentiary hearing on January 28, 2014.

68.   Throughout the legal proceedings, WIKA Singapore has been paying Heidt's attorney fees and legal costs in compliance with its indemnification agreement.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has diversity jurisdiction over the parties and the subject matter of this case.

### Preliminary Injunction Standard

2.   To obtain a preliminary injunction, an applicant must establish:

> (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

Bluefield Water Ass'n, Inc. v. City of Starkville, Miss., 577 F.3d 250, 252-53 (5th Cir. 2009) (quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195-96 (5th Cir. 2003)).

3.   A preliminary injunction is "an extraordinary remedy which should not be granted unless the party seeking it has

'clearly carried the burden of persuasion' on all four requirements." Id.

4.   The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

5.   Daily alleges causes of action against Heidt for breach of contract, breach of confidentiality, misappropriation of trade secrets, conversion, and tortious interference with business relationships.  Daily alleges causes of action against WIKA Process and Gayesco for misappropriation of trade secrets, tortious interference with employee relationships, and tortious interference with existing and prospective business relationships.

### Substantial Likelihood of Success on the Merits: Heidt's Breach of Contract

6.   The Non-Competition Agreement by its express terms "shall be construed in accordance with and governed by the laws of the State of Texas."

7.   Texas law presumes a party has read and knows the terms of a contract that he has signed.  In re Bank One, N.A., 216 S.W.3d 825, 826 (Tex. 2007).  "Absent fraud, misrepresentation, or deceit, a party is bound by the terms of the contract he signed, regardless of whether he read it or thought it had different terms."  In re McKinney, 167 S.W.3d 833, 835 (Tex. 2005).

24

8.   Heidt is bound by the terms of the Non-Competition Agreement and the Confidentiality Agreement to the full extent they are enforceable.

9.   Under Texas law, "[a]n agreement not to compete is in restraint of trade and therefore unenforceable on grounds of public policy unless it is reasonable." DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 681 (Tex. 1990). Whether a covenant not to compete is reasonable presents a question of law. See Vais Arms, Inc. v. Vais, 383 F.3d 287, 295 (5th Cir. 2004).

10.   Under Section 15.50(a) of the Texas Business and Commercial Code, a covenant not to compete is enforceable to the extent that it (1) is ancillary to an otherwise enforceable agreement; and (2) contains reasonable limitations as to duration, geographic area, and scope of activity that impose no greater restraint than is necessary to protect the goodwill or other business interest of the promisee. TEX. BUS. & COMM. CODE § 15.50(a); see also Guy Carpenter & Co., Inc. v. Provenzale, 334 F.3d 459, 465 (5th Cir. 2003).

11.   Heidt's covenant not to compete is ancillary to an otherwise enforceable agreement because Daily promised to provide Heidt with access to confidential information in exchange for Heidt's promise not to compete, and did provide such access. See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 646 (Tex. 2006) ("[A]n at-will employee's non-compete covenant becomes

enforceable when the employer performs the promises it made in exchange for the covenant.") (finding non-competition agreement enforceable because employer did provide access to confidential information as promised).

12. The covenant in this case provides that Heidt, for a period of two years following his termination from employment with Daily, may not, directly or indirectly:

    (a)   perform for, render service to, or otherwise assist any Competitor in any position, job, task, function, skill, or responsibility that Employee has provided for, or on behalf of, the Company in the twenty-four (24) month period preceding the termination of Employee's employment; or

    (b)   accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects that the Company's Confidential Information to which Employee had access during his employment with the Company, or in the preceding twenty-four (24) month period, would likely assist the competitor.

A "Competitor" is defined as "any company that engineers, designs, manufactures, installs, repairs, or services reactor thermometry products for use in the refining, petrochemical, and chemical industries." The covenant is geographically limited to the United States and any country in which Daily does business.

13. The two-year duration of the covenant not to compete is reasonable and consistent with covenants upheld by Texas courts. *See, e.g.,* <u>Butler v. Arrow Mirror & Glass, Inc.</u>, 51 S.W.3d 787,

790-91 (Tex. App.-Houston [1st Dist.] 2001); <u>Property Tax Assocs.,</u> <u>Inc. v. Staffeldt</u>, 800 S.W.2d 349, 351 (Tex. App.-El Paso 1990).

    14.  Geographic restrictions are reasonable to the extent they are commensurate with the territory in which the employee worked during his employment with the employer. *See* <u>Butler</u>, 51 S.W.3d at 793. "Covenants with wide geographic areas have been upheld frequently in Texas courts, especially when the area covered constitutes the employee's actual sales or work territory." <u>M-I</u> <u>LLC v. Stelly</u>, 733 F. Supp. 2d 759, 798 (S.D. Tex. 2010) (Ellison, J.) (citing <u>Vais Arms, Inc. v. Vais</u>, 383 F.3d 287, 295 (5th Cir. 2004)). Even a worldwide non-competition agreement may be upheld under circumstances where determining the scope of the geographical area of former employment was difficult. *See* <u>Learn2.com, Inc. v.</u> <u>Bell</u>, No. 3:00-CV-812-R, 2000 U.S. Dist. LEXIS 14283, at *31 (N.D. Tex. July 20, 2000) ("[I]t is likely that [the employer] can convince this Court that the territory within which the employee worked during his employment had no geographical boundaries. Thus, the covenant-not-to-compete without geographical limits will likely be held to be reasonable, as long as [the employee] is not pre-vented from earning a living.") (granting preliminary injunction).

    15.  A non-competition agreement has been enforced to prohibit a former employee from working for a competitor in "any geographic area where Employer does business or is authorized to do business," which encompassed at least 300 locations in 75 countries. <u>M-I LLC</u>,

733 F. Supp. 2d at 794-95.  The Court found that the contract did not bar the employee from working in the oil and gas industry altogether, but only in the oil displacement tools or services industry.  Id. at 797.  The broad geographic scope did not make the covenant unenforceable in light of the defendant's upper management position, in which he was responsible for the business's relationship with major international clients, and especially because the employee possessed intimate knowledge of sensitive company information including many trade secrets.  Id. at 799.

16.  Heidt's Non-Competition Agreement is likely to be found reasonable and enforceable.  Heidt was a high-level sales manager at Daily with direct sales responsibilities for large portions of the United States and Canada, for all of Europe, and all of Russia, and with access to Daily's confidential information regarding its clients and sales worldwide.  The field of reactor thermometry is very narrow, with a commensurately narrow customer base and limited numbers of major licensors, and extremely few competitors who produce and sell reactor thermometry products, but who do so on a global scale.  Heidt's knowledge of Daily's confidential information is extensive, so much so that despite claiming to have not retained any copies of it, Heidt after resigning from Daily has been able to share with Daily's competitors detailed confidential and other information about Daily's customers, sales strategies, pricing, margins, and other data.  Heidt's high profile attendance

at global conferences in behalf of Daily, and his development of contacts with Daily customers and prospective customers and with licensors who operate on a global scale, enabled Heidt to receive from Daily sales credits for projects both inside and outside his assigned sales regions--including projects in countries for which he now has sales responsibility for Daily's competitor. Although Daily assigned to Heidt direct responsibility for sales in large portions of the world (all of Europe, Russia, and large portions of the United States and Canada), it also directed him to work with licensors, which led to sales in many other parts of the world and for which Daily also compensated Heidt. There appears to have been no country in the world where Daily does business that was excluded from Heidt's sales efforts in behalf of Daily either direct to customers or through licensors. Indeed, Heidt has disclosed to Defendants--Daily's competitors--Daily's confidential information regarding customers and projects both within and outside of the geographical sales territory assigned to Heidt when employed by Daily. Moreover, the Non-Competition Agreement does not bar Heidt from working in the refining, petrochemical, and chemical industries, but only from performing for Daily's competitors the kind of work he performed for Daily in his last two years of employment, in the narrow field of reactor thermometry products, and from disclosing confidential information he obtained during those years. For these reasons, the Non-Competition Agreement is

likely to be found reasonable and not greater than necessary to protect Daily's legitimate interests.

17.  Daily has clearly carried its burden to show that Heidt breached his Non-Competition Agreement when he accepted employment at a competitor of Daily in Singapore, a country where Daily does business.

18.  Because covenants not to disclose do not impact trade and competition in the same manner as do covenants not to compete, they are not subject to the statutory limitations applicable to non-competition clauses.  *See* Guy Carpenter & Co., 334 F.3d at 465.

19.  Daily has clearly carried its burden to show that Heidt breached his Non-Competition Agreement and Confidentiality Agreement when he shared Daily's confidential information with Daily's competitors.

20.  Daily has clearly shown a substantial likelihood that it will succeed on the merits of its breach of contract claims against Heidt.

<u>Substantial Likelihood of Success on the Merits:</u>
<u>Defendants' Misappropriation of Trade Secrets</u>

21.  To prevail on a trade secret misappropriation claim under Texas law, "a plaintiff must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from

the plaintiff." CQ, Inc. v. TXU Min. Co., L.P., 565 F.3d 268, 273 (5th Cir. 2009) (quoting Gaia Techs. Inc. v. Recycled Prods. Corp., 175 F.3d 365, 376 (5th Cir. 1999))

22.  A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." In re Bass, 113 S.W.3d 735, 739 (Tex. 2003) (quoting Computer Assocs. Intern., Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1996)).  "Items such as customer lists, pricing information, client information, customer preferences, buyer contacts, market strategies, blueprints, and drawings have been shown to be trade secrets." T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App.-Houston [1st Dist.] 1998) (citations omitted).

23.  Daily had trade secrets that were well known to Heidt and that he was bound to maintain in confidence.  Heidt willingly--even eagerly--has established a pattern of divulging numerous of Daily's trade secrets to WIKA Process and Gayesco--at times on his own initiative and at other times in response to Defendants' requests for such secrets.  Thus, Defendants among other things improperly obtained from Daily the identities of certain customers and prospective customers, certain customers' preferences, market strategies in certain regions of the world, confidential bid information, pricing strategies, and the like.  Defendants have

used the trade secrets wrongfully obtained from Daily without its permission.  *See*, *e.g.*, Finding of Fact No. 60, WIKA Process's President Lemmens's directive to employees of Gayesco and WIKA Process, "We have to jump on opportunities like this!"

24.  Daily has established a substantial likelihood of success on the merits of its claims against Defendants for misappropriation of trade secrets.

## Irreparable Injury

25.  "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.  A presently existing actual threat must be shown.  However, the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis."  United States v. Emerson, 270 F.3d 203, 262 (5th Cir. 2001) (internal quotations and emphasis omitted).

26.  "In Texas, injury resulting from the breach of non-compete covenants is the epitome of irreparable injury."  A&A Global Indus., Inc. v. Wolfe, CIV.A.3:01CV1515-D, 2001 WL 1388020, at *5 (N.D. Tex. Nov. 6, 2001) (Fitzwater, J.) (quoting Am. Express Fin. Advisors, Inc. v. Scott, 955 F.Supp. 688, 693 (N. D. Tex. 1996)); *see also* Traders Int'l, Ltd. v. Scheuermann, Civ. A. No. H-06-1632, 2006 WL 2521336, at *9 (S.D. Tex. Aug. 30, 2006) (Miller, J.) (the "substantial possibility" that a defendant's

solicitation of his former employer's customers would cause the former employer to lose the customers' business satisfied the requirement of irreparable injury).

27.  An employee who possesses trade secrets belonging to a former employer and accepts employment with one of its competitors, even if acting in good faith, will have difficulty preventing his knowledge from infiltrating his work.  *See* FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 504-05 (5th Cir. 1982) (citing Weed Eater, Inc. v. Dowling, 562 S.W.2d 898, 902 (Tex. Civ. App.-Houston 1978)).  Thus, the courts have recognized the need for injunctive relief in these situations.  Id.; Baker Petrolite Corp. v. Spicer, Civ. A. No. 06-1749, 2006 WL 1751786, at *9-10 (S.D. Tex. June 20, 2006) (Miller, J.) (granting injunctive relief when former employee with knowledge of confidential information and trade secrets took similar job working for competitor).

28.  Additionally, "the disclosure of confidential information satisfies the irreparable injury prong for purposes of a preliminary injunction."  Traders Int'l, 2006 WL 2521336, at *9.

29.  Daily has demonstrated a clear and convincing threat of irreparable harm, both by proving that Heidt is working for a competitor in violation of his Non-Competition Agreement, and by proving that Heidt has been using Daily's confidential, proprietary and/or trade secret information unlawfully to compete against Daily, and is sharing that information with Daily's competitors in

33

violation of the Non-Competition Agreement and the Confidentiality Agreement.

30.  The monetary impact that Defendants' wrongful conduct has had and ultimately will have on Daily and its business operations is difficult, if not impossible, to ascertain and quantify.  Daily in all reasonable probability has suffered and will continue to suffer injuries to its operations and goodwill that cannot adequately be calculated in monetary damages or measured by customary pecuniary standards.  Daily has no adequate remedy at law for the damages already caused, and that are threatened to be caused, by Defendants' unlawful conduct.

31.  Delay in seeking a preliminary injunction has been raised by defendants in some federal trademark and patent cases, and Defendants rely on such cases to oppose Plaintiff's motion in this case governed by state law.  "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explana-tion, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."  Wireless Agents, L.L.C. v. T-Mobile, USA, Inc., CIV.A. 3:05-CV-0094D, 2006 WL 1540587, at *4 (N.D. Tex. June 6, 2006) (Fitzwater, J.) (internal citations and punctuation omitted) (patent infringement case finding no risk of irreparable harm when plaintiff sought injunction over one year after filing suit and

over two years after learning of infringing device).  "Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm."  *Id.* (citing <u>Polymer Technologies, Inc. v. Birdwell</u>, 103 F.3d 970, 974 (Fed. Cir. 1996). However, delay will not negate a finding of irreparable harm where the plaintiff has a good explanation. *See* <u>PIU Mgmt., LLC v. Inflatable Zone Inc.</u>, CIV.A. H-08-2719, 2010 WL 681914, at *7 (S.D. Tex. Feb. 25, 2010) (Miller, J.) (trademark infringement case finding "that the Plaintiffs have established 'a good explanation' for delaying the filing of their request for preliminary relief" where plaintiffs first tried to negotiate the dispute with defendant before filing suit, and defendant contributed to delay by resisting service).

32.  Daily, a small company with no in-house attorney, did not engage a forensic expert to examine Heidt's returned laptop until nearly four months after Heidt's resignation, and Daily was therefore slow in coming out of the gate.  Since then, however, Daily has shown diligence in prosecuting to enforce Heidt's agreements and to obtain relief from Defendants' complicity with him.  Defendants, on the other hand, in state court resisted expedited discovery needed to prepare for the preliminary injunction hearing and, on the last business day before Plaintiff's motion was to be heard, Defendants removed the case to this Court. Once in federal court Defendants persisted in opposing accelerated

discovery, which finally required judicial intervention to permit the case to go forward.  It is Plaintiff who is prejudiced by delay, not Defendants who continued to do business as they pleased and who resisted accelerated discovery that would expedite hearing on Plaintiff's motion.  Plaintiff has a decent although not an ideal explanation for its delay in seeking a preliminary injunction, but Defendants have suffered no prejudice as a result thereof, and Plaintiff has shown an ongoing immediate threat of continued irreparable injury to Plaintiff if a preliminary injunction is not issued.

33.  Plaintiff's initial delay of perhaps four months does not preclude it from recovering the equitable preliminary relief it seeks in the present motion.

## Balance of Harms

34.  The threatened injury to Daily if a preliminary injunction does not issue far outweighs any potential harm caused to Defendants by the issuance of an injunction.  Defendants' continued wrongful conduct will result in Daily facing a substantial risk of losing customers it otherwise would have had and an erosion of its goodwill, losses that are difficult or impossible to quantify by monetary damages.  Gayesco's President from the start assessed that Defendant's successful recruitment of Heidt--which entailed Heidt breaching his Non-Competition

Agreement--would be "a severe body blow to Daily."  In contrast, Heidt with his carefully negotiated bargain with WIKA securing a guarantee of his salary for up to two years if required to comply with his two-year Non-Competition Agreement, has no material risk of harm from an injunction.  Moreover, Heidt is not prevented from pursuing a host of other employment possibilities in the refining, petrochemical, and chemical industry that do not violate his Non-Competition Agreement.  Furthermore, enjoining WIKA Process and Gayesco from using or disclosing any of Daily's confidential information and trade secrets that they obtained from Heidt imposes no undue burden on them.  A balancing of the equities clearly favors granting of the preliminary injunction.

## Public Interest

35.  A preliminary injunction based on the facts of this case will not disserve the public interest.  To the contrary, it is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law.  Amerispec, Inc. v. Metro Inspection Servs., Inc., CIV.A.3:01-CV-0946-D, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001) (Fitzwater, J.) (granting injunction based on non-competition agreement).

## Conclusion

36.   Daily has demonstrated a substantial likelihood of success on the merits of its breach of contract and trade secret misappropriation claims and a likelihood of irreparable injury if a preliminary injunction does not issue.   Further, the ongoing threatened injury to Daily from Defendants' continued wrongful conduct decidedly outweighs any potential injury to Defendants caused by the issuance of a preliminary injunction, and a preliminary injunction will not disserve the public interest. Daily has clearly shown itself entitled to the preliminary injunctive relief it seeks.

37.   Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   FED. R. CIV. P. 65(c). The Court finds that it is proper to require of Plaintiff a bond in the amount of $25,000.00 as a condition for issuance of the preliminary injunction.

38.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

## Order

For the reasons set out, Daily's Motion for Preliminary and Permanent Injunction is GRANTED.   An Order of Preliminary Injunction is separately issued based upon the foregoing Findings of Fact and Conclusions of Law.

The Clerk will enter this Order, providing a correct copy to all parties of record.

SIGNED at Houston, Texas, on this 21st day of February, 2014.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE